**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SAINT ANTHONY HOSPITAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: |
| | ) | |
| THERESA EAGLESON, in her official | ) | |
| capacity as Director of the Illinois | ) | |
| Department of Healthcare and Family | ) | |
| Services, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff, Saint Anthony Hospital ("**Saint Anthony**" or "**Plaintiff**"), for its complaint against Theresa Eagleson ("**Eagleson**" or **"Defendant"**), in her official capacity as Director of the Illinois Department of Health and Family Services ("**HFS**"), states as follows:

**INTRODUCTION**

1.      Saint Anthony is a charitable hospital that serves a largely poor, Medicaid population on the near west side of Chicago. The combination of (i) the COVID-19 pandemic, (ii) resulting restrictions on Saint Anthony imposed by the State of Illinois ("**State**"), and (iii) the State's failure to comply with federal law by seeing that managed care organizations ("**MCOs**") with which the State has contracted make timely and accurate payment for Medicaid services, threatens Saint Anthony's ability to provide vital medical care, as it has for over a century. The State's actions violate Saint Anthony's rights under the federal Medicaid laws and regulations. Saint Anthony sues to enforce those rights. It seeks emergency injunctive relief because the State's failure to follow federal Medicaid requirements threatens Saint Anthony's ability to provide

essential medical services during the most significant public health crisis since the pandemic of 1918.

2.　　The public interest in assuring that Saint Anthony can continue to operate effectively in this crisis is of paramount importance. Upon information and belief, many other "safety net" hospitals like Saint Anthony that serve a similar Medicaid-dependent patient cohort are facing the same critical funding problems for the same reasons.

3.　　While the current Medicaid payment crisis has been brought to a head by the COVID-19 pandemic, its origins predate it. For years, the State, through HFS, has failed to comply with its obligations under the federal Social Security Act and implementing regulations with regard to the operation of the State's Medicaid program that are meant to protect the finances of safety-net health care providers like Saint Anthony, and thus assure their ability to provide necessary medical services to their patient cohort.

4.　　The State, through the MCOs and due to its own delays in processing applications and making payments, as of mid-February 2020, is currently past due paying Saint Anthony Medicaid payments of at least $22 million, as more fully described below in paragraphs 70-74. Given the lack of rationale, consistency and explanation in the MCOs' payments to Saint Anthony and its failures to make payment, discussed in paragraphs 55-64, the amounts are likely much higher. That is a great deal of money for any hospital, but a dire problem for a 150-bed charitable hospital serving a mostly poor, Medicaid-dependent population.

5.　　Under former Governor Rauner's administration, the State aggressively shifted its Medicaid reimbursement process by contracting with private healthcare insurance companies—generally referred to as managed care organizations or MCOs—rather than administering Medicaid reimbursement itself. The State pays MCOs billions of federal and State Medicaid

dollars and entrusts them with ensuring that the most vulnerable patient populations are provided necessary medical care, and that health care providers are compensated for their services on a fair and timely basis. Federal and state laws require the State to ensure that the MCOs timely and properly make these payments to providers like Saint Anthony. Neither the MCOs, which are agents of the State, nor the State are meeting their obligations.

6.    The MCOs have systematically delayed and denied claims without justification, failed to pay undisputed claims, and when payments are made, they refuse to provide the detail necessary for Saint Anthony to determine if it is receiving proper payment or, if not, why not. When asked by HFS to provide this detail to the providers, several large MCOs have admitted that they cannot do so. The MCOs appear to operate on a "squeaky-wheel" principle: whichever hospital raises the loudest outcry gets paid something, but not necessarily what it was owed.

7.    Saint Anthony has repeatedly raised these issues with HFS and asked it to fix this broken system. It has advocated for legislative reform seeking greater accountability and transparency from the MCOs and participated in bi-weekly meetings with HFS focused on these issues. But the problems persist. Before the COVID-19 pandemic, these problems were serious. Now, they threaten the ability of Saint Anthony to respond to the pandemic.

8.    Nearly four weeks ago, hoping to avoid litigation in the midst of a pandemic and seeking a long-term, systemic solution to these problems, Saint Anthony provided the State a draft of this Complaint and asked the State to agree, on a without-prejudice basis to both sides, to provide interim financial assistance in the form of partial payment of what Saint Anthony claims is owed and to discuss longer-term solutions, in exchange for a temporary standstill of litigation. The parties had made some progress toward such a standstill agreement, but reached impasse. Judicial intervention is therefore required to make the State comply with its obligations.

9.    Saint Anthony brings this action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 against Eagleson, in her official capacity as Director of HFS, to order HFS to comply with the federal and state statutory and regulatory mandate to safeguard Medicaid money and oversee and manage the MCOs to which the State has entrusted billions of federal and State dollars.  (Eagleson, HFS, and the State are used interchangeably herein except where noted.)

10.    The State's broken Medicaid managed care system has been driving community hospitals like Saint Anthony, which turn away no one and depend on Medicaid to serve its disproportionately poor patient population, to the brink of being unable to carry out its mission. Without immediate relief, the financial and medical obligations of Saint Anthony related to the COVID-19 pandemic, exacerbated by the State's MCO debacle, likely mean that some patients who urgently need care may not get it, and dire outcomes can be foreseen.

11.    On March 14, 2020, Governor JB Pritzker announced that his administration would file a request for a federal waiver to expand Medicaid coverage as COVID-19 continues to spread across Illinois.  He stated that "[d]uring this crisis my administration is working to ensure that those who fear that they may be getting sick have access to the testing and treatment that they need without being saddled with costly medical bills for their care."[1]  Saint Anthony supports the Governor's plans to use every tool at his disposal to protect the public and stem the COVID-19 pandemic, including providing Medicaid coverage for those who cannot afford medical care. However, expanding health care coverage is only half the equation if providers like Saint Anthony

---

[1]    Office of the Governor, *Gov. Pritzker to File Federal Waiver to Expand Medicaid Coverage During COVID-19 Pandemic*, ILLINOIS.GOV (Mar. 14, 2020), https://www2.illinois.gov/Pages/news-item.aspx?ReleaseID=21252.    The federal government subsequently approved the waiver. Stephanie Goldberg, *Feds OK Illinois' move to expand health care access for 3 million people,* CRAIN'S CHICAGO BUSINESS (Mar. 24, 2020), https://www.chicagobusiness.com/health-care/feds-ok-illinois-move-expand-health-care-access-3-million-people.

4

are not paid.  It is futile if the State cannot ensure—as it is required to do by federal law—that its MCOs are fully and promptly paying hospitals like Saint Anthony for the services they provide so that those hospitals have the funds to keep their doors open.

## THE PARTIES

12.     **Saint Anthony Hospital** is a not-for-profit Illinois corporation located on 19th Street between California Avenue and Marshall Boulevard in Chicago.

13.     The Illinois Department of Healthcare and Family Services is the single state agency for Illinois that is responsible for the oversight and administration of the State's Medicaid program.  **Theresa Eagleson** is the Director of HFS and is responsible for ensuring that Illinois's Medicaid programs comply with federal law.  Eagleson is sued in her official capacity.

## JURISDICTION AND VENUE

14.     This action is brought pursuant to 42 U.S.C. § 1983 to enforce rights created in the federal Medicaid Statute, 42 U.S.C. §§ 1396a(a)(8) & (a)(37), 1396u-2(f), and 1396b(m)(2)(A)(xii).  Jurisdiction exists over Saint Anthony's federal claims under 28 U.S.C. §§ 1331 and 1343.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b).  The parties reside in this District and the events giving rise to the claims asserted herein occurred in this District.

## FACTS

### I.     Saint Anthony Is A Safety Net Hospital that Provides High Quality, Cost-Effective Care to All Patients.

16.     Since 1898, Saint Anthony has provided hospital care, social services, and a wide range of other community services to underserved and often impoverished residents of the West Side and Southwest Side of Chicago.  It provides hospital services to all in need.  Saint Anthony is a "Safety-Net Hospital," which means it serves a high number of Medicaid patients, 305 ILCS

5/5-5e.1, as well the uninsured and other vulnerable populations. Saint Anthony serves its patients not only without regard to their ability to pay, but with award-winning and highly-rated care that every patient deserves.

17. Saint Anthony is the top-performing Medicaid provider in the City of Chicago and among the top-performing providers in the State of Illinois. The federal agency that oversees Medicaid—the Centers for Medicare and Medicaid Services ("**CMS**")—has ranked Saint Anthony the number one hospital in Chicago in Total Performance. Saint Anthony ranks number nine in Total Performance among all Illinois hospitals.[2]

18. Saint Anthony was the first hospital in Illinois, and remains the only hospital in Chicago, awarded the Perinatal Certification from the Joint Commission for its commitment to integrated, patient-centered care for mothers and newborns.[3]

19. In both 2018 and 2019, Saint Anthony received the Partners in Progress Award as part of the Illinois Health and Hospital Association's Innovation Challenge. In 2018, Saint Anthony received the award for implementing a new quality improvement model that contributed to a 90% decrease in hospital-acquired infections in patients and an estimated cost savings of almost half a million dollars.[4] In 2019, it received the award again, this time for implementing a

---

[2] *Hospital Compare: Hospital Value-Based Purchasing (HVBP) - Total Performance Score*, MEDICARE.GOV, https://www.medicare.gov/HospitalCompare/Data/total-performance-scores.html (last updated Jan. 29, 2020).

[3] *See* Concerning the role of the Joint Commission in hospital accreditation and evaluation, THE JOINT COMMISSION, https://www.jointcommission.org/en/accreditation-and-certification/health-care-settings/hospital/ (last visited Mar. 23, 2020).

[4] *IHA Recognizes Illinois Hospitals and Health Systems for IHA Innovation Challenge: Partners in Progress Award*, THE ILL. HEALTH & HOSP. ASS'N (Jan. 17, 2018), https://www.team-iha.org/files/non-gated/news/innovation-challenge.aspx.

new comprehensive Antimicrobial Stewardship Program to reduce unnecessary antibiotic use and medical costs.[5]

20.     Saint Anthony is also a five-star-rated (the top rating) dialysis center, as rated by CMS.[6]

21.     In addition to providing high quality care, Saint Anthony has been, until threatened by the State's recent overhaul of its Medicaid managed care system, fiscally sound. From 2015 to 2019, Saint Anthony's cash on hand has fallen 98%: from over $20 million (enough to fund 72 days of operation) to less than $500,000 (less than 2 days).[7] Its net revenue per patient has dropped over 20%. Even after taking into account the migration to outpatient care over this period, this equates to receiving $24 million less for the same quality patient care it has always provided (and does not include the additional $22 million currently owed to Saint Anthony). This decrease is due almost entirely to the unnecessary and often unexplained delays in payments, and lack of consistency and rationale, on the part of the MCOs, and the State's failure to ensure that the MCOs comply with express Medicaid obligations regarding payment of claims.

---

[5]     *IHA Innovation Challenge: Partners in Progress Award Presented*, THE ILL. HEALTH & HOSP. ASS'N (Feb. 21, 2019), https://www.team-iha.org/files/non-gated/news/iha-2019-innovation-challenge-press-release-final.aspx?ext=.

[6]     *Dialysis Facility Compare, SAH Dialysis Clinic*, *Quality of patient care*, MEDICARE.GOV, https://www.medicare.gov/dialysisfacilitycompare/#profile&pid=142758&pdist=1.6&loc=60623&lat=41.8475982&lng=-87.7271123&sort=1%7CASC&dist=100&previouspage=results (last visited Mar. 27, 2020).

[7]     This decline does not take into account borrowing by Saint Anthony, grants Saint Anthony received, and a $15 million increase in payables over that period. Without those events, the true decline in cash would have been almost double.

II.      **The Illinois Medicaid Program.**

A.      **Traditional Medicaid Fee-for-Service and Medicaid Managed Care.**

22.      Medicaid is a health benefit program jointly funded by the federal and state governments to provide for the delivery and payment for healthcare services on behalf of low-income individuals and families.  *See generally* Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*  Under Medicaid, the federal government provides funds to states, which in turn contribute additional funds and administer the Medicaid program within their borders.

23.      To participate in Medicaid, states must comply with federal statutes and regulations that govern the program.  *See, e.g., Bertrand v. Maram*, No. 05 C 0544, 2006 WL 2735494, at *1 (N.D. Ill. Sept. 25, 2006).  Illinois participates in Medicaid and thus must comply with the federal laws governing Medicaid.  States must also submit a "plan" to the federal government for approval. *See* 42 U.S.C. § 1396a(a), (b); *see also* 42 C.F.R. § 430.10 ("The State plan is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and . . . contains all information necessary for CMS to determine whether the plan can be approved to serve as a basis for Federal financial participation (FFP) in the State program."); 42 C.F.R. §§ 430.12–430.25.

24.      In Illinois, HFS is the single state agency responsible for the oversight and administration of the Medicaid program.  As the Director of HFS, Eagleson is responsible for ensuring that Illinois's Medicaid programs comply with federal law.

25.      States that participate in Medicaid do so through two programs. Historically, the most common program was for each State to administer Medicaid directly and directly pay physicians, hospitals, and other healthcare providers for services rendered, typically based upon a set fee for a particular service.  *See, e.g.*, 42 U.S.C. § 1396a(a)(30)(A).

26.     Alternatively, under the Medicaid managed care program, states can enter into contracts with private healthcare insurance companies—MCOs—to allow those entities to administer Medicaid services to people who enroll in the entities' respective health plans. *See* 42 U.S.C. § 1396u-2; *see also* 42 U.S.C. § 1396b(m); 42 C.F.R. § 438. States usually pay the MCOs a "capitation" or "capitated" rate on a per member, per month basis such that the MCOs take the risk for the payment of claims and administrative costs. *See, e.g.*, 42 C.F.R. § 438.6(c). MCOs are then responsible for paying the providers the Medicaid-eligible healthcare costs incurred by their enrollees, who are the providers' patients. Some of the MCOs are for-profit entities, and therefore have incentives to deny or delay claims. Even non-profit MCOs, as discussed below, have incentives to delay payments and "borrow" Medicaid money to pay non-Medicaid bills before reimbursing providers.

27.     To ensure timely payment of claims, the Medicaid statute outlines several requirements that a state Medicaid plan must contain, including a requirement that the state "provide for claims payment procedures" to ensure payment on 90% of all clean claims submitted by certain providers within 30 days and 99% of all clean claims submitted by such providers within 90 days (the "**Prompt Payment Requirement**"). *See* 42 U.S.C. § 1396a(a)(37).

28.     When states contract with MCOs, federal and state laws and regulations require states to oversee MCOs to ensure they are properly administering Medicaid. Among other requirements, states must ensure that MCOs comply with the same Prompt Payment Requirement imposed on states that administer Medicaid directly – pay 90% of clean claims submitted by a medical provider within 30 days of the MCO receiving the claim, and pay 99% of clean claims within 90 days of receipt. 42 U.S.C. § 1396a(a)(37)(A); 42 U.S.C. § 1396u-2(f); 42 C.F.R. § 447.45(d)(2)-(3); 42 C.F.R. § 447.46; 305 ILCS 5/5-30.1(g). In other words, states are permitted

to delegate to MCOs the administration of claims, but they retain the Prompt Payment Requirement.

29.    States also must have in effect a monitoring system addressing all aspects of its contracted MCOs, including, specifically, monitoring of MCOs' performance in the areas of administration and management, appeal and claims management, and financing.  42 C.F.R. § 438.66(b).  States also must maintain provider complaint and appeal logs and collect audited financial and patient encounter data from each MCO to improve MCO performance.  42 C.F.R. § 438.66(c)(3), (c)(9).

30.    The State and the MCOs it employs fail routinely and extensively to comply with these requirements in their dealings with Saint Anthony and, upon information and belief, many other hospitals.  This is new.  Before the Rauner administration instituted the expanded and overhauled managed care regime, Saint Anthony achieved a high and predictable level of Medicaid reimbursement from the State when the State administered a direct payment system.  Saint Anthony has not materially changed its billing practices or provision of care.  It follows the same procedures for reimbursement from MCOs but is not getting paid either as promptly or as fully as it was under the prior system.  When Saint Anthony asks for explanations from MCOs and from the State, it often gets the run-around.  Transparency is woefully lacking.  It often does not know which claims were not paid in full or the reasons for such underpayments.

**B.    The State's Haphazard Roll-Out of Expanded Medicaid Managed Care.**

31.    Illinois's Medicaid managed care program was introduced in 2006 and significantly and rapidly expanded under former Governor Rauner to include a variety of populations and services.  In 2010, HFS spent $251 million on MCOs, 2.58% of its entire expenditures on care for

the year.[8]  By 2019, the total expenditure for MCOs had increased fifty-fold, to $12.73 billion, and is projected to be $15.87 billion for 2020.[9]

32.     Former Governor Rauner aimed to expand the managed care program to 80 percent of Medicaid beneficiaries.[10]  His plan also expanded the State's managed care program to all 102 counties.   In 2017, Rauner's administration sought to consolidate a number of Medicaid managed care programs that applied to different populations and reduce the number of MCOs that could participate from twelve to seven.[11]

33.     At the time of the bidding process to become one of the seven coveted MCOs, the process was criticized as opaque.  Even members of the Illinois General Assembly did not know the criteria for the winning bids.  Providers were also concerned that the expansion and awarding of bids moved too quickly and without sufficient oversight.[12]  The Office of the Comptroller recommended that the procurement process be put on hold pending a third-party review given the many concerns related to the consolidation of MCOs and expansion of coverage.[13]

---

[8]     Ill. State Comptroller, *Illinois' Massive Shift to Managed Care*, FISCAL FOCUS (May 2019), https://illinoiscomptroller.gov/news/fiscal-focus/fiscal-focus-archives/view-entire-pdf-version-of-may-2019-issue-of-fiscal-focus/.

[9]     *Fiscal Year 2020 State Spending On Managed Care Organizations*, ILL. STATE COMPTROLLER, https://www.illinoiscomptroller.gov/Office/MCO/ (last updated Mar. 27, 2020).

[10]     Lisa Schencker, *Rauner to revamp Medicaid program in hopes of saving money, improving care,* CHICAGO TRIBUNE (Feb. 27, 2017), https://www.chicagotribune.com/business/ct-rauner-medicaid-illinois-0228-biz-20170227-story.html.

[11]     Kim Geiger, *Rauner says Medicaid plan will save money despite increased contract costs*, CHICAGO TRIBUNE (Nov. 29, 2017), https://www.chicagotribune.com/politics/ct-met-bruce-rauner-medicaid-managed-care-20171129-story.html.

[12]     *Id.*

[13]     Ill. State Comptroller's Fiscal Policy Div., *Staff report on the Medicaid Managed Care Organization RFP (2018-24-001)*, ILL. STATE COMPTROLLER (May 2, 2017), https://illinoiscomptroller.gov/financial-data/find-a-report/special-fiscal/mco-report/.

34.     Despite the concerns, the Rauner administration pushed ahead and HFS finalized the contracts with seven MCOs in 2017.  The total value of the seven new managed care contracts was $63 billion, making it the largest single procurement in Illinois history.[14]

35.     After the State-mandated consolidation of the MCOs, the managed care program with the seven selected MCOs was named "HealthChoice Illinois" and launched on January 1, 2018.[15]   The seven MCOs are: Blue Cross Blue Shield of Illinois, CountyCare, Harmony Health Plan, IlliniCare Health Plan, Meridian Health, Molina Healthcare of Illinois, and NextLevel Health.  As of January 2020, over 2.1 million people are enrolled in the Medicaid managed care program,[16] covering approximately 80% of Medicaid enrollees in Illinois.[17]

36.     As discussed below, the concerns regarding the hasty roll-out of the MCO expansion and awarding of the contracts to the seven MCOs was well-founded.  The system is not functioning in compliance with federal law.  HFS has failed to see to it that the MCOs are fulfilling their obligations, to the harm of Saint Anthony and the patients it serves.

**III.     The Problems Caused by the State's Lack of Oversight of MCOs.**

37.     The State rapidly expanded Medicaid managed care based on promises of improved patient outcomes, greater efficiencies, and cost savings.  Instead, the haphazardly-planned and

---

[14]     *See* Ill. State Comptroller, *supra* note 8, at 3.

[15]     *Medical Providers: Provider Notice Issued 10/27/2017*, ILL. DEP'T OF HEALTHCARE & FAMILY SERVS. (Oct. 26, 2017), https://www.illinois.gov/hfs/MedicalProviders/notices/Pages/prn171027b.aspx.

[16]     *Healthchoice Illinois Enrollments-January 2020*, ILL. DEP'T OF HEALTHCARE & FAMILY SERVS. (Feb. 5, 2020), https://www.illinois.gov/hfs/SiteCollectionDocuments/202001MCOEnrollmentReportforWebsite.pdf.

[17]     *Welcome to HealthChoice Illinois: Medicaid managed care*, ILL. DEP'T OF HEALTHCARE & FAMILY SERVS., https://www.illinois.gov/hfs/MedicalProviders/cc/Pages/defaultnew.aspx (last visited Mar. 23, 2020).

poorly-executed expansion created an ineffective and inefficient system that allows MCOs to operate without sufficient State oversight and negatively impacts access to health care by underserved and needy patients.

38.     The dysfunction of the State's expanded Medicaid managed care system has been apparent from the start.  After the announcement of the planned consolidation of the MCOs in 2017, a number of hospital and related providers complained that the existing MCOs were improperly denying claims.  The Illinois House of Representatives adopted a resolution directing the Auditor General to conduct an audit of the State's managed care program.  In January 2018, the Auditor General released an audit in which he concluded that HFS "did not maintain the complete and accurate information needed to adequately monitor $7.11 billion in payments made to and by the 12 MCOs during FY16."[18]  The Auditor General found that HFS could not provide complete data regarding how often beneficiaries received medical care, which services healthcare providers were paid for, average payout ratios, or MCO claim denial rates.[19]  He also found that HFS made multiple monthly duplicate payments to MCOs for the same months for the same individuals.[20]

39.     The Illinois Comptroller later stated that this audit, and another conducted in March 2018, "revealed inadequate oversight of MCOs by HFS."[21]

---

[18]     State of Illinois, Office of the Auditor General, *Performance Audit of Medicaid Managed Care Organizations*, AUDITOR.ILL.GOV (Jan. 2018) ("Audit"), https://www.auditor.illinois.gov/Audit-Reports/Performance-Special-Multi/Performance-Audits/2018_Releases/18-Medicaid-MCOs-Perf-Full.pdf.

[19]     *Id.* at v.

[20]     *Id.* at iii.

[21]     *See* Ill. State Comptroller, *supra* note 8, at 8.

40.     In its FY 2018 Annual Report, issued April 1, 2019, HFS admitted that "the previous administration did not adequately develop some components of the [Medicaid managed care] program," and that it was working to "eliminate unnecessary payment delays and create more transparency in the program."[22]

41.     In response to these failings, and in an attempt to implement the oversight procedures required by federal law, Illinois law requires that HFS publish on its website at least quarterly an "MCO Performance Metrics Report" describing "each MCO's operational performance, including, but not limited to . . . claims payment, including timeliness and accuracy [and] provider disputes."  305 ILCS 5/5-30.1(g-6).  In addition, HFS is separately required to publish on its website every six months "an analysis of MCO claims processing and payment performance . . . , which identifies the percentage of claims adjudicated within 30, 60, 90, and over 90 days, and the dollar amounts associated with those claims."  305 ILCS 5/5-30.1(g-7).

42.     HFS has not complied with these reporting requirements.  HFS last published an MCO Performance Metrics Report for the fourth quarter of 2017.  That report did not contain information on claims activity, stating: "Data Currently Under Review by the Department."[23]  HFS has published no MCO Performance Metrics Reports for any quarter in 2018 or 2019.  HFS published its first and only "'analysis' on managed care organization (MCO) claims processing and payment performance" on November 1, 2018, analyzing data from the first quarter of 2018.

---

[22]     Theresa Eagleson, *FY 2018 Annual Report, Medical Assistance Program*, ILL. DEP'T OF HEALTHCARE & FAMILY SERVS. (April 1, 2019), https://www.illinois.gov/hfs/SiteCollectionDocuments/2018AnnualReport.pdf.

[23]     *ICP MCO Performance Metrics SFY 2017 Q4*, ILL. DEP'T OF HEALTHCARE & FAMILY SERVS., https://www.illinois.gov/hfs/SiteCollectionDocuments/1stOctICPIDHFSDashboards.pdf (last visited Mar. 23, 2020).

The analysis shows that in the first quarter of 2018, only 76.57% of claims were adjudicated by MCOs within 30 days, and fewer than 90% of claims were adjudicated within 90 days.[24] HFS published no analyses in 2019.

43.     The lack of oversight and effective management of MCOs by HFS has created massive and serious challenges for hospitals such as Saint Anthony, including initial claim denial rates that are unjustifiably high, long payment delays, and administrative burdens that require substantial resources and clinical staff time to meet myriad authorization requirements imposed by the MCOs.

44.     *Claim denials.*  Since the overhaul of the State's Medicaid managed care program, Saint Anthony's claims have been denied by the MCOs at rates that are multiples of those Saint Anthony experienced in the past.

45.     In the absence of data from HFS or MCOs, the Illinois Hospital Association ("**IHA**") has conducted a quarterly MCO Administrative Survey, the results of which demonstrate an initial average denial rate of 26% for claims submitted to MCOs by a representative sample of member hospitals in 2018,[25] which is well above the single-digit rates for private insurance or non-Medicaid claims.

46.     For Saint Anthony, the current rate of denials by the MCOs is four times greater than under the previous system.

---

[24]     *Final Report – hospital payments – to HFS*, ILL. DEP'T OF HEALTHCARE & FAMILY SERVS. (Nov. 1, 2018), https://www.illinois.gov/hfs/SiteCollectionDocuments/Finalreporthospitalpayments.pdf.

[25]     *Memorandum: IHA's Medicaid Managed Care Legislation & Advocacy Strategy*, THE ILL. HEALTH & HOSP. ASS'N (Feb. 15, 2019), https://www.team-iha.org/files/non-gated/advocacy/medicaidmco-legislationadvocacy-strategy.aspx?ext=.pdf.

47. Often claims are denied because of administrative paperwork delays by the MCOs, including the MCOs' own failure to update their rosters when a new provider is added, or technical "gotchas" that should have no bearing on the approval of a claim. For example, Illinicare MCO denied $92,000 in charges submitted by Saint Anthony because the patient label was placed on a State-mandated consent form for the procedure instead of the patient's name being handwritten on the form. Meridian/Harmony MCO recently denied a pediatric charge from Saint Anthony because the claim did not include the birth weight, which was irrelevant to the service provided.

48. The high denial rate by MCOs means that Saint Anthony is not paid for a substantial amount of services it provides, or it must embark on a time-consuming, resource-intensive, often futile appeals process.

49. HFS is well-aware of the unjustifiably high claims denial rate by the MCOs. As the Illinois Comptroller acknowledged in a May 2019 report, medical providers like Saint Anthony have informed HFS that MCOs are slow to pay and are denying claims at higher rates than were being denied previously. The Comptroller's report was unable to confirm denial rates, however, because it does not have access to the necessary data.[26] This is the same data HFS is required to, but does not, regularly collect and publish.

50. **_Delays in payment._** Even when Saint Anthony has successfully navigated the unduly complicated process of having a claim approved for payment, it faces another hurdle in getting paid. Despite requirements in both federal and state law mandating timely payment of claims, HFS allows MCOs to regularly fail to comply with those obligations, as discussed below in paragraphs 72-73.

---

[26] _See_ Ill. State Comptroller, *supra* note 8, at 9.

16

51.     The MCOs regularly delay making payments for claims even after the MCO determines that the claim is valid and owed.  Recently, CountyCare, the MCO owned and run by Cook County, had about $350 million in unpaid adjudicated claims, including over $1.1 million owed to Saint Anthony.[27]  County officials have blamed each other and the State for the delays in payment.[28]  Regardless of the cause, Saint Anthony has to wait anywhere from 90 days to 2 years to be paid by MCOs, all while still timely making payroll and struggling to pay its vendors. Indeed, Saint Anthony has not always been able to timely pay vendors, as a recently filed collection lawsuit against it alleges.  *See* Medline Industries, Inc., v. Saint Anthony Hospital, No. 2020 L 001948 (Cir. Ct. Cook County) (seeking recovery of more than $900,000 for medical equipment).

52.     ***Increased administrative burden.***  Each MCO in the State's managed care system has had different policies and procedures, creating a labyrinth for the hospitals to navigate to attempt to get paid for the services they have provided.   Coupled with the HFS-sanctioned run-around given by the MCOs to hospitals related to claims processing and payment, the State's managed care system has imposed significant administrative burdens on Saint Anthony.

53.     Acknowledging the unnecessary burdens this system has placed on hospitals, HFS claims to be working with the MCOs on developing standardized procedures and  "billing guidelines" "so[] that payments are made on time and appropriately."[29]  As of the end of 2019—

---

[27]     Stephanie Goldberg, *Feds look in county Medicaid payment backlog*, CRAIN'S CHICAGO BUSINESS (Mar. 13, 2020),  https://www.chicagobusiness.com/health-care/feds-look-county-medicaid-payment-backlog.

[28]     *Id.*

[29]     *Medicaid Advisory Committee Meeting Minutes*, ILL. DEP'T OF HEALTHCARE & FAMILY SERVS. (Nov. 2, 2018), https://www.illinois.gov/hfs/SiteCollectionDocuments/November22018MACMeetingMinutes.pdf.

nearly two years after the roll-out of the revamped managed care program—the "Comprehensive Billing Guide" is still not complete.[30]

54.     Meanwhile, Saint Anthony is facing unjustified denials, unwarranted delays in payments that violate Medicaid rules, and increased costs to try to navigate this broken system. Saint Anthony and other hospitals that serve low-income patients have had to divert resources that would otherwise be used for patient care to pay consultants and hire employees to deal with payments (or lack thereof) from the MCOs and to focus on potentially cutting needed services as a direct result of reimbursement issues.

55.     ***Lack of transparency.***  As detailed above, despite a number of laws aimed at shedding light on the practices and profits of MCOs, there is a dearth of data from HFS or the MCOs regarding their performance and whether they comply with federal and state law.

56.     More importantly for Saint Anthony's bottom-line, HFS has also permitted MCOs to operate without transparency in their dealings with providers, which has prevented Saint Anthony and other hospitals from determining whether the MCOs, when they actually do make payments, are paying the providers what they are due.

57.     The payments the MCOs make to Saint Anthony and other providers have several components, including the base rate for a particular service and certain "add-ons" and "adjustors" under programs including the Hospital Assessment Program.  *E.g.,* 305 ILCS 5/14-12.  However, the MCOs do not provide itemized claims data showing a breakdown of how it calculated the total amount of payment for a claim, leaving Saint Anthony to guess at whether it has received the full amount due to it.

---

[30]     *Medical Providers: Provider Notice Issued 11/07/2019*, ILL. DEP'T OF HEALTHCARE & FAMILY SERVS. (Nov. 7, 2019),
https://www.illinois.gov/hfs/MedicalProviders/notices/Pages/prn191107b.aspx.

58.     Additionally, the State has increasingly funneled certain "access" payments that it paid directly to hospitals through the MCOs.  The purpose of the "access" payments has been to assist, for example, safety net hospitals that have special and greater needs than other hospitals with a more diverse patient population.  Historically, the "access" payments have been paid in lump sums by the State on a monthly basis throughout the year.

59.     Federal regulations have in recent years placed limitations on how providers can be paid "access" payments.  In 2019, CMS informed HFS that it must be compliant with CMS's regulations for 2018 and going forward related to access payments.  To comply, HFS purportedly retroactively modified how it makes these payments.  It is now in the process of phasing out the lump-sum payments and shifting to an entirely claims-based payment system administered by the MCOs.[31]  HFS is "committed to a process where the [new payment process] will continue to equal as closely as possible the total amount of [access payments] hospitals have been receiving monthly."[32]  However, HFS has failed to provide the required transparency from the MCOs to show that promise is being fulfilled.[33]  Saint Anthony estimates that it has been underpaid a total of $9.75 million related to past access payments.

60.     Last month, HFS shifted the payment of certain "access" payments to flow, in theory, directly from MCOs to the hospitals.[34]  However, even after delaying the date for the roll-

---

[31]     *Medical Providers: Provider Notice Issued 01/30/2020*, ILL. DEP'T OF HEALTHCARE & FAMILY SERVS. (Jan. 30, 2020),
https://www.illinois.gov/hfs/MedicalProviders/notices/Pages/prn200130a.aspx.

[32]     *Id.*

[33]     Stephanie Goldberg, *Why a multibillion-dollar funding program is dividing hospitals*, CRAIN'S CHICAGO BUSINESS (Mar. 6, 2020), https://www.chicagobusiness.com/health-care/why-multibillion-dollar-funding-program-dividing-hospitals.

[34]     *Medical Providers: Provider Notice Issued 2/13/2020*, ILL. DEP'T OF HEALTHCARE & FAMILY SERVS. (Feb. 13, 2020),
https://www.illinois.gov/hfs/MedicalProviders/notices/Pages/prn200213a.aspx

out,[35] some of the MCOs were not equipped to issue the payments, resulting in delays in paying Saint Anthony. Until last month, Saint Anthony received the access payments by the 12th business day of each month. As of the 20th business day of last month, Saint Anthony had not been paid by four of the six MCOs, resulting in a shortfall of $1.2 million and Saint Anthony being short on payroll.

61.     The guesswork created by the MCOs lack of transparency makes it impossible to know if Saint Anthony has been paid properly. What is known, however, is the bottom line: Saint Anthony is being paid much less than before the Medicaid managed care expansion under the prior administration.

62.     Indeed, it appears that some payments by MCOs to Saint Anthony are based on nothing more than Saint Anthony's vigorous and persistent complaints. For example, one MCO, NextLevel, finally paid in 2019 100% of the 2017 claims that it had disputed to Saint Anthony.

63.     Unless they pull the numbers out of a hat, MCOs should know how they calculate each payment and what components add up to the total amount. Yet they reportedly do not know that information, and, regardless, certainly do not share it with Saint Anthony and, on information and belief, other providers. Despite complaints from Saint Anthony and other hospitals, HFS has failed to require MCOs to provide this basic level of information, responsiveness and explanation for its payments, adjustments and failures to make payment.

64.     Saint Anthony has repeatedly tried to resolve disputes with the MCOs, but its attempts have been met with delays, unreasonable requests for additional information, and a general lack of responsiveness. After months of haggling and innumerable hours wasted by Saint

---

[35]     *Id.*

Anthony staff, the MCOs often simply offer to settle disputed claims at a substantial discount with no explanation for the number offered.

65.     Given the lack of oversight from HFS, the actions by MCOs are not surprising. MCOs increase net income by not paying claims. HFS has given MCOs *carte blanche* to delay and deny claims and payments, with zero transparency as to what is ultimately paid. Some of the MCOs have used that to improve their bottom line. MCOs receive the funds HFS provides, but do not promptly and fully pay those funds to the providers. The difference presumably increases their bottom line.

66.     MCOs are cash cows. Recently, one MCO, Molina, announced that it would buy another, NextLevel Health, for $50 million.[36] Cook County—which owns the MCO CountyCare—reportedly has been using CountyCare's Medicaid money to pay other Cook County bills, resulting in massive payment delays to providers. Recent reports state that "CountyCare has become the main money-maker for Cook County government. Cook County's health system budget makes up nearly half of the county's overall $6 billion budget."[37] HFS has done nothing to address this obvious conflict of interest between Cook County government and the MCO it owns that is supposed to be paying providers like Saint Anthony.

67.     There are clear winners and losers in Illinois' MCO system: the MCOs win, providers lose, and once providers reduce care or shut down, Medicaid recipients will lose, too.

---

[36]     Crain's Staff, *Molina to buy NextLevel Health*, Crain's Chicago Business (Jan. 6, 2020), https://www.chicagobusiness.com/health-care/molina-buy-nextlevel-health.

[37]     Kristen Schorsch, *Six Takeaways From Cook County Health's Response To The Inspector General*, WBEZ Chicago (Sept. 6, 2019), https://www.npr.org/local/309/2019/09/06/757998141/six-takeaways-from-cook-county-health-s-response-to-the-inspector-general.

68.     The problem will get worse as the "access" payments that historically have provided some stability and clarity in hospital Medicaid revenue will increasingly be administered by the MCOs that fail to itemize the payments they make to hospitals (when they make them). That shift in payment mechanism is a policy choice made by CMS that should, in theory, be more equitable.  But in Illinois, where MCOs fail to pay claims timely and properly, and HFS allows them to do so, this transition of access payments results in billions of dollars being diverted from providers and shifted to the payment system that many MCOs are abusing.  The first phase of this transformation shifted $571 million from lump-sum access payments to MCO-controlled payments.  This amount represented over 25% of the net program funds.  The next phase is to be implemented July 1, 2020 and will shift an additional $909 million thereby in total funneling almost 75% of funds that once went directly to the providers now through the MCOs.

69.     State leaders have acknowledged these problems.  As Illinois State Senator Kimberly Lightford has said: "We have a broken managed care program in Illinois" resulting in "billions of dollars . . . shifted from patient care to these for-profit companies."[38]

**IV.     The State's Lack of Oversight Over MCOs Imperils Saint Anthony.**

70.     The State's failure to provide the required oversight of MCOs has placed unsustainable financial pressure on Saint Anthony since the expansion and overhaul of the Medicaid managed care system.  Now, in the face of the COVID-19 pandemic, Saint Anthony's finances are approaching a crisis point.

71.     As stated above, prior to the expansion and overhaul of the MCO system, Saint Anthony had over 72 days of cash on hand (over $20 million); today is has less than two days of

---

[38]     Lisa Schencker, *Illinois hospitals say they're not getting paid, question state's outsourcing of Medicaid*, CHICAGO TRIBUNE (Mar. 11, 2019), https://www.chicagotribune.com/business/ct-biz-hospital-medicaid-payments-20190305-story.html.

cash on hand (less than $500,000). Taking into account the loans and grants Saint Anthony received in 2019, as well as a significant increase in payables, the actual cash on hand is significantly less. As of the filing of this Complaint, the downward trend is continuing in 2020. From 2015 to 2019, Saint Anthony's net revenue per patient has dropped over 20%. Through February 2020, the State, through the MCOs, currently owes Saint Anthony almost $20 million in Medicaid payments, including "access" payments administered by the MCOs.[39]

72.    In 2019, the six MCOs that Saint Anthony submitted claims to on a monthly basis regularly violated the Prompt Payment Requirement.[40] Applying a very conservative definition of "clean claim," the MCOs paid on average only 59% of the indisputably clean claims submitted to them by Saint Anthony within 30 days.[41] The 90-day monthly average was 92%. Some of the MCOs performed far worse: Meridian had an average monthly rate of only 39.9% of claims paid within 30 days, with some months with no claims that were submitted by Saint Anthony paid within 30 days; CountyCare had an average monthly rate of 46.6% of payments made within 30 days, with the rate as low as 1% of claims submitted by Saint Anthony paid within 30 days one month.

73.    The MCO performance is worse than these conservative numbers indicate. The payment statistics stated in the preceding paragraph exclude many clean claims that should have been paid in compliance with the Prompt Payment Requirement, but were not. For example, the payment statistics in the preceding paragraph do not include claims for which the MCOs requested

---

[39]    Given the transparency issued discussed above, this amount likely excludes amounts otherwise due and payable either at the claim level or as part of the access payments.

[40]    Harmony was exiting the market during this period and as such was excluded from this analysis.

[41]    A clean claim is generally one that can be processed without the need to obtain additional information from the provider or a third party.

additional information, even though MCOs often requested additional information as a delay tactic; such claims were "clean" under the Medicaid definition of not requiring additional information to be entitled to payment. Also excluded are other clean claims: those that were "lost" by the MCOs and those for which the MCO paid the wrong amount initially. When all of the true "clean" claims are included, the MCOs' actual failure to comply with the Prompt Payment Requirement is significantly worse than the data described in the preceding paragraph.

74.    Saint Anthony's financial troubles are also caused by the State's systemic failure to properly process applications for Medicaid and make payments it owes Saint Anthony under the State's medical assistance programs. Federal law requires states to ensure that applications for Medicaid eligibility are promptly processed so that all available medical benefits are furnished with reasonable promptness. *See* 42 U.S.C. § 1396a(a)(8) ("A State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."); *see also* 42 U.S.C. § 1396a(a)(10)(A) ("A State plan for medical assistance must . . . provide—for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17), (21), (28) and (29) of [42 U.S.C. § 1396d(a)]" to all eligible individuals). Yet the State has acknowledged "major Medicaid backlogs" and "delays of the Medicaid application and renewal processes[.]"[42] The Secretary of the Illinois Department of Healthcare and Family Services admitted that "[t]hese problems built up through a lack of resources and prioritization[.]"[43] Illinois has stated that it is working to resolve this

---

[42]    *State Agencies Prepare Aggressive Hiring Effort to Resolve Medicaid Backlog*, ILLINOIS.GOV (July 1, 2019), https://www2.illinois.gov/IISNews/20281-BacklogHiring.PressRelease.7.1.2019.pdf.

[43]    *Id.*

problem, but Saint Anthony currently has outstanding applications and outstanding claims for payment directly from the State valued at approximately $3.5 million.

75.     In March 2020, one of Saint Anthony's largest medical suppliers filed suit against Saint Anthony seeking payment of nearly $900,000 owed from Saint Anthony.  As of last month, Saint Anthony was owed well more than that from one MCO (CountyCare) alone, on claims that the MCO had already determined were valid and owed.  The MCO was simply not paying.  As a result, Saint Anthony struggles to meet its bills.

76.     Saint Anthony is not the only hospital to have been financially strained by the State's dysfunctional Medicaid managed care program.  Just recently, on March 13, 2020, Pipeline Health, which owns Louis A. Weiss Hospital and West Suburban Medical Center, laid off 52 workers, citing the State's "failure to pay hospitals serving large volumes of Medicaid patients on a timely and adequate basis[.]"[44]

77.     Illinois, like the rest of the world, is in the midst of the COVID-19 pandemic.  Saint Anthony has been proactive to serve its patients, temporarily converting non-ICU floors to create additional ICU beds.  Saint Anthony has substantially increased purchases of ventilators and other necessary supplies and equipment.  Saint Anthony estimates that increased costs and lost revenue for March through May of this year due to COVID-19 preparedness could be over $10 million, including lost inpatient activity and pressure from the State and the Centers for Disease Control and Prevention to largely suspend or cancel outpatient and clinic services, which has further reduced Saint Anthony's ability to generate provider reimbursement requests at the time when

---

[44]     Abdel Jimenez, *Louis A. Weiss Memorial Hospital and West Suburban Center lay off 52 workers, citing lack of state Medicaid funding*, CHICAGO TRIBUNE (Mar. 13, 2020), https://www.chicagotribune.com/business/ct-biz-weiss-west-suburban-hospital-layoffs-20200313-7iy3avome5gyzd6f43sw25yk2i-story.html.

funds are needed more than ever. At the same time Saint Anthony is not being paid what it is owed from MCOs, the State's temporary facilities at McCormick Place are poaching Saint Anthony's nursing staff with above-market rates.

78.     The possibility of something like the COVID-19 crisis is why it was important for Saint Anthony to have maintained more than 72 days of operating cash on hand in the period prior to the MCO overhaul.  As of the date of this complaint, Saint Anthony's cash on hand is for less than 2 days.  Its operating cash reserve is gone because HFS has allowed MCOs to flout Medicaid's payment requirements, in violation of federal law.  Saint Anthony has no other recourse than this Court.

## <u>COUNT I</u>

### Declaratory and Injunctive Relief under 42 U.S.C. § 1983 for violation of 42 U.S.C. §§ 1396a(a)(37), 1396u-2(f), and 1396b(m)(2)(A)(xii)

79.     Plaintiffs restate and incorporate the allegations in Paragraphs 1 through 78 as if fully set forth herein.

80.     The State, through HFS, has an obligation to hospitals and other providers to ensure their Medicaid claims are timely paid by Illinois' MCOs.  HFS has breached that obligation.

81.     The federal Medicaid statute requires HFS to "ensure" 90% of claims are paid within 30 days and 99% are paid within 90 days.  42 U.S.C. § 1396a(a)(37).  This requirement applies to MCOs.  42 U.S.C. § 1396u-2(f).  A State "shall" not receive Medicaid money unless its MCOs comply with this requirement.  42 U.S.C. § 1396b(m)(2)(A)(xii).

82.     The MCOs in the State's managed care program repeatedly and consistently fail to pay 90% of claims within 30 days and 99% of claims within 90 days.

83. HFS's failure to ensure timely payments from MCOs, including its failure to monitor and remedy its MCOs' payment performance, violates 42 U.S.C. §§ 1396a(a)(37), 1396u-2(f), and 1396b(m)(2)(A)(xii).

84. On information and belief, HFS disputes that its actions violate 42 U.S.C. §§ 1396a(a)(37), 1396u-2(f), and 1396b(m)(2)(A)(xii).

85. HFS's actions and inactions alleged in this Complaint have placed at risk the continued ability of Saint Anthony to provide critical patient services to its patient cohort. Without timely and immediate payment from the MCOs or HFS for the services it has provided and continues to provide, Saint Anthony cannot financially sustain itself. That risk is further heightened by the expanding health crisis from the COVID-19 pandemic.

86. Absent injunctive relief, Saint Anthony will suffer irreparable injury for which there is no adequate remedy at law, including, without limitation, the likely reduction of its operations and inability to fulfill its mission. The public interest strongly supports the entry to injunctive relief to permit Saint Anthony to continue to serve its safety-net function, especially during the present public health emergency.

87. Saint Anthony is entitled to the following relief under Count I:

    A.    A declaratory judgment that HFS has violated 42 U.S.C. §§ 1396a(a)(37), 1396u-2(f), and 1396b(m)(2)(A)(xii) by failing to ensure the MCOs in the State's Medicaid managed care system meet the timely payment requirements set forth therein.

    B.    An injunction requiring HFS to immediately use all available means to bring itself into compliance with 42 U.S.C. §§ 1396a(a)(37) and 1396u-2(f), including by causing each of its MCOs to: (1) pay at least 90% of all claims

Saint Anthony submitted to the MCOs more than 30 days prior to the date of injunction; (2) pay at least 99% of all claims Saint Anthony submitted to the MCOs more than 90 days prior to the date of injunction; and (3) deem any claims not paid within 90 days granted and pay such claims immediately.

C.    An injunction requiring HFS to collect monthly reports on MCOs' payment of claims and publish those reports on HFS's website.

D.    An injunction requiring HFS to require MCOs to use a standard, transparent format for all claim payment remittances that identifies core, add-on, access, partial, and other payments.

E.    In the alternative, if HFS is unable, promptly and effectively, to ensure that MCOs comply with the law and make payments requested in subparagraph B, an injunction requiring HFS to immediately terminate its MCO contracts, to retake responsibility for payment of claims, and bring itself into compliance with 42 U.S.C. §§ 1396a(a)(37) and 1396u-2(f), including by deeming granted and paying immediately a sufficient number of outstanding claims to ensure that the State and/or its MCOs have paid at least 90% of all claims submitted by Saint Anthony to each terminated MCO more than 30 days prior to the date of injunction and at least 99% of all claims submitted by Saint Anthony to each terminated MCO more than 90 days prior to the date of injunction.

F.      To appoint a receiver for HFS to oversee HFS's compliance with Medicaid timely payment requirements, including overseeing HFS's statutory obligation to create procedures that ensure timely payment.

G.      Attorneys' fees and expenses pursuant to 42 U.S.C. § 1988.

H.      Such other relief as the Court deems appropriate.

## COUNT II

### Declaratory and Injunctive Relief under 42 U.S.C. § 1983 for violation of 42 U.S.C. § 1396a(a)(8)

88.      Plaintiffs restate and incorporate the allegations in Paragraphs 1 through 87 as if fully set forth herein.

89.      The State, through HFS, has an obligation to hospitals and other providers to ensure their Medicaid claims are timely paid by Illinois' MCOs. HFS has breached that obligation.

90.      The federal Medicaid statute requires HFS to furnish "medical assistance" "with reasonable promptness." 42 U.S.C. § 1396a(a)(8). "Medical assistance" includes not only medical care and services, but also "payment of part or all of the cost of" such care and services. 42 U.S.C. § 1396d(a). The Medicaid statute does not define "reasonable promptness" for payments, but Section 1396a(a)(8) requires HFS to pay claims on the schedule set in 42 C.F.R. § 447.45, *see Doctors Nursing & Rehab. Ctr., LLC v. Norwood*, No. 1:16-cv-9837, 2017 WL 3838031, at *5 & n.15 (N.D. Ill. Sept. 1, 2017), which is the implementing regulation for Section 1396a(a)(37). 42 C.F.R. § 447.45 requires 90% of clean claims to be paid within 30 days and 99% of clean claims to be paid within 90 days.

91.      The MCOs in the State's managed care program repeatedly and consistently fail to pay 90% of claims within 30 days and 99% of claims within 90 days.

29

92.     HFS's failure to ensure timely payments from MCOs, including its failure to monitor and remedy its MCOs' payment performance, violates 42 U.S.C. § 1396a(a)(8).

93.     On information and belief, HFS disputes that its actions violate 42 U.S.C. § 1396a(a)(8).

94.     HFS's actions and inactions alleged in this Complaint have placed at risk the continued ability of Saint Anthony to provide critical patient services to its patient cohort.  Without timely and immediate payment from the MCOs or HFS for the services it has provided and continues to provide, Saint Anthony cannot financially sustain itself.  That risk is further heightened by the expanding health crisis from the COVID-19 pandemic.

95.     Absent injunctive relief, Saint Anthony will suffer irreparable injury for which there is no adequate remedy at law, including, without limitation, the likely reduction of its operations and inability to fulfill its mission.  The public interest strongly supports the entry to injunctive relief to permit Saint Anthony to continue to serve its safety-net function, especially during the present public health emergency.

96.     Saint Anthony is entitled to the following relief under Count II:

A.      A declaratory judgment that HFS has violated 42 U.S.C. § 1396a(a)(8) by failing to ensure the MCOs in the State's Medicaid managed care system furnish "medical assistance," including payment for medical care and services, with "reasonable promptness."

B.      An injunction requiring HFS to immediately use all available means to bring itself into compliance with 42 U.S.C. § 1396a(a)(8), including by including by causing each of its MCOs to: (1) pay at least 90% of all claims Saint Anthony submitted to the MCOs more than 30 days prior to the date

of injunction; (2) pay at least 99% of all claims Saint Anthony submitted to the MCOs more than 90 days prior to the date of injunction; and (3) deem any claims not paid within 90 days granted and pay such claims immediately.

C.      An injunction requiring HFS to collect monthly reports on MCOs' payment of claims and publish those reports on HFS's website.

D.      An injunction requiring HFS to require MCOs to use a standard, transparent format for all claim payment remittances that identifies core, add-on, access, partial, and other payments.

E.      In the alternative, if HFS is unable, promptly and effectively, to ensure that MCOs comply with federal law by making the payments requested in subparagraph B, an injunction requiring HFS to immediately terminate its MCO contracts, to retake responsibility for payment of claims, and bring itself into compliance with 42 U.S.C. § 1396a(a)(30)(A), including by deeming granted and paying immediately a sufficient number of outstanding claims to ensure that the State and/or its MCOs have paid at least 90% of all claims submitted by Saint Anthony to each terminated MCO more than 30 days prior to the date of injunction and at least 99% of all claims submitted by Saint Anthony to each terminated MCO more than 90 days prior to the date of injunction.

F.      To appoint a receiver for HFS to oversee HFS's compliance with Medicaid timely payment requirements, including overseeing HFS's statutory

obligation to furnish "medical assistance," including payment for medical

care and services, with "reasonable promptness."

G.     Attorneys' fees and expenses pursuant to 42 U.S.C. § 1988.

H.     Such other relief as the Court deems appropriate.

Dated:  April 27, 2020                   Respectfully submitted,

SAINT ANTHONY HOSPITAL

By:   /s/ Michael L. Shakman
              One of its attorneys

Michael L. Shakman
Edward W. Feldman
William J. Katt
Mary Eileen C. Wells
Miller Shakman Levine & Feldman LLP
180 North LaSalle Street
Suite 3600
Chicago, IL 60601
(312) 236-3700