# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
OF THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SAINT ANTHONY HOSPITAL | ) | Case No.  1:20-cv-02561 |
| | ) | |
| Plaintiff, | ) | Judge Andrea R. Wood |
| | ) | |
| vs. | ) | Magistrate Judge Sunil Harjani |
| | ) | |
| THERESA EAGLESON, in her official | ) | |
| capacity as Director of the Illinois | ) | |
| Department of Healthcare and Family | ) | |
| Services | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO COMPEL ARBITRATION AND STAY THIS ACTION

Intervenor Meridian Health Plan of Illinois, Inc. ("Meridian") hereby moves this Court to compel arbitration of disputes raised by plaintiff Saint Anthony Hospital ("Saint Anthony") in its Complaint against defendant Theresa Eagleson, in her capacity as Director of the Department of Healthcare and Family Services ("HFS") for the State of Illinois (the "State").  The Complaint alleges that Meridian has improperly (a) denied claim payments, (b) delayed claim payments, (c) imposed administrative burdens in processing claims, and (d) lacked transparency when making claim payments.  (ECF No. 1 at ¶¶ 1, 6, 38, 43-57, 60-61, 63, 72.)  All such disputes must be arbitrated pursuant to the Hospital Agreement entered into between Meridian and Saint Anthony, pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4.  Meridian further requests that the Court stay this action—as it concerns Meridian—pursuant to Section 3 of the FAA, 9 U.S.C. § 3.

## I. INTRODUCTION.

This action is a blatant attempt by Saint Anthony to avoid the Hospital Agreement and related arbitration provision it entered into with Meridian.  Meridian is one of six managed care

organizations (MCOs) contracted with HFS to enroll Medicaid beneficiaries as health plan members. As permitted by applicable law, Meridian entered into its related Hospital Agreement with Saint Anthony, which governs and controls Meridian's obligations to pay Saint Anthony for services rendered. This Hospital Agreement broadly concerns all aspects of Meridian's payment obligations to Saint Anthony, including the timing and manner in which Meridian must process and pay claims. Importantly, the Hospital Agreement includes a mandatory arbitration provision that applies to all payment disputes.[1]

Through its Complaint in this action, Saint Anthony alleges that the MCOs, including Meridian, "have systematically delayed and denied claims without justification, failed to pay undisputed claims, and when payments are made, they refuse to provide the detail necessary for Saint Anthony to determine if it is receiving proper payment or, if not, why not." (ECF No. 1 at ¶¶ 1, 6, 7, 10.) Saint Anthony also contends that it "has no other recourse than this Court." (*Id*. at ¶ 78.) But Saint Anthony does have a recourse for any purported wrongdoing—an arbitration. It just chose not to use it or mention it to the Court.

Inexplicably, Saint Anthony did not demand payment from Meridian or mandatory arbitration under the Hospital Agreement. Instead, Saint Anthony filed its improper Complaint against HFS claiming that the MCOs, and thereby HFS, have violated federal law, and asking this Court to compel the State to compel Meridian to pay amounts allegedly past due for claims submitted under the Hospital Agreement. In the alternative, after complaining about the "broken Medicaid managed care system," Saint Anthony asks this Court to dismantle that system by

---

[1] Given that binding arbitration clauses are standard in the industry, it is likely that each of the other MCOs also has a binding arbitration clause in its contract with Saint Anthony.

"requiring HFS to immediately terminate its MCO contracts," including Meridian's, and to itself "pay[] immediately." (*Id*. at ¶¶ 7, 10, 87(E), 96(E).)

Saint Anthony neither mentions nor attaches the Hospital Agreement with Meridian, making it impossible for this Court to determine what—if anything—is actually due and when. Those issues must be resolved in binding arbitration, which Meridian commenced on June 16, 2020 against Saint Anthony before the American Arbitration Association, and the Court should stay this entire action as it concerns Meridian pending the completion of that Arbitration.

## II. <u>BACKGROUND.</u>

Meridian exclusively provides government-sponsored healthcare plans to low-income individuals, families and children, pregnant women, the elderly and individuals with disabilities through Meridian's Medicaid and Medicare contracts with state and federal agencies. (ECF No. 1 at ¶ 22; *see, e.g.*, https://corp.mhplan.com/en/.) Meridian has no commercial products, and thus receives all of its revenue from state or federal governments. Meridian is highly regulated and therefore has a stringent burden to ensure the proprietary of any payments it makes to healthcare providers like Saint Anthony.

In 2017, the State selected Meridian as one of seven MCOs authorized to administer managed care services to Medicaid beneficiaries through a contract with HFS. (ECF No. 1 at ¶¶ 26, 35.)[2] Under this contract, Meridian administers benefits on behalf of Medicaid members who reside in the State and enroll in Meridian's health plan. (*Id.* at ¶ 26.) The State pays Meridian a capitated rate on a per member, per month basis. (*Id.*) Meridian is then responsible for contracting with providers (like Saint Anthony) and paying for Medicaid-eligible healthcare costs incurred by

---

[2] Although HFS originally chose seven MCOs, there are currently only six MCOs contracted with HFS.

Meridian's members, pursuant to the terms agreed to by Meridian and those providers. (*Id.*); *see, e.g.*, *Midwest Emergency Assocs.-Elgin Ltd. v. Harmony Health Plan of Ill., Inc.*, 888 N.E.2d 694, 696 (Ill. App. Ct. 2008) (generally discussing Medicaid managed care arrangements).

**The Hospital Agreement.**

In managed Medicaid, an MCO's payment obligations are subject to certain state and federal laws, with an important exception that is applicable here—the statutory provisions for timely payment apply "**unless** the health care provider and the organization agree to an alternate payment schedule," and the "MCO and its providers may, by mutual agreement, establish an alternative payment schedule." *See, e.g.*, 42 U.S.C. § 1396u-2(f) (emphasis added); 42 C.F.R. § 447.46. That is precisely what happened here—while Meridian follows the State's requirements for claims, Meridian also entered into the Hospital Agreement with Saint Anthony, in which the parties' agreed to specific rules and processes with regard to claims submitted by Saint Anthony, including provisions concerning the processing and timeliness of payment. (Ex. 1-A.)

The Hospital Agreement, which has been effective since October 1, 2014, requires Saint Anthony to provide certain authorized, covered medical services to Meridian's members. Saint Anthony must then submit timely claims for payment to Meridian in a prescribed manner. (*Id.* at §§ 2, 4.) Meridian then processes, adjusts, pays, or denies the claims in compliance with the time frames and other requirements specified by the parties. (*Id.* at § 4.) The parties must "make a good faith effort to negotiate and resolve all billing disputes." (*Id.* at § 4.9.) In the event they are unable to do so, such disputes are subject to binding arbitration. (*Id.* at §§ 6.1, 6.2.)[3]

---

[3] Section 6.2.1 of the Hospital Agreement provides that when negotiations fail, the parties "may request" mediation, but only if both parties agree. Meridian has chosen not to pursue mediation of the parties' disputes.

**The Complaint.**

Through the Complaint, Saint Anthony alleges that HFS has violated federal law by failing to ensure that the MCOs "make timely and accurate payment for Medicaid services." (ECF No. 1 at ¶ 1; *see also id*. at 11, 79-96.) To support that premise, Saint Anthony disputes the payments it received from Meridian. Among other things, Saint Anthony contends that Meridian has improperly (a) denied claim payments, (b) delayed claim payments, (c) imposed administrative burdens in processing claims, and (d) lacked transparency when making claim payments. (*Id*. at ¶¶ 1, 6, 38, 43-57, 60-61, 63, 72.) Among other relief, Saint Anthony asks this Court to enter an injunction requiring the State to "use all available means" <u>to cause Meridian to make</u> certain claim payments to Saint Anthony, and for Meridian to use a particular format when issuing claim payment remittances. (*Id*. at ¶¶ 87, 96.) All such matters are squarely covered by the Hospital Agreement. (*See* Ex. 1-A.)[4]

**The Arbitration.**

On June 16, 2020, pursuant to the arbitration provisions of the Hospital Agreement, Meridian filed an Arbitration Demand against Saint Anthony with the American Arbitration Association (the "Arbitration"). In the Arbitration, Meridian has demanded arbitration with respect to all matters in dispute under the Hospital Agreement, including the disputes Saint Anthony has raised in this matter concerning (1) claim denials, (2) delays in payment, (3) an alleged administrative burden, (4) Meridian's alleged lack of transparency, and (5) any and all other disputes arising out of the Hospital Agreement. (*See* Ex. 4.)

---

[4] Meridian and Saint Anthony entered into related practitioner agreements also effective October 1, 2014, as amended. To the extent applicable, those agreements also control billing and payment disputes and include an arbitration provision. (*See* Ex. 1-B, 1-C.)

### III. <u>LEGAL STANDARD.</u>

The FAA governs this matter. The FAA has "the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). "The FAA applies to all contracts involving interstate commerce…Therefore, if a contract involves interstate commerce, a court must resolve arbitration disputes according to the FAA…." *Kong v. Allied Prof'l Ins. Co.*, 750 F.3d 1295, 1303 (11th Cir. 2014). Courts broadly construe the "interstate commerce" requirement to apply to any contract affecting interstate commerce. *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273-74 (1995) ("[t]he word 'involving' is broad and is indeed the functional equivalent of 'affecting' [interstate commerce].").

The interstate commerce requirement is satisfied here because the disputes concern amounts allegedly owed for services provided by Saint Anthony to Meridian's Medicaid members, where Meridian receives federal funding for those members as an MCO. *See THI of New Mexico at Hobbs Ctr., LLC v. Spradlin*, 893 F. Supp. 2d 1172, 1184 (D.N.M. 2012), aff'd, 532 F. App'x 813 (10th Cir. 2013) (finding FAA interstate commerce requirement is met where plaintiff received federal funding from Medicaid program); *Fosler v. Midwest Care Ctr. II, Inc.*, 928 N.E.2d 1, 14-15 (Ill. App. Ct. 2009) (finding FAA applied where facility received Medicaid funding).

The FAA eliminates district court discretion and requires the Court to compel arbitration of issues covered by arbitration agreements. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citations omitted). Pursuant to Section 4, upon a showing that a party has failed to comply with a valid arbitration agreement, the Court "shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. Section 3 requires the Court to stay an action "upon being satisfied" that an issue in the action is "referable to arbitration." 9 U.S.C. § 3. Both Sections apply here.

## IV.  ARGUMENT.

This Court should (A) compel arbitration of Saint Anthony's disputes with Meridian pursuant to Section 4 of the FAA, and (B) stay this entire action as it concerns Meridian pursuant to Section 3 of the FAA.

### A.  The Court Should Compel Arbitration.

In the Seventh Circuit, "[t]o compel arbitration, a party need only show:  (1) an agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal by the opposing party to proceed to arbitration."  *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 466 F.3d 577, 580 (7th Cir. 2006).  Because all three elements are satisfied here, this Court should compel arbitration of all disputes Saint Anthony has raised with respect to Meridian.

**First**, the Hospital Agreement includes a dispute resolution provision requiring arbitration. (*See* Ex. 1-A at Section 6.2.2.)  Under this Section "either party may seek binding arbitration," and "Both Parties agree to binding arbitration."  (*Id.* at § 6.2.2.)  As such, there is an indisputable agreement to arbitrate, satisfying the first requirement to compel arbitration.

**Second**, the core disputes asserted by Saint Anthony—that Meridian has failed to timely and properly pay for claims submitted—fall within the scope of the parties' arbitration provision under the Hospital Agreement, which broadly applies to disputes "perceived" by the parties, subject to certain inapplicable exceptions.  (*Id.* at § 6.)  Here, the Complaint raises numerous disputes covered by the Hospital Agreement, including the following examples:

- ***Claim Denials.***  Saint Anthony alleges that its claims "have been denied by the MCOs [including Meridian] at rates that are multiples of those Saint Anthony experienced in the past," and that "[o]ften claims are denied because of administrative paperwork delays by the MCOs."  (ECF No. 1 at ¶ 44, 47.)  As an example, according to Saint Anthony,

"Meridian/Harmony MCO recently denied a pediatric charge from Saint Anthony because the claim did not include the birth weight, which was irrelevant to the service provided." (*Id.* at ¶ 47.) Sections 4.4 and 4.5 of the Hospital Agreement govern such claim denials, rejections, and adjustments. (*See* Ex. 1-A.)

- **_Delays in Payment._** Saint Anthony alleges that "[t]he MCOs [including Meridian] regularly delay making payments for claims even after the MCO determines that the claim is valid and owed," and Saint Anthony "has to wait anywhere from 90 days to 2 years to be paid by MCOs." (ECF No. 1 at ¶ 51.) Saint Anthony also alleges that "Meridian had an average monthly rate of only 39.9% of claims paid within 30 days, with some months with no claims that were submitted by Saint Anthony paid within 30 days." (*Id.* at ¶ 72.) Sections 4.3, 4.4, and 4.5 of the Hospital Agreement establish and govern such timing requirements for Meridian to process and pay Saint Anthony's claims. (*See* Ex. 1-A.)

- **_Administrative Burden._** Saint Anthony alleges that "[e]ach MCO in the State's managed care system has had different policies and procedures, creating a labyrinth for the hospitals to navigate to attempt to get paid for the services they have provided." (ECF No. 1 at ¶ 52.) Saint Anthony further alleges that "the State's managed care system [including Meridian] has imposed significant administrative burdens on Saint Anthony." (*Id.*) Sections 1.3 and 4.2.1 of the Hospital Agreement establish the administrative requirements for Saint Anthony to submit claims to Meridian. (*See* Ex. 1-A.)

- **_Lack of transparency._** Saint Anthony alleges that "the MCOs [including Meridian] do not provide itemized claims data showing a breakdown of how it calculated the total amount of payment for a claim, leaving Saint Anthony to guess at whether it has received the full amount due

to it." (ECF No. 1 at ¶ 57.) Section 4.5 of the Hospital Agreement governs requirements for Meridian to adjust payments on a submitted claim. (*See* Ex. 1-A.)

Because all of the above matters fall squarely within the Hospital Agreement, they must be arbitrated. To the extent there is any question, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). "[A] court may not deny a party's request to arbitrate an issue unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Fyrnetics (Hong Kong) Ltd. v. Quantum Grp., Inc.*, 293 F.3d 1023, 1030 (7th Cir. 2002) (citation omitted). Here, the only susceptible interpretation is that the Hospital Agreement and related arbitration provision covers the disputes at issue.

Moreover, should Saint Anthony contest the scope of the Arbitration, that issue must itself be referred to arbitration. The FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions," "so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Henry Schein, Inc. v. Archer & White Sales, Inc.,* 139 S. Ct. 524, 527, 530 (2019). Here, the parties clearly and unmistakably delegated scope questions to the arbitrators by incorporating two alternative sets of rules into their arbitration provision, both of which require arbitrators to resolve scope questions.[5] As such, it is for the arbitrators to resolve

---

[5] The Hospital Agreement states: "either party may seek binding arbitration under either the Rules for Arbitration of the Alternative Dispute Resolutions Service of the American Health Lawyers Association or the American Arbitration Association." (Ex. 1-A at § 6.2.2.) These rules provide: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the

any disputes concerning the scope of the Arbitration, further satisfying the second requirement to compel arbitration. *See, e.g.*, *Nandorf, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 410 F. Supp. 3d 882, 889 (N.D. Ill. 2019) ("[S]uch express incorporation of AAA Rules provides additional clear and unmistakable evidence of the parties' intent to arbitrate arbitrability.").

**Third,** by filing its Complaint asking this Court to enter an injunction requiring the State to "use all available means" to cause Meridian to make certain claim payments to Saint Anthony, or alternatively to terminate Meridian's MCO contract (ECF No. 1 at ¶¶ 87, 96), Saint Anthony has refused arbitration, necessitating this Court's intervention. *See, e.g.*, *Grumhaus v. Comerica Sec., Inc.*, 223 F.3d 648, 651 (7th Cir. 2000) (explaining that "a plaintiff expresses his intent to submit to a judicial forum by filing a complaint" and "knowing selection of one forum over another and willing participation in the ensuing litigation" is "plainly inconsistent with a desire to arbitrate.").

In short, all three requirements to compel arbitration are thus met. As a result, this Court should compel arbitration pursuant to Section 4 of the FAA.

    **B.**    **The Court Should Stay This Action With Respect To Meridian.**

Pursuant to Section 3 of the FAA, when a dispute is referred to arbitration, the court "shall on the application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement…." 9 U.S.C. § 3. "For arbitrable issues, a § 3 stay is mandatory." *Volkswagen Of Am., Inc. v. Sud's Of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007). Accordingly, this Court must stay all matters in the Complaint referred to arbitration.

---

arbitrability of any claim or counterclaim," and the arbitrator "shall have the power to determine his or her jurisdiction and any issues of arbitrability." (*See* Ex. 2 at R-7; Ex. 3 at 3.1.)

Any non-arbitrable issues that directly or indirectly relate to Meridian should also be stayed as a matter of this Court's sound discretion. *Id.* Such a stay is proper and preferable when "arbitration might help resolve, or at least shed some light on, the issues remaining in federal court." *Id*. at 972. In fact, numerous cases stay both arbitrable and non-arbitrable issues where, as here, there are overlapping facts and issues risking inconsistent results. *See, e.g.*, *Elsasser v. DV Trading, LLC*, No. 17-CV-04825, 2020 WL 1248667, at *11 (N.D. Ill. Mar. 16, 2020) (staying litigation because nonarbitrable claim runs "a substantial risk of overlapping with facts and issues likely to arise in" arbitration); *In re Dealer Mgmt. Sys. Antitrust Litig.,* No. 18-CV-864, 2020 WL 832365, at *7 (N.D. Ill. Feb. 20, 2020) (staying litigation because the risk of inconsistent rulings is significant and the court would end up duplicating work if the action was not stayed); *G&G Closed Circuit Events, LLC v. Castillo*, No. 14-CV-02073, 2017 WL 1079241, at *10 (N.D. Ill. Mar. 22, 2017) (staying litigation because "[c]losely related factual questions, though not the same legal questions, will be front and center in the arbitration."); *WMS Gaming, Inc. v. IGT*, 31 F. Supp. 3d 974, 978-80 (N.D. Ill. 2014) (staying entire case where arbitrable and non-arbitrable issues were closely tied as "the complaint refers to the facts underlying" the arbitrable issue); *Indus. Opportunity Partners, L.P. v. Kendrion Fas Controls Holding GmbH*, No. 13-CV-6622, 2013 WL 5878585, at *4 (N.D. Ill. Nov. 1, 2013) (staying "more robust" litigation claims because arbitral issues relating to determination of items and amounts owed is "likely to inform (and perhaps even resolve) issues material to the lawsuit"); *Technology & Intellectual Property Strategies Group PC v. Insperity, Inc.*, No. 12-cv-03163-LHK, 2012 WL 6001098, at *13 (N.D. Cal. Nov. 29, 2012) (staying entire case, including claims against defendant who was not a party to the arbitration agreement, because "arbitration of any claims against [the arbitrating party] are likely to predominate over any individual claims against [the non-arbitrating party]").

Here, staying the entire case as it directly or indirectly relates to Meridian, including any discovery or potential rulings, is particularly appropriate because the entire Complaint and its requests for relief attempt an end run around the Hospital Agreement. As noted above:

- Saint Anthony alleges that HFS has violated federal law by failing to ensure that the MCOs, including Meridian, have complied with certain federal statutes and regulations. (*See, e.g.*, ECF No. 1 at ¶¶ 1, 6-8, 11, 87(E), 96(E).)

- Saint Anthony seeks an injunction requiring the State to "use all available means" to cause Meridian to make certain claim payments to Saint Anthony, and for Meridian to use a particular format when issuing claim payment remittances. (*Id.* at ¶¶ 87, 96.)

- Saint Anthony seeks "an injunction requiring HFS to immediately terminate its MCO contracts," including the contract with Meridian. (*Id.* at ¶¶ 87(E), 96(E).)

All of these allegations and the requested relief are purportedly based on Meridian's alleged improper denials, delayed payments, administrative burden and lack of transparency. (*Id.* at ¶¶ 38, 43-57, 60-61, 63, 72, 87(E), 96(E).) But before Saint Anthony is entitled to any relief, it must first prove that Meridian breached its obligations under the Hospital Agreement—all such issues must be adjudicated in the Arbitration. Until that Arbitration is completed, no relief should be granted in this action that in any way relates to Meridian.

As explained by the Seventh Circuit, "*Mages* [is a case] in which a party to an arbitration agreement, trying to get around it, sues not only the other party to the agreement but some related party with which it has no arbitration agreement, in the hope that the claim against the other party will be adjudicated first and have preclusive effect in the arbitration. Such a maneuver should not be allowed to succeed. . . ." *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 530 (7th Cir.

1996), discussing *Morrie Mages & Shirlee Mages Found. v. Thrifty Corp.,* 916 F.2d 402, 407 (7th Cir. 1990).  As in *Mages*, this Court should disallow Saint Anthony's improper attempt to avoid the arbitration provisions to which it willingly agreed.

### V.  <u>CONCLUSION.</u>

For all of these reasons, Meridian respectfully requests that the Court grant this Motion (a) compelling Saint Anthony to arbitrate its disputes with Meridian pursuant to Section 4 of the FAA, and (b) staying this entire action as it concerns Meridian pursuant to Section 3 of the FAA pending the completion of the Arbitration.

Dated:  June 16, 2020                                  Meridian Health Plan of Illinois, Inc.

By:  /s/ *Ashlee M. Knuckey*
      One of its Attorneys

Ashlee M. Knuckey
aknuckey@lockelord.com
Steven T. Whitmer
swhitmer@lockelord.com
LOCKE LORD LLP
111 South Wacker Drive
Chicago, Illinois  60606
Phone:  312.443.0700
Fax:     312.443.0336

## CERTIFICATE OF SERVICE

I, Ashlee M. Knuckey, an attorney, hereby certify that I served a copy of the foregoing MOTION TO COMPEL ARBITRATION on all counsel of record through the ECF system on this 16th day of June, 2020.

By: /s/ *Ashlee M. Knuckey*

Ashlee M. Knuckey
aknuckey@lockelord.com
Steven T. Whitmer
swhitmer@lockelord.com
LOCKE LORD LLP
111 South Wacker Drive
Chicago, Illinois 60606
Phone: 312.443.0700
Fax:     312.443.0336

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SAINT ANTHONY HOSPITAL | ) | Case No.: 20 CV 2561 |
| | ) | |
| Plaintiff, | ) | Judge: Andrea Wood |
| | ) | |
| vs. | ) | Magistrate: Sunil Harjani |
| | ) | |
| THERESA EAGLESON, in her official | ) | |
| capacity as Director of the Illinois | ) | |
| Department of Healthcare and Family | ) | |
| Services | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DECLARATION OF DEREK PUNZALAN</u>

I, Derek Punzalan, declare as follows:

1.     I am the Senior Director of Network Management for Meridian Health Plan of

Illinois, Inc. ("Meridian").  As part of my responsibilities in this role, I am familiar with

Meridian's contracts with healthcare providers in Illinois.

2.     A true and correct copy of the *Hospital Agreement* entered into by Saint Anthony

Hospital and Meridian, and effective since October 1, 2014, is attached as **Exhibit A**.

3.     A true and correct copy of the *Practioner Agreement* entered into by Saint

Anthony PHO and Meridian, and effective since October 1, 2014, is attached as **Exhibit B**.

4.     A true and correct copy of the *Amendment to the System Agreement* entered into

by Saint Anthony PHO, LLC and Meridian, and effective since January 1, 2019, is attached as

**Exhibit C**.

5.     I have personal knowledge of the matters set forth in this Declaration and, if

called as a witness in this action, can and would testify competently thereto.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 16, 2020, at Chicago, Illinois.

# EXHIBIT A



## ILLINOIS HOSPITAL AGREEMENT

This Hospital Agreement ("Agreement") shall be effective as of the 1st day of October, 2014 between Meridian Health Plan, ("Plan") an Illinois corporation and Health Maintenance Organization ("HMO") under the laws of the State of Illinois, and _Saint Anthony Hospital_____, ("Hospital") a Hospital licensed under the laws of the State of Illinois (collectively the "Parties.")

### Recitals

Whereas, Plan has a certificate of authority to operate as an HMO in the State of Illinois;

Whereas, Plan desires to contract with Hospital for the provision of Covered Services to Enrollees; and

Whereas, Hospital desires to provide Covered Services as specified in this Agreement to Enrollees for the consideration, and under the terms and conditions set forth in this Agreement;

Whereas, Hospital desires to provide prior authorized medically necessary services to all of Plan's covered Enrollees for all products.

In consideration of the foregoing and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

### 1. DEFINITION OF TERMS

As used in this Agreement, the following terms have the following meaning:

**1.1** **Benefits Certificate** means the written document approved by IDHFS or the Department of Insurance, as issued to the Enrollee, which explains the scope of benefits, limitations of coverage, and exclusions governing the Enrollee's health care benefit coverage.

**1.2** **Capitated Financial Alignment Demonstration Program (FAD)** means the program to test new service delivery and payment methods and models for those individuals dually eligible for Medicare and Medicaid.

**1.3** **Clean Claim** means a claim that:

   a) Is submitted within the time frame required under this Agreement;
   b) Identifies the name and appropriate tax identification number of the health professional or the health facility that provided treatment or service and includes a matching provider ID number assigned by Plan;
   c) Identifies the patient (Enrollee/Subscriber ID number assigned by Plan, address, and date of birth);
   d) Identifies Plan (Plan name and/or ID number);
   e) Lists the date (m/d/y) and place of service;
   f) Is for covered service (services must be described using uniform billing coding and instructions (ANSI X12 837) and ICD-9/10-CM diagnosis. Claims submitted solely for the purpose of determining if a service is covered are not considered Clean Claims);
   g) If necessary, substantiates the medical necessity and appropriateness of the care or services provided, that includes any applicable authorization number if prior authorization is required by Plan;
   h) Includes additional documentation based upon services rendered as reasonably required by Plan Policies;
   i) Is certified by Hospital that the claim is true, accurate, prepared with the knowledge and consent of Hospital, and does not contain untrue, misleading, or deceptive information, that identifies each attending, referring, or prescribing physician, dentist, or other practitioner by means of a program identification number on each claim or adjustment of a claim;

j) Is a claim for which Hospital has verified the Enrollee's eligibility and enrollment in Plan before the claim was submitted;

k) Is not a duplicate of a claim submitted within forty-five (45) days of the previous submission;

l) Is submitted in compliance with all of Plan's prior authorization and claims submission guidelines and procedures as identified in the Provider Manual;

m) Is submitted electronically if Hospital has the ability to submit claims electronically; and

n) Uses the data elements of UB-04, as appropriate.

**1.4** **CMS** means the Centers for Medicare & Medicaid Services.

**1.5** **Commercial Enrollee** means a Subscriber in any of Plan's Commercial products.

**1.6** **Co-Payment** means the predetermined amount an Enrollee must pay, whether stated as a percentage or a fixed dollar, to receive a specific service or benefit.

**1.7** **Covered Services** means those Medically Necessary health care services that are properly authorized and covered under the terms of the applicable Payor Contract and rendered in accordance with the terms of this Agreement and the Provider Manual.

**1.8** **Credentialing and Re-Credentialing** means the policy that Plan will follow in credentialing a new applicant in providing Covered Services and when appropriate, re-credentialing every two years.

**1.9** **Elective Admissions and Services** means all health services not necessary to evaluate, screen and stabilize an Emergency Medical Condition as required by the Emergency Medical Treatment and Active Labor Act, 42 USC 1395dd ("EMTALA").

**1.10** **Emergency Medical Condition** means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, with an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in: (i) serious jeopardy to the health of the individual or in the case of a pregnant woman, the health of the woman or her unborn child; (ii) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily organ or part.

**1.11** **Enrollee** means an individual who, pursuant to the applicable individual or group Enrollee contract with Plan, is eligible to receive Covered Services. The term Enrollee includes eligible dependents of a Subscriber, Medicaid Enrollees, Medicare Enrollees, Commercial Enrollees and FAD Enrollees.

**1.12** **FAD Enrollee** means an individual who is eligible to receive Health Care Services pursuant to Plan's agreements with IDHFS and CMS as a participant in the Capitated Financial Alignment Demonstration Program.

**1.13** **HFS Medical Program** means the Illinois Medical Assistance Program administered under Article V of the Illinois Public Aid Code (305 ILCS 5/5-1 et seq.) or its successor program and Titles XIX (42 U.S.C. 1396 et seq.) and XXI (42 U.S.C. 1397aa et seq.) of the Social Security Act and Section 12-4.35 of the Illinois Public Aid Code (305 ILCS 5/12-435); the State Children's Health Insurance Program administered under 215 ILCS 106 and Title XXI of the Social Security Act (42 U.S.C. 1397 aa et seq.).

**1.14** **Hospital-Based Practitioner** means a licensed physician employed by Hospital or under contract with Hospital for the provision of professional medical services to patients of Hospital, including, without limitation, radiologists, anesthesiologists, pathologists, and emergency room physicians.

**1.15** **Hospital Services** means Covered Services customarily provided by a hospital including, without limitation, inpatient services, outpatient services and emergency services, treatment and supplies.

**1.16** **Inpatient Services** means all Hospital Services that Hospital provides to an Enrollee who is admitted to Hospital for a period twenty-four (24) hours or more. This term shall not include any professional component of the services, or any personal, non-medical expenses incurred by Enrollee.

2

**1.17** **IDHFS** means the Illinois Department of Health and Family Services.

**1.18** **IDHFS/Plan Agreement** means the agreement between the State of Illinois and Plan pursuant to which Plan agrees to arrange for the delivery of Covered Services to Enrollees.

**1.19** **Medicaid Enrollee** means an Enrollee in any of Plan's Medicaid or SCHIP products.

**1.20** **Medicaid Rates** means the entire amount payable by IDHFS to Hospitals for covered medical services provided to Medicaid beneficiaries who are not enrolled in a health plan pursuant to a Plan Agreement. It includes, without limitation, Diagnosis Related Group (DRG) payments, Per Diem payments for exempt units, outpatient fee screen payments and applicable pass-through payments. The amount payable is reduced by any other available resource such as Medicare, other insurance or a beneficiary's patient pay amount or spend down amount required to be collected by Hospital.

**1.21** **Medical Director** means the individual designated by Plan to act as its Medical Director.

**1.22** **Medically Necessary or Medical Necessity** means health care services which are all of the following:
a)     Appropriate and necessary for the diagnosis or treatment of a medical condition;
b)     Provided for the diagnosis or direct care and treatment of a medical condition;
c)     Within accepted medical and surgical standards; professional and technical standards;
d)     Not primarily for the convenience of the Enrollee, the Enrollee's physician or another health care provider;
e)     The most appropriate level of service which can be provided safely;
f)     Applicable federal and state laws, rules and regulations;
g)     IDHFS promulgated Medicaid policies for Medicaid Enrollees;
h)     CMS promulgated policies for Medicare Enrollees; and
i)     CMS and/or IDHFS promulgated policies as applicable for FAD Enrollees.

**1.23** **Medicare Advantage Plans** are health plan options that are part of the Medicare program and provide Medicare-covered health care (Parts A and B) through Plan. This coverage can include prescription drug coverage (Part D).

**1.24** **Medicare Enrollee** means an Enrollee in any of Plan's Medicare Advantage Plans.

**1.25** **Medicare Part D** is a federal program to subsidize the costs of prescription drugs for Medicare beneficiaries in the United States. It was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) and went into effect on January 1, 2006.

**1.26** **Non-Covered Service** means health services that (i) are not described in Plan's Certificate of Coverage, or (ii) are services provided before an individual becomes an Enrollee or after an individual ceases to be enrolled as an Enrollee of Plan or, (iii) services not required by EMTALA for which Hospital did not secure Prior Authorization, if required or (iv) otherwise not covered by the Enrollee's benefit program, or (vi) not medically necessary.

**1.27** **Outpatient Services** means all Covered Services other than Inpatient Services.

**1.28** **Participating Practitioner** means a duly licensed physician by the State of Illinois who has individually agreed or is an employee, independent contractor or member of a professional service corporation that has agreed to provide Covered Services for Enrollees on behalf of Plan pursuant to a contract or agreement with Plan.

**1.29** **Participating Provider** means a health care provider, including individuals, organizations and facilities, who/which have entered into agreements with Plan to provide Covered Services to Enrollees. A Participating Physician is also a Participating Provider.

**1.30**  **Plan** means Meridian Health Plan of Illinois, Inc., which contracts with IDHFS, CMS, other government sponsored programs and/or individuals and groups for commercial insurance, to provide medical assistance to Enrollees.

**1.31**  **Plan Policies** refers not only to documents so titled by Plan but also to Plan Provider Manual, Plan Formulary, procedures, and guidelines developed by Plan which address matters such as verification of eligibility, coordination of benefits, transfer policies, quality management, utilization management, peer review and Enrollee grievance procedures, standards, bulletins and subsequent additions, revisions and deletions. Plan shall make Plan Policies available to Hospital at all times in an easily accessible and comprehensible format.

**1.32**  **Physician Services** means Covered Services provided by a physician and includes primary care and specialty care services.

**1.33**  **Primary Care Practitioner (PCP)** means a physician who has the responsibility for providing initial and primary care to and for managing the total patient care of Enrollees. A Primary Care Physician may be a general practitioner, internist, pediatrician, family practitioner or obstetrician/gynecologist.

**1.34**  **Prior Authorization or Authorized** refers to Hospital securing the approval of Plan before delivery to provide non-emergency services to an Enrollee. The standards governing prior authorization and the procedure for obtaining are delineated in Plan Policies.

**1.35**  **Special Needs Plan** means a type of Medicare Advantage Coordinated Care Plan focused on individuals with special needs. Enrollees must have one or more types of Special needs as identified by Congress: 1) institutionalized; 2) dually eligible; and/or 3) individuals with severe or disabling chronic conditions.

**1.36**  **Subscriber** means an individual who: (a) Has entered into contract with Plan, or on whose behalf a contract was entered into; and (b) Meets all applicable eligibility criteria; and (c) Has completed an enrollment application form which has been received by Plan; and (d) For whom Plan has received prepaid amounts of money (premiums on a monthly basis).

**1.37**  **Utilization and Quality Management** REDACTED
REDACTED

## 2.  OBLIGATIONS OF HOSPITAL

**2.1**  **Provision of Covered Services.** Hospital agrees to provide Prior Authorized Medically Necessary Covered Services to Enrollees in the same manner, in accordance with the same standards, and within the same time availability, as provided to its other patients within the existing resources of Hospital, subject to Hospital's compliance with Plan's Prior Authorization policies. Hospital shall not, other than for reasons of safety, segregate Enrollees in any way or treat them in a location or manner different from any of its other patients. Hospital shall provide all services required by the Emergency Medical Treatment and Active Labor Act, ("EMTALA") and may do so without Prior Authorization. Hospital shall accept Prior Authorized Medically Necessary Elective Admissions of Enrollees that have been arranged by physicians having admitting privileges at Hospital.

**2.2**  **Non-Discrimination.** Hospital shall not unlawfully discriminate in the acceptance or treatment of an Enrollee because of the Enrollee's religion, race, color, national origin, age, sex, income level, health status, marital status, disability or such other categories of unlawful discrimination as are or may be defined by federal or state law.

**2.3**  **Non-Covered Services.** In the event an Enrollee requests services that are Non-Covered Services, such services may be provided by Hospital at the Enrollee's sole cost and expense. Hospital shall be under no obligation to furnish Non-Covered Services to Enrollees. Plan is not responsible to pay the costs of any Non-Covered Service. Hospital must receive a signed agreement from the Enrollee prior to the provision of any Non-Covered Service in which the Enrollee states that he/she will assume responsibility for the costs of the Non-Covered Service. Hospital agrees not to charge amounts in excess of its normal and customary charge for such services. In the event Hospital does not obtain a signed release, Hospital shall hold Plan and Enrollee harmless from any costs or obligations related

4

to such service. Hospital agrees to cooperate with Plan in resolving any grievances related to the provision of any Non-Covered Service.

**2.4** **Verification of Enrollee Eligibility.** Hospital shall verify the eligibility of and Plan enrollment status of Enrollees.

**2.5** **Hospital Admission and Services.**

    **2.5.1** **Elective Admissions and Services.** All Elective Admissions and Services provided to an Enrollee must have Prior Authorization. Any Elective Admission shall be arranged by a physician with admitting privileges at Hospital. Hospital shall have the responsibility to verify Prior Authorization at the time of admission.

    **2.5.2** **Screening and Stabilization.** Hospital shall provide all services required by EMTALA, and such services do not require Prior Authorization.

    **2.5.3** **Request for Inpatient Admission.** In seeking Prior Authorization for hospitalization following stabilization of an Enrollee treated pursuant to EMTALA, Hospital shall provide Plan with requested information obtained from the medical screening examination, provided in accordance with EMTALA, and including presenting symptoms, physical findings, current medical status, and current diagnosis(es).

**2.6** **Government Agency Access.** Hospital shall permit authorized government agencies and their subcontractors to conduct on-site evaluations of Hospital's facilities, offices and records as required by state and federal laws and regulations. If Plan receives such notice, Plan shall give Hospital reasonable notice of any agency's plans to conduct a site visit, unless Plan is prohibited from providing such notice by law.

**2.7** **Plan Access.** Upon reasonable notice from Plan, Hospital will allow Plan personnel to: (i) inspect Hospital's facilities, offices, and equipment during normal business hours; (ii) inspect and review the medical records of Plan Enrollees; and (iii) obtain copies of Enrollees' medical records and claims records for quality and utilization management and investigations of fraud, waste or abuse.

**2.8** **Maintenance of License.** Hospital shall maintain in good standing all licenses required by state and federal law or regulation and shall maintain certification under Titles XVIII and XIX of the Social Security Act for all services Hospital has agreed to provide pursuant to this Agreement. Hospital shall maintain accreditation of all applicable facilities and services by the Joint Commission (TJC) or the American Osteopathic Association ("AOA."). Hospital shall be enrolled as a provider in the Medical Assistance Program. Hospital will ensure that all nurses and other ancillary staff and paramedic personnel are licensed, certified or registered, as required to perform their duties.

**2.9** **Maintenance of Records.** Hospital shall maintain all pertinent financial and accounting records and evidence pertaining to the provision of Covered Services to Enrollees in accordance with generally accepted accounting principles and other procedures specified by federal or state governments. Hospital shall maintain legible, comprehensive and chronological medical records documenting each episode of service to Enrollees and detailing, as appropriate, history, physical findings, diagnoses and treatment plans. Financial and medical records shall be maintained by Hospital for such times as are or may be required by state and federal law and regulations.

**2.10** **Insurance.** Hospital shall maintain at all times policies of general liability and professional liability insurance or self-insurance with minimum limits of liability of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in annual aggregate covering Hospital, its agents and employees against any claims for damages out of any act or omission by Hospital, its agents and employees during terms of this Agreement. Hospital shall also maintain at all times automobile insurance, unemployment compensation insurance and workers' compensation insurance or self-insurance in accordance with the requirements of applicable federal and state laws and regulations. Upon request, Hospital shall furnish Plan with original certificates of insurance evidencing the insurance coverages and riders required. Hospital shall notify Health Plan fifteen (15) days in advance of any change or cancellation in insurance.

**2.11    Medical Treatment.** Hospital agrees that Plan shall have no liability for the medical judgment of health care providers employed by or under contract with Hospital.

**2.12    Required Disclosures.** Hospital shall notify Plan in writing within ten (10) days of any of the following events:

    **2.12.1**  Suspension, termination, or cancellation of Hospital's state license, Medicaid certification or Medicare certification;

    **2.12.2**  Failure to maintain insurance coverage or self-insurance as prescribed in Section 1.10;

    **2.12.3**  Loss, suspension or termination of TJC or AOA accreditation;

    **2.12.5**  Any change in assumed name(s) or taxpayer identification number(s) through which Hospital provides services and under which Hospital may submit claims under this Agreement.

    **2.12.6**  Hospital is not currently enrolled as a provider in the HFS Medical Program, or has voluntarily withdrawn from the HFS Medical Program as the result of a settlement agreement.

**2.13    Hospital Compliance with Plan Policies.** Hospital agrees to be bound by the Plan Policies under the conditions set forth in section 3.2 and 3.2.1 below.

**2.14    Physician Qualifications.**

    **2.14.1    Hospital Credentialing/Re-Credentialing.** Hospital shall cooperate with the credentialing and re-credentialing processes of Plan. Hospital represents that its Hospital-Based Physicians are licensed and in good standing to practice medicine in the State of Illinois. Hospital agrees to immediately notify Plan of the termination or suspension admitting privileges of any physician known to Hospital to be a Plan Participating Provider.

    **2.14.2    Admitting Physicians.** Hospital represents that all physicians providing services at Hospital to Enrollees shall be members of the medical staff of the Hospital in accordance with the Hospital's medical staff bylaws, policies, procedures, rules and regulations. No physician shall obtain or maintain medical staff membership or clinical privileges at Hospital by virtue of being a Participating Provider with Plan. A physician shall not be denied or granted admitting privileges based solely on whether the physician is or is not a Participating Provider.

    **2.14.3    Intentionally Left Blank.**

**2.15    Payment Administration.** Hospital will cooperate with Plan's claims payment administration as set forth in Plan Policies including, but not limited to, coordination of benefits, subrogation, verification of coverage, prior certification and record keeping.

**2.16    No Unfair Labor Practices.** Hospital represents and warrants that it will not engage in unfair labor practices.

**2.17    Non-Discriminatory Hiring.** In the performance of services pursuant to this Agreement, Hospital agrees not to discriminate against any employee or applicant for employment, with respect to their hire, tenure, terms, conditions or privileges of employment, or any matter directly or indirectly related to employment, because of race, color, religion, national origin, ancestry, age, sex, height, weight, marital status, physical or mental handicap or disability. Further, Hospital agrees to comply with the provisions of the Americans with Disabilities Act of 1990 (42 USC 12101 et seq., and 47 USC 225) and all Illinois non-discrimination laws.

**2.18    Quality, Utilization and Risk Management (Q/U/RM).**

REDACTED

REDACTED

6

# REDACTED

**2.19    Compliance with Laws and Regulations.**  In performing its obligations under this Agreement, Hospital shall comply with all applicable laws, rules and regulations.

**2.20    Public Health Reporting.**  Hospital agrees to comply with specific State of Illinois Law for reporting communicable disease and other health indicators.

**2.21    Access to Premises.**  Hospital shall allow duly authorized agents or representatives of the state and federal government, during normal business hours, access to its premises to inspect, audit, monitor or otherwise evaluate the Hospital's performance pursuant to the contract between Plan and IDHFS, and CMS and Hospital shall produce relevant records requested as part of such review or audit. Plan shall notify Hospital as soon as practicable of its knowledge of any such site visit.

**2.22    Laboratory Services.**  Hospital shall adhere to the provisions of the Clinical Laboratory Improvement Amendments of 1988 (CLIA) Public Law 100-578 requirements for supplying laboratory services.

**2.23    Referrals.**  No provider employed by a hospital or any affiliate is required or in any way obligated to refer Enrollees to providers also employed or under contract with the hospital or an affiliate.

**2.24    Lobbying Certification.**  Hospital certifies to the best of Hospital's knowledge and belief, that no federally appropriated funds have been paid or will be paid by or on behalf of Hospital, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any federal contract, the making of any federal loan or grant, or the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan or cooperative agreement.

**2.24.1    Funds.**  If any funds other than federally appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this federal contract, grant, loan or cooperative agreement, Hospital shall complete and submit Standard Form LLL, "Disclosure Forms to Report Lobbying," in accordance with its instructions.  Such Form is to be obtained at Hospital's request from the Office of Management and Budget.

**2.25    Medical Services.**  Hospital represents and warrants that it has complied with and is complying with all applicable statutes, orders, rules and regulations promulgated by any Federal, State, Municipal or other governmental authority relating to the conduct of Hospital's property and operations and that there are no violations of any statute, order, rule or regulation pertaining thereto now existing or threatened.  Hospital further represents and warrants that it shall discharge its obligations under this Agreement in compliance with all applicable Federal and State statutes and regulations and in accordance with all policies, procedures and requirements from time to time promulgated by the U.S. Department of Health and Human Services, CMS and Illinois Department of Healthcare and Family Services (IDHFS).

## 3.    OBLIGATIONS OF PLAN

**3.1    Prior Authorization.**  All Hospital Services provided to Enrollees that are not mandated by EMTALA require Prior Authorization by Plan pursuant to Plan Policies.  Hospital shall provide Plan with information obtained from the medical screening examination, provided in accordance with EMTALA, and presenting symptoms, physical findings, current medical status, and current diagnosis within twenty-four (24) hours or the next business day.  All non-emergent services must be authorized as described in the Plan Policies.

**3.1.1    Documentation of Prior Authorization Process.**  Medical information submitted as required in Section 2.1 in support of the Prior Authorization request may be provided orally or in writing.  If provided orally, the Plan Prior Authorization employee who takes the telephone request from Hospital shall write down, tape record or electronically record the information provided.  Both Plan and Hospital staff will record each other's name and

7

the time of telephone contact. If Plan gives Prior Authorization for treatment or admission, Plan shall provide Hospital with an authorization number or code.

    **3.1.2    Authorization Response.** Failure of Plan to respond to Hospital with approval or denial of Prior Authorization within the time frame set in Section 3.1 shall be deemed as Prior Authorization for Medically Necessary treatment appropriate to the diagnosis presented when seeking Prior Authorization.

    **3.1.3    Effect of Prior Authorization.** Prior Authorization by Plan shall not prevent Plan from a retrospective evaluation of medical services provided by Hospital pursuant to Plan Policies . Plan agrees that the grant of Prior Authorization for Covered Services shall create a rebuttable presumption that Medically Necessary services appropriate to the diagnosis presented at the time of Prior Authorization shall be paid for pursuant to this Agreement. Plan shall bear the burden to support denial of payment for Prior Authorized services through the dispute resolution process provided in this Agreement. Plan agrees that it will not conduct retrospective review so long as Plan has been provided a reasonable opportunity to conduct full and complete concurrent utilization management review in accordance with Plan Policies while the Member was hospitalized, except where (1) Hospital, a Participating Provider or any other provider rendering care at or on behalf of Hospital, has provided inaccurate or incomplete information to Plan, (2) the patient was not a known Member as of the time of the provision of care or (3) the total claim amount crosses the threshold for outlier reimbursement and Plan is reviewing charges in order to determine their eligibility for inclusion as allowable.

**3.2    Plan Policies.** Plan shall provide Hospital with all Plan Policies upon execution of this Agreement.

    **3.2.1    Amendments to Plan Policies.** During the term of this Agreement, Plan may implement changes in the Plan Policies as may be required by state or federal law or regulation, Medicare and/or Medicaid policy or at its discretion. If changes in the Plan Policies are required due to changes in law, regulation, and policy beyond the control of Plan, Plan shall provide a minimum of thirty (30) days' notice to Hospital prior to implementation, unless the required changes are mandated to be implemented in less time. For changes in Plan Policies that are not required by law, regulation or policy, Plan shall provide a minimum of thirty (30) days' notice to Hospital prior to implementation of such change, If Hospital does not exercise its option to terminate the agreement, Hospital agrees to comply with the amendment(s).

**3.3    Insurance.** Plan shall maintain at all times managed care errors and omissions liability insurance or self-insurance with minimum coverage of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) annual aggregate, covering Plan and its agents and employees against any claims for damage arising directly or indirectly in connection with its activities under this Agreement, Plan shall also maintain such amounts of insolvency or stop-loss insurance as may be required by the laws of the State of Illinois pertaining to HMOs. Additionally, Plan shall maintain at all times automobile insurance, unemployment compensation insurance, and workers' compensation insurance or self-insurance in accordance with the requirements of all applicable federal and state laws and regulations. Upon reasonable request, Plan shall furnish Hospital with original certificates of insurance evidencing the insurance coverages and riders required.

**3.4    Plan Determinations.** Plan agrees that, provided the information supplied by Hospital is accurate, Hospital shall have no liability for determinations, including without limitation, determinations regarding coverage, Prior Authorization and Medical Necessity that are made by Plan employees or contractors.

**3.5    Compliance with Laws and Regulations.** Plan represents that it has never been suspended, excluded or terminated as a contractor under Medicaid, Medicare, or other state or federal health care program, and that it operates and will continue to operate in conformity with the statutes and regulations applicable to Medicaid and Medicare contractors. In performing its obligations under this Agreement, Plan shall comply with all laws, rules and regulations of the United States and of the State of Illinois. All health professionals and laboratories providing services under this Agreement shall be licensed and/or certified as required by law, including a valid Clinical Laboratory Improvement Amendments (CLIA) certificate and comply with the CLIA regulations found at 42 C.F.R. Part 493, if applicable.

8

**3.6    Quality, Utilization and Risk Management. (Q/U/RM)** REDACTED
REDACTED

**3.7    Information.** Plan will provide Hospital with the following documents: (i) the current Credentialing, Re-Credentialing and Hearing Policy and; (ii) the current Utilization and Quality Management programs and, within a reasonable time after adoption, any changes or amendments; and, (iii) the current grievance procedures and, within a reasonable time after adoption, any changes or amendments; and, (iv), if Hospital bears risk under this Agreement, Hospital quarterly reports measuring actual utilization against utilization targets for Hospital.

**3.8    Maintenance of Records.** Plan shall maintain all pertinent financial and accounting records pertaining to the operation of this Agreement in accordance with generally accepted accounting principles or other procedures specified or accepted by the state or federal government. Plan will, from time to time and upon reasonable notice from Hospital, permit Hospital to inspect during regular business hours those financial statements and enrollment records which Plan maintains and which pertain to the operation of this Agreement. Plan shall maintain financial records for such time period as is or may be required under state or federal laws or regulations.

**3.9    Enrollee Disputes.** Plan will notify Hospital of all Enrollee complaints involving Hospital. Hospital agrees to assist Plan in resolving disputes with Enrollees.

**3.10    Enrollee Identification.** Plan shall provide for distribution of identification cards to its Enrollees. Each card will include a toll-free number that Hospital may use to check eligibility and enrollment in Plan.

**3.11    Lobbying Certification.** Plan certifies to the best of Plan's knowledge and belief, that no federally appropriated funds have been paid or will be paid by or on behalf of Plan, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any federal contract, the making of any federal loan or grant, or the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan or cooperative agreement.

**3.11.1    Funds.** If any funds other than federally appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this federal contract, grant, loan or cooperative agreement, Plan shall complete and submit Standard Form LLL, "Disclosure Forms to Report Lobbying," in accordance with its instructions. Such Form is to be obtained at Plan's request from the Office of Management and Budget.

**3.12    Sub-capitation Reporting.** The Health Plan shall report to the IDHFS any arrangement between the Health Plan and Hospital whereby Hospital is sub-capitated or assumes risk.

**4.    PAYMENT FOR SERVICES**

**4.1    Compensation.** Plan shall pay for all services required by EMTALA and for Prior Authorized Covered Services that Hospital provides to Enrollees in accordance with the payment rates or schedules set forth in the applicable attachments as provided in Section 8, which are incorporated into this Agreement. Hospital shall not be paid for Covered Services where Prior Authorization was required under the terms of this Agreement and was not obtained in accordance with Section 3.1 or the Plan Policies.

**4.2    Billing.** Hospital shall exhaust all primary insurance resources which could cover all or part of the costs of services delivered to an Enrollee prior to submitting any bill for services to Plan pursuant to this Agreement. Hospital shall bill Plan for Prior Authorized Covered Services and services provided pursuant to EMTALA.

**4.2.1    Electronic Billing.** Any electronic billing statement submitted by the Hospital to Plan shall include all information required in the UB-04/CMS-1450 form, including detailed and descriptive medical, service and patient data and identifying information. If Hospital uses a clearinghouse for electronic claims processing, the date of receipt by Plan will be the date Plan or Plan's clearinghouse receives control of the claim from the Hospital's clearinghouse. If the Hospital's clearinghouse returns the claim for incorrect or incomplete information, the billing

9

statement will not be considered received by Plan and the time limits for payment will not begin to run until actually received. If both Hospital and Plan use the same clearinghouse, the date of receipt by Plan will be considered the date on which the clearinghouse has determined pursuant to the contract with Hospital that all ordered checks and edits are complete.

**4.2.2    Billing Submission Deadline.** Hospital shall present Plan with the billing statement within one hundred and eighty (180) days from the date of performance of Covered Services to Enrollees. It is acknowledged that situations may necessitate the extension of the one hundred and eighty (180) day submission deadline and the Parties may agree to extend this deadline on a case-by-case basis. Among the justifications for delaying submission of a claim are: changes in eligibility, coordination of benefits, other third-party payor issues or internal Hospital risk management. Absent an agreement to extend the time for submission of a bill, Plan shall have no obligation to pay any bill submitted beyond this one hundred and eighty (180) day limit.

**4.3    Payment.** Plan shall make payment to Hospital within thirty (30) days of receipt of a Clean Claim. Hospital shall not resubmit any billing during a thirty (30) day period except in response to a Plan request for additional information pursuant to Section 4.4.

**4.4    Rejected Claims.** Plan shall provide Hospital with a written request for additional information within thirty (30) days after receipt of an inaccurate or insufficient billing statement. A corrected bill submitted by Hospital pursuant to this section shall reinitiate Section 4.3's time for processing a Clean Claim. A bill rejected after resubmission pursuant to this section shall be referred to the dispute resolution process and will not bear interest unless imposed under the dispute resolution process.

**4.5    Adjusted Payments.** Plan may make an adjusted payment on a submitted claim within forty-five (45) days from the date of receipt where the circumstances do not support the billing criteria for the level of service submitted on the claim. Any adjusted payment shall include a full and complete explanation and remittance advice. Hospital reserves the right to contest any adjustment and pursue any remedies through the dispute resolution processes in this Agreement.

**4.6    Recoupment.** Plan may recoup from, or offset against, amounts owed to Hospital under this Agreement, any payments made by Plan to Hospital that are in violation of Medicaid and/or Medicare policy, Plan Policies or this Agreement. Hospital has the right to dispute any action by Plan to recoup or offset claims pursuant to this section through resort to the Dispute Resolution Procedures of this Agreement.

**4.7    Enrollee Hold Harmless.** Except for applicable Enrollee deductibles, coinsurance or co-payments, Hospital shall look only to Plan for compensation for Covered Services rendered to an Enrollee and shall accept the payments set forth in this Agreement as payment in full for all Covered Services rendered to an Enrollee. In no event, including but not limited to nonpayment by Plan, insolvency of Plan or breach of this Agreement, shall Hospital bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, seek deductibles, coinsurance or co-payments from or have any recourse against an Enrollee or persons (other than Plan) acting on his/her behalf for Covered Services provided pursuant to this Agreement. Hospital shall give notice to Enrollees regarding any charges for Non-Covered Services. Notwithstanding the foregoing, Hospital may accept payments from third-party payors (e.g. auto insurance, etc.) or others who are legally responsible for payment of an Enrollee's medical bill. This Section shall survive termination of this Agreement, regardless of the cause of termination and shall be construed to be for the benefit of Enrollees. Hospital further agrees that this Section supersedes any oral or written agreement hereafter entered into between Hospital and Enrollee or persons acting on the Enrollee's behalf insofar as such agreement relates to payment for Covered Services provided under the terms and conditions of this contract. Except as otherwise provided in this Agreement or as required by CMS-Medicare or IDHFS-Medicaid laws, bulletins and federal law, this Section 4.7 is not intended to apply to services provided after this contract has been terminated or to Non-Covered Services.

**4.8    Third-Party Payors and Coordination of Benefits.** In the event that an Enrollee's medical expenses are eligible, in whole or in part, to be paid by any governmental program, other than by Medicaid or Medicare, or by a public or private insurance or benefit plan (collectively, "third-party payors"), Plan shall coordinate primary and secondary payment responsibility with such other third party payors pursuant to federal and state third party liability statutes and regulations including but not limited to 42 C.F.R. 433.135-139, and the Illinois Workers' Compensation

10

Act, 820 ILCS 305, as amended. Hospital shall cooperate with Plan's efforts to recover such payments or reimbursements.

**4.9     Billing Disputes.** At least quarterly throughout the term of this Agreement the Parties will make a good faith effort to negotiate and resolve all billing disputes. Every bill must be considered in such a quarterly billing resolution conference prior to submission to dispute resolution under the provisions of Section 6.2.

**4.10     Financial Relationship with Plan.** Plan will not prohibit Hospital from discussing Hospital's financial relationship with Enrollees.

**4.11     Fiscal Intermediary Rate Letter.** Hospital agrees to provide Plan with its updated FI Rate letter within thirty (30) days of receipt from CMS. Provider's payment rates will be adjusted only in accordance with the updated FI Rate letter, the first of the following month, after thirty (30) days of its receipt by Plan.

**5.     TERMINATION**

**5.1     Term and Renewal.** The term of this Agreement is for one (1) year unless terminated by either party pursuant to this Agreement. The Agreement begins at 12:01 AM on the effective date stated above. This Agreement shall automatically renew on an annual basis unless either party notifies the other in writing ninety (90) days prior to the renewal day of the Party's intention to terminate the Agreement.

**5.2     Termination without Cause.** After the first six (6) months, this Agreement may be terminated without cause by either party upon written notice given ninety (90) days in advance of such termination.

**5.3     Termination for Cause.** Either party may terminate this Agreement for a material breach of this Agreement upon written notice given sixty (60) days in advance of such termination. The failure of Plan to make payments required under this Agreement may be deemed to be a material breach. The failure of Hospital to comply with Plan Policies may be deemed a material breach. In the event of notification of intent to terminate with cause by either party, the breaching party shall have twenty one (21) days to cure such breach. Unless the material breach is cured, the twenty one (21) day period to cure will not extend the termination date.

**5.4     Automatic Termination.** This Agreement will automatically terminate if any of the following events occur:

**5.4.1     Suspension or termination for any reason of Plan as a Medicaid contractor, but only with respect to Medicaid and Medicare services;

**5.4.2     Suspension or termination for any reason of Plan as a Medicare contractor, but only with respect to Medicare services in this Agreement;

**5.4.3     Plan loss of Certificate of Authority as an HMO;

**5.4.4     Hospital's state license, Medicare or Medicaid certification or TJC or AOA accreditation is revoked, terminated, or suspended; or

**5.4.5     Suspension, termination or exclusion of Hospital from participation for any length of time from a governmental health care program by any governmental agency.

**5.5     Termination due to Material Change in Plan Policies.** Pursuant to section 3.2.1 above, Plan must notify Hospital of changes in Plan Policies in a timely manner prior to implementation. In the event that Plan elects to amend Plan Policies, and such amendment affects Hospital adversely, Hospital shall be entitled to terminate this Agreement. Hospital shall notify Plan immediately of its intent to terminate under this Section 5.5. Termination pursuant to this Section shall be effective on the effective date of such amendment but in no case less than fourteen (14) days following such notification of termination pursuant to this Section 5.5.

11

**5.6    Rights upon Termination.** Upon termination of this Agreement, the rights of each party hereunder shall terminate, provided however, that Hospital shall be required to treat Enrollees receiving authorized treatment at the time of termination of this Agreement until Enrollee is discharged. Plan shall be required to pay Hospital pursuant to payment terms of this Agreement for all services performed in connection with such treatment. Subject to treatment concerns of the Enrollee including continuity of care involving attending specialists and availability of alternative hospital providers, Plan shall use its best efforts to arrange for the reassignment and transfer of Enrollees as soon as possible following the termination of this Agreement.

**6.    DISPUTE RESOLUTION**

**6.1    Notice.** When either party perceives the existence of a dispute, it shall give written notice to the other party describing the nature of the dispute and a proposed resolution. The Parties shall negotiate in good faith in an attempt to resolve the dispute. Section 6.2 of this Agreement shall not apply to matters relating to Plan credentialing, re-credentialing or peer review activities.

**6.2    Mediation and Binding Arbitration.**

**6.2.1    Mediation.** If the negotiations required in Section 5.1 fail to resolve the dispute, either party may request mediation under the Rules for Mediation of the Alternative Dispute Resolution Service of the American Health Lawyers Association. If the other party agrees, then both Parties shall participate in that mediation. Costs shall be apportioned in accordance with the Rules for Mediation. The legal and administrative costs of the parties shall not be considered costs of mediation subject to apportionment.

**6.2.2    Binding Arbitration.** If Parties do not mediate or mediation does not resolve the dispute within sixty (60) days of the request for mediation, either party may seek binding arbitration either under the Rules for Arbitration of the Alternative Dispute Resolution Service of the American Health Lawyers Association or the American Arbitration Association. Both Parties agree to binding arbitration. The Parties agree that such arbitration will take place in a mutually agreed upon location. Costs shall be apportioned pursuant to the Rules for Arbitration. The legal and administrative costs of the Parties shall in neither case be considered costs of arbitration subject to apportionment. An award entered by the arbitrator shall be final and judgment may be entered on it in accordance with applicable law. A request for binding arbitration is not valid if it is made after the date when the institution of legal or equitable proceedings on the underlying dispute would be barred by the applicable statute of limitations. The Parties exclude the following matters from the operation of this arbitration clause: (1) any counterclaim, cross-claim or third party claim for indemnity or contribution between Hospital and Plan in any Enrollee's suit against Hospital, unless a Court requires the Parties to submit the Enrollee's entire claim to arbitration; (2) any dispute concerning termination of this Agreement, which claim shall be resolved through the procedures specified for such event in Paragraph 4.1, 4.2 or 4.3, whichever may be applicable to the particular termination in dispute; and (3) any dispute for which a dispute resolution procedure or mechanism is specified in Plan's Provider Manual.

**6.3    Limitation on Binding Arbitration.** The binding arbitration procedures described in Section 5.2.2 above shall not apply to any claims between the Parties arising out of third-party claims asserting malpractice or professional negligence and the Parties are not precluded from asserting claims against each other based on contribution, indemnity, breach of contract, or other legal theories, by way of cross-claim or third-party complaint in any court action commenced by a third party which alleges malpractice or professional negligence against either or both Parties to this Agreement.

**7.    MISCELLANEOUS PROVISIONS**

**7.1    Additional Products.** Plan reserves the right to introduce new products in addition to the current Managed Care Products while this Agreement is in effect and to designate Hospital as a Participating or Non-Participating Provider in any such new product. To the extent that the terms for the provision of Covered Services in new products are different than those contained herein in a manner that reduces the payment terms to Hospital or would materially change Hospital's obligations hereunder, they shall be agreed to by the Parties in advance of such participation hereto if Plan offers participation in these programs to Hospital.

**7.4    Relationship of Parties.** The relationship of Hospital to Plan is that of an independent contractor. Neither Hospital nor any of its employees shall be considered under the provisions of this Agreement or otherwise as being

12

an employee of Plan nor shall Plan nor any of its employees be considered under the terms of this Agreement or otherwise as being an employee of Hospital. Each party is solely responsible to meet its own financial obligations to its employees including provision of workers' compensation and unemployment insurance coverage, malpractice and other liability insurance, payment of federal state and local taxes and any other costs or expenses necessary to carry out its obligations under this Agreement. No work, act, commission or omission of any party, its agents, servants or employees, pursuant to the terms and conditions of this Agreement, shall be construed to make or render any party, its agents, servants or employees, an agent, servant, representative or employee of, or joint venturer with, the other party.

7.5    **Treatment Options.** Hospital shall not be prohibited from discussing treatment options with Plan Enrollees that may not reflect Plan's position or may not be covered by Plan.

7.6    **Advocating on Behalf of Plan Enrollees.** Hospital shall not be prohibited from advocating on behalf of a Plan Enrollee in any grievance or utilization review process or individual authorization process to obtain necessary health care services.

7.7    **Orderly Transfer.** Hospital agrees, in the event of termination of this Agreement, to cooperate with Plan in the orderly transfer of Enrollees being treated or evaluated.

7.8    **Accreditation.** Both Parties agree to cooperate and facilitate the efforts of the other party to obtain and maintain appropriate accreditation from TJC AOA, National Committee for Quality Assurance ("NCQA"), Accreditation Association for Ambulatory Health Care ("AAAHC"), URAC or other appropriate accrediting body.

7.9    **Confidential Information.** The Parties agree that the items of information subject to confidentiality under this Agreement are: (i) medical information relating to individual Enrollees; (ii) the schedule of compensation to be paid to Hospital; (iii) all QU/RM documents and peer review information; and, (iv) any financial or utilization information provided by Hospital to Plan including charge masters detailing the compensation schedule (if different from Medicaid Rates) set forth in the relevant attachments to this Agreement. Otherwise, all other information, including the general manner by which Hospital is paid under this Agreement and the general terms and conditions of this Agreement may be shared with Enrollees in the reasonable and prudent judgment of the Parties to this Agreement.

7.9.1    Notwithstanding the above designation as confidential, Plan may disclose financial or utilization information to third parties as necessary: (i) to satisfy internal quality and utilization requirements; (ii) to share with employees or agents of Plan who need to know the information carry out Plan's quality and utilization obligations; (iii) to satisfy mandatory governmental or regulatory reporting requirements; (iv) to compare cost, quality and service among providers with whom Plan has contracted or intends to contract; (v) for premium setting purposes; (vi) for HEDIS reporting; (vii) for TJC, NCQA, URAC or other reporting necessary for accreditation purposes; or (viii) to perform any of Plan's obligations under this Agreement. Any information disclosed to third parties pursuant to this subsection shall remain confidential and Plan shall require third-party recipients of such information to maintain confidentiality.

7.9.2    Plan shall be permitted to prepare and disclose to a third-party a report of Hospital's quality data provided however, that Hospital quality data shall not include any information that identifies an individual Enrollee or an individual Hospital or information that is privileged or confidential under peer review or patient-confidentiality state or federal laws. For purposes of this subsection, Hospital's quality data includes, without limitation: (i) utilization data of all contracted Hospitals in the aggregate; (ii) HEDIS data production and performance evaluation; (iii) Enrollee satisfaction data; (iv) Overall compliance with TJC or other comparable quality standards (i.e., NCQA, URAC); and (v) Plan's disenrollment data.

7.10    **Grievances.** Plan shall notify Hospital of any and all Enrollee complaints involving Hospital. Hospital shall notify Plan of any and all Enrollee complaints received from Enrollees. Hospital and Plan shall make good faith efforts to investigate complaints and work together to resolve Enrollee complaints in a fair and equitable manner. Hospital shall participate in and cooperate with Plan's grievance procedures and comply with final determinations provided in accordance with Plan Policies. A copy of the grievance procedure shall be provided to

13

an Enrollee at the time of enrollment and to Hospital upon execution of this Agreement. This provision shall survive termination of this Agreement.

**7.11   Ownership of Medical Records.** All medical records shall belong to Hospital. The release, disclosure, removal or transfer of such records shall be governed by state and federal law and the Parties established policies and procedures. Hospital agrees to make an Enrollee's medical records available to Plan for purposes of assessing quality of care, conducting medical care evaluations and audits and determining on a concurrent basis the medical necessity and appropriateness of care provided to Plan Enrollees. Hospital also agrees to make Enrollees medical records available to appropriate state and federal authorities and their agents for purposes of assessing quality of care or investigating Enrollee grievances. Hospital agrees to comply with all applicable state laws and administrative rules and federal laws and regulations related to privacy and confidentiality of medical records.

**7.12   Assignment.** Neither this Agreement nor any rights or obligations hereunder shall be assignable by either party without the prior written consent of the other party, nor shall the duties imposed herein upon either party be subcontracted or delegated without the prior written approval of the other party. Such approval shall not be unreasonably withheld or delayed

**7.13   Entire Agreement.** This Agreement (including attachments) and the Plan Policies contain the entire agreement between the Parties with respect to the subject matter of this Agreement. If a conflict develops between this Agreement and the Plan Policies, Plan Policies shall take precedence. Neither Hospital nor Plan shall be subject to any requirements other than as set forth in this Agreement or Plan Policies. The failure of a party to insist on the strict performance of any condition, promise, agreement or undertaking set forth herein shall not be construed as a waiver or relinquishment of the right to insist upon strict performance of the same condition, promise, agreement or undertaking at a future time.

**7.14   Severability.** If any provision of this Agreement or portion is declared invalid or unenforceable, the remaining provisions shall nevertheless remain in full force and effect.

**7.15   Notices.** Any notice required to be given pursuant to the terms and provisions of this Agreement shall be sent by first class mail, facsimile, or by certified mail, return receipt requested, postage prepaid, to the other party as follows:

| Meridian Health Plan<br>333 S Wabash Ave Suite 2900<br>Chicago, IL 60604 | Hospital Name: Saint Anthony Hospital<br>Address: 2875 W. 19th Street<br>City, State, Zip: Chicago, IL 60623<br>Attn: CFO with copy to: General Counsel |
|---|---|

**7.16   Controlling Law.** This Agreement shall be construed and enforced in accordance with the laws of the State of Illinois. This agreement shall comply with all applicable Medicare laws, regulations and CMS instructions.

**7.17   Marketing.** Each party to this Agreement specifically authorizes the other party to include it in any and all marketing and advertising materials. Each party will provide the other party copies of any written marketing materials referencing the other. The Parties further acknowledge that this Agreement may be terminated and agree to hold the other harmless for any continued use of marketing materials if such materials were prepared before the receipt of a notice of termination. The Parties shall hold each other harmless from reliance upon inaccurate or incomplete information provided by the other party in such materials. Except for purposes encompassed by this Section 6.16, neither party shall utilize the trademarks or service marks of the other party without the express written approval of the other party.

**7.18   Limitation of Third-Party Rights.** This Agreement is intended solely for the benefit of the Parties, and is not intended to create any rights or benefits, either express or implied, in any other person, including, without limitation, patients of Hospital, Hospital's successors or assigns. Plan may not subcontract or resell any rights to Hospital access or prices created by this Agreement to any third-party without the express written approval of Hospital.

14

**7.19    Regulatory Approval.**  The Parties acknowledge and agree that this Agreement may be subject to approval by IDHFS, CMS and/or Department of Insurance.

**7.20    Mutual Cooperation.**  To the extent a conflict of interest is not created hereby each party shall cooperate with the other with respect to any action, suit or proceeding commenced against either party by a person or entity not a party hereto with respect to the subject matter thereof.

**7.21    Recitals** – The recitals are hereby incorporated into and made part of this Agreement.

## 8.    SERVICES COVERED UNDER THIS AGREEMENT

[ X ] Attachment B - Meridian Health Plan of Illinois Medicaid Managed Care Network
[X] Attachment C - Meridian Advantage Plan of Illinois (HMO SNP) Medicare MA-PD Plan Network
[ ] Attachment D – Intentionally Left Blank
[X] Attachment E - Meridian Complete Financial Alignment Demonstration Network
[ ] Other_____

9.    Catholic Directives - Plan acknowledges that Hospital's religious affiliation is Roman Catholic and that Hospital therefore adheres to the Ethical and Religious Directives for Catholic Health Facilities ("directives") issued by the National Conference of Catholic Bishops and the United States Catholic Conference, as may be revised from time to time. The Directives include but are not limited to the prohibition of euthanasia, sterilization, abortion, and other specified family planning techniques and procedures. In recognition of the foregoing, Plan agrees that Hospital will not provide services which are prohibited by the Directives. Hospital will provide Plan a copy of the Directives and revisions thereto upon request.

*[Signature Page Follows]*

15

**IN WITNESS WHEREOF, to signify their agreement to all of the terms and conditions hereof, the Parties have executed this Agreement as of the date(s) stated below:**

To be completed by Hospital:                    To be completed by Meridian Health Plan:

| | |
|---|---|
| Hospital Name: Saint Anthony Hospital | **Meridian Health Plan of Illinois** |
| | 333 S Wabash |
| | Suite 2900 |
| | Chicago, IL 60604 |
| Hospital License Number: | 866-606-3700 |
| ___51-217097___ | |
| | Signature: |
| Address: | |
| _____2975 W 19th Street_____ | David K. Livingston |
| | Printed Name: |
| _____Chicago, IL 60623_____ | |
| | President/COO |
| _____ | Title: |
| Telephone ( ) 7734844831 | ___10/1/2014___ |
| | Date: |
| Signature: | |
| | |
| Title: CFO | |
| ___9/29/14___ | |
| Date: | |

with cc to:  Justin Bynum CFO
             Aileen Brooks, VP and General Counsel

**Attachments:**
Attachment A – Schedule of Covered Services
Attachment B – Medicaid Terms
Attachment C – Medicare Terms
Attachment D – Intentionally Left Blank
Attachment E – FAD Terms
Attachment F – List of Hospital Practitioners and Providers

**ATTACHMENT A**
**Meridian Health Plan**
**-Schedule of Covered Health Services-**

1.  **"REIMBURSABLE SERVICES"** are those medical and hospital services which are Covered Services and for which Hospital may submit itemized claims for Fee-For-Service payment pursuant to the respective attachments as provided in Section 8.

The services to be provided are as indicated by the X mark in the appropriate blanks below:

A.  **Hospital Services**
X___ Emergency Department Services – 24 hours per day, 7 days per week
_X___ Urgent Care Services
_X___ Outpatient Services
_X___ Inpatient services – 24 hours per day, 7 days per week
_X___ Birthing services such as labor and delivery rooms, birthing rooms or birthing centers
_X___ Other: Specify Clinic based services

B.  **Physician Services**
___ General/Family Practice
___ General Surgery
___ Obstetrics/Gynecology
___ Pediatrics
___ Neonatology
___ Internal Medicine
___ Cardiology
___ Anesthesiology
___ Dermatology
___ Neurology
___ Neurosurgery
___ Otolaryngology
___ Ophthalmology
___ Orthopedics
___ Pathology
___ Psychiatry
___ Rehabilitative Medicine

___ Thoracic Surgery
___ Urology
___ Vascular Surgery
___ Mental Health
___ Dental Services (of the type not normally provided by a dentist)
___ Other: Specify

C.  **Non-Physician Services**
___ Family Planning
_X___ Laboratory
___ Pharmacy
_X___ Radiology
___ Vision Care/Optometry
___ Chiropractic
___ Home Health Care
___ Hearing Aids
_X___ Hearing and Speech
_X___ Podiatry
_X___ Speech Therapy
_X___ Physical Therapy
_X___ Occupational Therapy
___ Medical Equipment
___ Medical Supplies
___ Oxygen
___ Orthotics
___ Prosthetics
___ Substance Abuse Treatment
___ Transplant Services
_X___ Other: Psych: PHP and IOP
_X___ Dialysis

17

.

.

18

```
ATTACHMENT B
Meridian Health Plan
-Medicaid Terms-
```

**REIMBURSEMENT SCHEDULE**

# REDACTED

**MEDICAID REQUIREMENTS**

*For Medicaid, in accordance with state and federal regulations and official Medicaid guidance as well as HFS guidelines, Hospital is subject to the following requirements:*

**1.1** **Subcontractors** – The Parties agree that Hospital, in performing Hospital's duties and obligations hereunder, shall have the right, subject to the credentialing and re-credentialing requirements described in this Agreement, either to employ its own employees and agents or to utilize the services of persons, firms and other entities by means of subcontractual relationships; provided, however, that no such subcontract shall operate to relieve Hospital of its obligations hereunder and further provided that the format for all such subcontracts shall have been approved by HFS or the Department of Insurance in the event that either agency requires such approval; and further provided that Plan's liability for reimbursement hereunder shall extend only to Hospital, and only to the sums provided for herein, and that Hospital shall be solely responsible for reimbursement and/or payment of any employee or agent of Hospital for services performed pursuant to this Agreement. All such subcontracts shall be in writing and fulfill requirements of 42 CFR 434.6 that are appropriate to the service or activity delegated under the subcontract.

**1.2** **Plan Obligations to HFS** – Anything herein to the contrary notwithstanding, no term or provision of this Agreement shall operate to terminate the legal responsibility of Plan to the *HFS*, in concurrence with the Department of Insurance, with respect to Enrollees eligible for benefits under Title XIX (Medicaid) and Title XXI (SCHIP) of the Social Security Act. Hospital agrees that no subcontract can terminate the legal responsibility of Hospital to HFS with respect to Enrollees eligible for benefits under Title XIX and Title XXI of the Social Security Act. Hospital shall be bound by the terms and conditions of Plan's contract with HFS that are appropriate to the services delegated under this Agreement.

**1.3** **IDHFS Agreement** – Hospital will assist Plan in meeting its obligations under Plan's agreement with IDHFS, in concurrence with Department of Insurance with respect to Enrollees eligible for benefits under Title XIX of the Social Security Act (Medicaid), and hereby agrees to the terms and conditions of such agreement as they pertain or apply to Hospital. Hospital shall be bound by the terms and conditions of Plan's contract with DHFS that are appropriate to the service or activity delegated under this Agreement. Such requirements include, but are not

limited to, the record keeping and audit provisions of the contract between Plan and DHFS, such that DHFS or authorized persons shall have the same rights to audit and inspect Hospital as they have to audit and inspect Plan.

**1.4**     <u>Performance Evaluation</u> – Plan will periodically monitor the performance of Hospital. To the extent deficiencies or areas for improvement are identified during an informal or formal review, Hospital shall be required to take appropriate corrective action.

20

**ATTACHMENT C**
**Meridian Health Plan**
**-Medicare Terms -**

**REIMBURSEMENT SCHEDULE**

# REDACTED

# REDACTED

## REGULATORY REQUIREMENTS

CMS requires that specific terms and conditions be incorporated into the Agreement between a Medicare Advantage Organization or First Tier Entity and a First Tier Entity or Downstream Entity to comply with the Medicare laws, regulations, and CMS instructions, including, but not limited to, the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 ("MMA"); and

Except as provided herein, all other provisions of the Agreement between Plan and Hospital not inconsistent herein shall remain in full force and effect.

**Definitions:**

**Centers for Medicare and Medicaid Services ("CMS"):** the agency within the Department of Health and Human Services that administers the Medicare program.

**Completion of Audit:** completion of audit by the Department of Health and Human Services, the Government Accountability Office, or their designees of a Medicare Advantage Organization, Medicare Advantage Organization contractor or related entity.

**Downstream Entity:** any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, below the level of the arrangement between an MA organization (or applicant) and a first tier entity. These written arrangements continue down to the level of the ultimate provider of both health and administrative services.

**Final Contract Period:** the final term of the contract between CMS and the Medicare Advantage Organization.

**First Tier Entity:** any party that enters into a written arrangement, acceptable to CMS, with an MA organization or applicant to provide administrative services or health care services for a Medicare eligible individual under the MA program.

**Medicare Advantage ("MA"):** an alternative to the traditional Medicare program in which private plans run by health insurance companies provide health care benefits that eligible beneficiaries would otherwise receive directly from the Medicare program.

**Medicare Advantage Organization ("MA organization"):** a public or private entity organized and licensed by a State as a risk-bearing entity (with the exception of provider-sponsored organizations receiving waivers) that is certified by CMS as meeting the MA contract requirements.

**Member or Enrollee:** a Medicare Advantage eligible individual who has enrolled in or elected coverage through a Medicare Advantage Organization.

**Provider:** (1) any individual who is engaged in the delivery of health care services in a State and is licensed or certified by the State to engage in that activity in the State; and (2) any entity that is engaged in the delivery of health care services in a State and is licensed or certified to deliver those services if such licensing or certification is required by State law or regulation.

**Related entity:** any entity that is related to the MA organization by common ownership or control and (1) performs some of the MA organization's management functions under contract or delegation; (2) furnishes services to Medicare enrollees under an oral or written agreement; or (3) leases real property or sells materials to the MA organization at a cost of more than $2,500 during a contract period.

**Required Provisions:**

Hospital agrees to the following:

1. HHS, the Comptroller General, or their designees have the right to audit, evaluate, and inspect any pertinent information for any particular contract period, including, but not limited to, any books, contracts, computer or other electronic systems (including medical records and documentation of the first tier, downstream, and entities related to CMS' contract with Plan, (hereinafter, "MA organization") through 10 years from the final date of the final contract period of the contract entered into between CMS and the MA organization or from the date of completion of any audit, whichever is later. [42 C.F.R. §§ 422.504(i)(2)(i) and (ii)]

2. Hospital will comply with the confidentiality and enrollee record accuracy requirements, including: (1) abiding by all Federal and State laws regarding confidentiality and disclosure of medical records, or other health and enrollment information, (2) ensuring that medical information is released only in accordance

23

with applicable Federal or State law, or pursuant to court orders or subpoenas, (3) maintaining the records and information in an accurate and timely manner, and (4) ensuring timely access by enrollees to the records and information that pertain to them. [42 C.F.R. §§ 422.504(a)(13) and 422.118]

3. Enrollees will not be held liable for payment of any fees that are the legal obligation of the MA organization. [42 C.F.R. §§ 422.504(i)(3)(I) and 422.504(g)(1)(i)]

4. For all enrollees eligible for both Medicare and Medicaid, enrollees will not be held liable for Medicare Part A and B cost sharing, when the State is responsible for paying such amounts. Providers will be informed of Medicare and Medicaid benefits and rules for enrollees eligible for Medicare and Medicaid. Hospital may not impose cost-sharing that exceeds the amount of cost-sharing that would be permitted with respect to the individual under title XIX if the individual were not enrolled in such a plan. Providers will: (I) accept the MA plan payment as payment in full, or (2) bill the appropriate State source. [42 C.F.R. §§ 422.504(i)(3)(i) and 422.504(g)(1)(i)]

5. Any services or other activity performed in accordance with a contract or written agreement by Hospital are consistent and comply with the MA organization's contractual obligations. [42 C.F.R. § 422.504(i)(3)(iii)]

6. Contracts or other written agreements between the MA organization and providers or between first tier and downstream entities must contain a prompt payment provision, the terms of which are developed and agreed to by the contracting parties. The MA organization is obligated to pay contracted providers under the terms of the contract between the Plan and Hospital. [42 C.F.R. §§ 422.520(b)(1) and (2)] In accordance with 42 C.F.R. § 422.520(b), Hospital shall provide to Plan all information necessary for Plan to establish proper payment. Plan shall pay Provider for Covered Services rendered to Covered Persons in accordance with Section 7 of the Agreement. Any Clean Claim, as defined in 42 C.F.R. § 422.500, shall be paid within thirty (30) days of receipt by Plan at such address as may be designated by Plan, and Plan shall pay interest on any Clean Claim not paid within thirty (30) days of such receipt by Plan at the rate of interest required by law, or as otherwise set forth in the Provider Manual.

7. Hospital and any related entity, contractor or subcontractor will comply with all applicable Medicare laws, regulations, and CMS instructions. [42 C.F.R. §§ 422.504(i)(4)(v)]

8. If any of the MA organization's activities or responsibilities under its contract with CMS are delegated to any first tier, downstream and related entity:

   (i) The delegated activities and reporting responsibilities are specified as follows:

       The delegated activities are specified in the Agreement, if any.

   (ii) CMS and the MA organization reserve the right to revoke the delegation activities and reporting requirements or to specify other remedies in instances where CMS or the MA organization determine that such parties have not performed satisfactorily.

   (iii) The MA organization will monitor the performance of the parties on an ongoing basis.

   (iv) The credentials of medical professionals affiliated with the party or parties will be either reviewed by the MA organization or the credentialing process will be reviewed and approved by the MA organization and the MA organization must audit the credentialing process on an ongoing basis.

   (v) If the MA organization delegates the selection of providers, contractors, or subcontractor, the MA organization retains the right to approve, suspend, or terminate any such arrangement.

[42 C.F.R. §§ 422.504(i)(4) and (5)]

24

**ATTACHMENT D**
**Intentionally Left Blank**

**ATTACHMENT E**
**Meridian Health Plan**
**-FAD Terms-**

**REIMBURSEMENT SCHEDULE**

# REDACTED

9/28/12 Illinois Hospital Agreement – 2153

# EXHIBIT B

Meridian
Health Plan

**ILLINOIS PRACTITIONER AGREEMENT**

# REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

# EXHIBIT C



## Amendment to the System Agreement

# REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

REDACTED

REDACTED

# REDACTED

# EXHIBIT 2

# Commercial

## Arbitration Rules and Mediation Procedures

**Including Procedures for Large, Complex Commercial Disputes**



AMERICAN ARBITRATION ASSOCIATION®

Available online at **adr.org/commercial**

Rules Amended and Effective October 1, 2013
Fee Schedule Amended and Effective July 1, 2016

## Regional Vice Presidents

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, Virginia**
P. Jean Baker, Esq.
Vice President
Phone: 202.223.7093
Email: BakerJ@adr.org

**States: Oklahoma, Texas**
Andrew Barton
Vice President
Phone: 210.998.5750
Email: BartonA@adr.org

**States: Alabama, Georgia**
John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org

**States: City of Houston, Louisiana, Mississippi**
Ingeuneal C. Gray, Esq.
Vice President
Phone: 832.308.7893
Email: GrayI@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**
Karen Jalkut
Vice President
Phone: 617.695.6062
Email: JalkutK@adr.org

**States: Alaska, California, Hawaii, Oregon, Washington**
Serena K. Lee, Esq.
Vice President
Phone: 415.671.4053
Email: LeeS@adr.org

**States: Indiana, Kentucky, North Carolina, Ohio, South Carolina, Tennessee, West Virginia**
Michelle M. Skipper
Vice President
Phone: 704.643.8605
Email: SkipperM@adr.org

**States: Florida**
Rebecca Storrow, Ph.D.
Vice President
Phone: 954.372.4341
Email: StorrowR@adr.org

**States: Arizona, Colorado, Kansas, Idaho, Montana, Nebraska, Nevada, New Mexico, Utah, Wyoming**
Lance K. Tanaka
Vice President
Phone: 303.831.0824
Email: TanakaL@adr.org

**States: Arkansas, Illinois, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, Wisconsin**
A. Kelly Turner, Esq.
Vice President
Phone: 312.361.1116
Email: TurnerK@adr.org

**States: New York**
Jeffrey T. Zaino, Esq.
Vice President
Phone: 212.484.3224
Email: ZainoJ@adr.org

## Case Management Vice Presidents and Assistant Vice Presidents

Jeffrey Garcia
Vice President
Phone: 559.490.1860
Email: GarciaJ@adr.org
**Administers cases in: AK, AZ, AR, CA, CO, HI, ID, IL, IA, KS, LA, MN, MS, MO, MT, NE, NV, NM, ND, OK, OR, SD, TX, UT, WA, WI, WY**

John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org
**Administers cases in: AL, DC, FL, GA, IN, KY, MD, NC, OH, SC, TN, VA**

Yvonne Baglini
Assistant Vice President
Phone: 866.293.4053
Email: BagliniY@adr.org
**Administers cases in: CT, DE, MA, ME, MI, NH, NJ, NY, PA, RI, VT, WV**

# Table of Contents

Important Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Standard Arbitration Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Large, Complex Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9


Commercial Arbitration Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

   R-1. Agreement of Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

   R-2. AAA and Delegation of Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

   R-3. National Roster of Arbitrators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

   R-4. Filing Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

   R-5. Answers and Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

   R-6. Changes of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

   R-7. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

   R-8. Interpretation and Application of Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

   R-9. Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

   R-10. Administrative Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

   R-11. Fixing of Locale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

   R-12. Appointment from National Roster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

   R-13. Direct Appointment by a Party. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

   R-14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties. . . . . . . .16

   R-15. Nationality of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

   R-16. Number of Arbitrators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

   R-17. Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

   R-18. Disqualification of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

   R-19. Communication with Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

   R-20. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

   R-21. Preliminary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

   R-22. Pre-Hearing Exchange and Production of Information . . . . . . . . . . . . . . . . . . . . . .19

   R-23. Enforcement Powers of the Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

   R-24. Date, Time, and Place of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

   R-25. Attendance at Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

   R-26. Representation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

   R-27. Oaths . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

R-28. Stenographic Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

R-29. Interpreters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-30. Postponements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-31. Arbitration in the Absence of a Party or Representative . . . . . . . . . . . . . . . . . . . .22

R-32. Conduct of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-33. Dispositive Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-34. Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-35. Evidence by Written Statements and Post-Hearing Filing of Documents or
Other Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-36. Inspection or Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-37. Interim Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-38. Emergency Measures of Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-39. Closing of Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

R-40. Reopening of Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-41. Waiver of Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-42. Extensions of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-43. Serving of Notice and Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-44. Majority Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-45. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-46. Form of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-47. Scope of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-48. Award Upon Settlement—Consent Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-49. Delivery of Award to Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-50. Modification of Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-51. Release of Documents for Judicial Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . .29

R-52. Applications to Court and Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . .29

R-53. Administrative Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

R-54. Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

R-55. Neutral Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-56. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-57. Remedies for Nonpayment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-58. Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

Preliminary Hearing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

P-1. General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

P-2. Checklist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Expedited Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

E-1. Limitation on Extensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

E-2. Changes of Claim or Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

E-3. Serving of Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

E-4. Appointment and Qualifications of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . 34

E-5. Exchange of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

E-6. Proceedings on Documents and Procedures for the Resolution of Disputes
Through Document Submission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

E-7. Date, Time, and Place of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E-8. The Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E-9. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E-10. Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Procedures for Large, Complex Commercial Disputes . . . . . . . . . . . . . . . . . . . . . . 37

L-1. Administrative Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

L-2. Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

L-3. Management of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Administrative Fee Schedules (Standard and Flexible Fees) . . . . . . . . . . . . . . . . . 38

Commercial Mediation Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

M-1. Agreement of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

M-2. Initiation of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

M-3. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

M-4. Appointment of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

M-5. Mediator's Impartiality and Duty to Disclose . . . . . . . . . . . . . . . . . . . . . . . . 40

M-6. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

M-7. Duties and Responsibilities of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . 41

M-8. Responsibilities of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

M-9. Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

M-10. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

M-11. No Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

M-12. Termination of Mediation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

M-13. Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

M-14. Interpretation and Application of Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

M-15. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

M-16. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

M-17. Cost of the Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

**(b)** A respondent may file a counterclaim at any time after notice of the filing of the Demand is sent by the AAA, subject to the limitations set forth in Rule R-6. The respondent shall send a copy of the counterclaim to the claimant and all other parties to the arbitration. If a counterclaim is asserted, it shall include a statement setting forth the nature of the counterclaim including the relief sought and the amount involved. The filing fee as specified in the applicable AAA Fee Schedule must be paid at the time of the filing of any counterclaim.

**(c)** If the respondent alleges that a different arbitration provision is controlling, the matter will be administered in accordance with the arbitration provision submitted by the initiating party subject to a final determination by the arbitrator.

**(d)** If the counterclaim does not meet the requirements for filing a claim and the deficiency is not cured by the date specified by the AAA, it may be returned to the filing party.

## R-6. Changes of Claim

**(a)** A party may at any time prior to the close of the hearing or by the date established by the arbitrator increase or decrease the amount of its claim or counterclaim. Written notice of the change of claim amount must be provided to the AAA and all parties. If the change of claim amount results in an increase in administrative fee, the balance of the fee is due before the change of claim amount may be accepted by the arbitrator.

**(b)** Any new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim, shall be made in writing and filed with the AAA, and a copy shall be provided to the other party, who shall have a period of 14 calendar days from the date of such transmittal within which to file an answer to the proposed change of claim or counterclaim with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

## R-7. Jurisdiction

**(a)** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

**(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

# EXHIBIT 3

AHLA Dispute Resolution Service



RULES OF PROCEDURE FOR
# COMMERCIAL
# ARBITRATION

These rules apply to
claims received on or
after March 11, 2019

© 2019

American Health Lawyers Association.
1620 Eye Street, NW, 6th Floor, Washington DC 20006-4010.
All rights reserved.

# Table of Contents

Introduction ...................................................................................................................... 1

Section 1: Policies ............................................................................................................ 2
   **1.1**   **Applicable Version of Rules** ............................................................................ 2
   **1.2**   **Electronic Case Management System** ........................................................ 2
        A. APPLICABILITY ............................................................................................ 2
        B. NOTICE ............................................................................................................ 2
        C. FILING ............................................................................................................. 2
        D. SERVICE ........................................................................................................... 2
        E. OPTING OUT .................................................................................................. 2
   **1.3**   **Representation** ................................................................................................... 2
   **1.4**   **Counting of Days** ............................................................................................. 3
   **1.5**   **Disclaimer** ......................................................................................................... 3
   **1.6**   **Administrator** .................................................................................................... 3

Section 2: Filing a Claim ............................................................................................... 4
   **2.1**   **Requirements** .................................................................................................... 4
   **2.2**   **Service** ................................................................................................................ 4
        A. CASE MANAGEMENT SYSTEM ............................................................... 4
        B. ALTERNATIVE MEANS ............................................................................... 4

Section 3: Appointment of an Arbitrator .................................................................. 5
   **3.1**   **Criteria** .............................................................................................................. 5
   **3.2**   **Appointment Process** ...................................................................................... 5
        A. NUMBER OF CANDIDATES ...................................................................... 5
        B. RANKING SHEET ......................................................................................... 5
        C. CANDIDATE PROFILES .............................................................................. 5
        D. REVIEW OF CANDIDATES ........................................................................ 5
        E. INELIGIBLE CANDIDATES ........................................................................ 6
        F. RANKING CANDIDATES ............................................................................ 6
        G. SELECTION PROCESS ................................................................................. 6
   **3.3**   **Acceptance of Appointment** ......................................................................... 6
   **3.4**   **Appointment Date** .......................................................................................... 6
   **3.5**   **Arbitration Panels** .......................................................................................... 7
        A. DEFAULT PROCESS ...................................................................................... 7
        B. PRESUMPTION OF NEUTRALITY .......................................................... 7
        C. PANEL CHAIR ................................................................................................ 7
   **3.6**   **Alternative Selection Processes** .................................................................... 7

**TOC**

**Section 4: Arbitrators** ................................................................................................. 8
  **4.1 Conduct** ................................................................................................................. 8
    A. POWERS AND DUTIES ......................................................................... 8
    B. ETHICS ....................................................................................................... 8
    C. SETTLEMENT AND MEDIATION ....................................................... 8
  **4.2 Ex Parte Communication** ................................................................................. 8
    A. GENERAL RULE ...................................................................................... 8
    B. NON-NEUTRAL ARBITRATORS ......................................................... 8
    C. FAILURE TO PARTICIPATE ................................................................. 8
  **4.3 Case Management** ............................................................................................. 9
    A. DEFAULT TIMEFRAME ......................................................................... 9
    B. EXPEDITED REVIEW ............................................................................ 9
    C. EXCEPTIONAL CASES .......................................................................... 9
    D. TIMEFRAMES .......................................................................................... 9
  **4.4 Review Board** ................................................................................................... 9
    A. PURPOSE ................................................................................................... 9
    B. APPOINTMENT ....................................................................................... 9
    C. QUALIFICATIONS .................................................................................. 9
    D. REVIEW PANELS ................................................................................... 10
    E. COMPENSATION .................................................................................. 10
    F. ETHICS ..................................................................................................... 10
  **4.5 Removing an Arbitrator** ............................................................................... 10
    A. UNANIMOUS CONSENT .................................................................... 10
    B. WITHDRAWAL ....................................................................................... 10
    C. REMOVAL ............................................................................................... 10
  **4.6 Exigent Circumstances** ................................................................................. 11
  **4.7 Replacing an Arbitrator** ............................................................................... 11

**Section 5: Pre-Hearing Process** .......................................................................... 12
  **5.1 Objections, Answers, and Counterclaims** ............................................... 12
  **5.2 Preliminary Awards** ....................................................................................... 12
    A. ARBITRABILITY .................................................................................... 12
    B. INTERIM RELIEF .................................................................................. 12
  **5.3 Deposits** ........................................................................................................... 12
    A. REQUESTS ............................................................................................... 12
    B. DELAYED PAYMENT ........................................................................... 12
    C. NON-PAYMENT .................................................................................... 12
  **5.4 Status Conference** .......................................................................................... 13
  **5.5 Discovery** ......................................................................................................... 13
  **5.6 Motions** ............................................................................................................ 13
    A. IN GENERAL .......................................................................................... 13
    B. CONSOLIDATION ................................................................................ 13
  **5.7 Date, Time, and Location of the Hearing** ............................................... 13

**5.8    Subpoenas**........................................................................................................14

    A. ISSUANCE...........................................................................................................14

    B.  OBJECTIONS....................................................................................................14

**5.9    Inspection or Investigation**...................................................................14


**Section 6: Hearings**......................................................................................................15

**6.1    Exchange of Information**.........................................................................15

**6.2    Transcript**......................................................................................................15

**6.3    Attendance**....................................................................................................15

**6.4    Oaths**................................................................................................................15

**6.5    Conduct of Hearings**...............................................................................16

**6.6    Evidence**.........................................................................................................16

**6.7    Failure to Appear**.......................................................................................16

**6.8    Close of Hearing**........................................................................................16

    A. GENERAL RULE..............................................................................................16

    B.  POST-HEARING BRIEFS..............................................................................16


**Section 7: Final Awards**..............................................................................................17

**7.1    Deadline**..........................................................................................................17

**7.2    Basis**.................................................................................................................17

**7.3    Consent Award**...........................................................................................17

**7.4    Failure to Prosecute**.................................................................................17

**7.5    Scope of Relief**............................................................................................17

**7.6    Fees and Expenses**....................................................................................17

    A. BY AGREEMENT.............................................................................................17

    B.  STANDARD ALLOCATION.........................................................................17

    C.  MISBEHAVIOR................................................................................................18

**7.7    Form**.................................................................................................................18

**7.8    Reasoning**......................................................................................................18

**7.9    Corrections**...................................................................................................18

**7.10  Effect and Use**............................................................................................18


**Section 8: Post-Award Proceedings**......................................................................19

**8.1    Final Accounting**.......................................................................................19

**8.2    Release of Documents**.............................................................................19

**8.3    Judicial Proceedings**.................................................................................19

**TOC**

**Section 9: Emergencies**.................................................................................20

    **9.1**   **Request for Emergency Relief**..........................................................20

    **9.2**   **Emergency Appointment**.................................................................20

    **9.3**   **Standard of Review**..........................................................................20

    **9.4**   **Deposit**................................................................................................20

    **9.5**   **Relief**...................................................................................................20

    **9.6**   **Extension of Appointment**..............................................................20

**Section 10: Class Arbitrations**.....................................................................21

**Exhibit 1: Arbitrator Selection Process**.....................................................22

**Exhibit 2: Guidelines for Med-Arb and Arb-Med**.....................................27

**Exhibit 3: Fee Schedule**.................................................................................28

# Introduction

Arbitration is a centuries-old way for industries to promote commerce through self-regulation. It is particularly well suited for disputes involving health care because of the complex nature of the health care marketplace and its highly regulated nature. Disputes are best resolved by arbitrators who understand the laws and regulations governing the delivery of health goods and services and the context in which they are provided.

Disputes impede the close cooperation needed to deliver quality health care. By resolving claims quickly, arbitration helps the health care system maintain its focus on promoting wellness and treating patients.

For further information about these rules or our dispute resolution program, please contact:

Administrator
American Health Lawyers Association
Dispute Resolution Service
1620 Eye Street, N.W., 6th Floor
Washington, D.C. 20006-4010

drs@healthlawyers.org
Phone: 202-833-0762

# Section 3:
# Appointment of an Arbitrator

## 3.1 Criteria

If the filing party (Claimant) produces a document that arguably requires arbitration of the claim under the Rules, the Administrator will appoint an arbitrator pursuant to the process described in this Section. After receiving appropriate evidence and argument, the arbitrator, once appointed, shall have the power to determine his or her jurisdiction and any issues of arbitrability.

## 3.2 Appointment Process*

The appointment process begins after the requirements in Section 2 have been met. Unless the parties agree otherwise in writing, the Administrator will appoint a single, neutral arbitrator through the process set forth in the Rules.

(a) NUMBER OF CANDIDATES. In its Demand for Arbitration, the filing party may request and pay for:

5 candidates with each party having the right to strike 1 candidate;
10 candidates with each party having the right to strike up to 2 candidates;
12 candidates with each party having the right to strike up to 3 candidates; or
15 candidates with each party having the right to strike up to 5 candidates.

If the filing party initially requests fewer than 15 candidates, then prior to the due date for rankings (see subsection (f) below), any party may expand the number of candidates by paying the difference between the filing fee applicable to the number of candidates it is requesting and the fee already paid by the filing party.

(b) CANDIDATE LIST. The Administrator will provide a list of candidates based on information provided by the Claimant in the Demand for Arbitration and any additional information a responding party may choose to provide.

(c) CANDIDATE PROFILES. The Administrator will provide the parties with the profiles and resumes of all candidates. Profiles and resumes are completed by candidates. AHLA does not verify the information in profiles and resumes and does not warrant that they are accurate, current, or complete.

(d) REVIEW OF CANDIDATES. In ranking candidates, parties should carefully assess the candidates' qualifications and experience. Parties may contact candidates directly to inquire about their suitability and their availability for appointment. Such contacts must be in writing, and a copy of any such communication must be provided to the other party(ies). When corresponding with candidates, parties may disclose the general nature of the question in dispute in the case, but may not discuss its merits.

*Amended on September 15, 2019 to increase the options for lists of candidates. The Fee Schedule was amended accordingly.

# EXHIBIT 4

**In the Matter of the Arbitration Between:**

| | | |
|---|---|---|
| MERIDIAN HEALTH PLAN OF ILLINOIS, INC., | ) | American Arbitration Association |
| | ) | |
| Claimant, | ) | |
| | ) | Commercial Arbitration Rules |
| and | ) | |
| | ) | |
| SAINT ANTHONY HOSPITAL. | ) | |
| | ) | |
| Respondent. | ) | |

## ARBITRATION DEMAND

**Via Certified U.S. Mail to:**

**Saint Anthony Hospital**
**Attn. Randy Stein**
**2975 W 19th Street**
**Chicago, IL 60623**

 **PLEASE TAKE NOTICE** that claimant Meridian Health Plan of Illinois Inc., ("Meridian"), by its attorneys, Locke Lord LLP, hereby demands arbitration of any and all disputes that have arisen between Meridian and Saint Anthony Hospital ("Saint Anthony") in connection with the Illinois Hospital Agreement dated October 1, 2014 (the "Hospital Agreement"), which is attached as Exhibit A. In support of its arbitration demand, Meridian states the following:

## BACKGROUND

 1. Meridian is a managed care organization ("MCO") that exclusively provides government-sponsored healthcare plans to low-income individuals, families and children, pregnant women, the elderly and individuals with disabilities through Meridian's Medicaid and Medicare contracts with state and federal agencies. (*See, e.g.*, https://corp.mhplan.com/en/.)

2.      Meridian has no commercial products, and thus receives all of its revenue from state or federal governments.  Meridian is highly regulated and therefore has a stringent burden to ensure the proprietary of any payments it makes to healthcare providers like Saint Anthony.

3.      In 2017, the State selected Meridian as one of seven MCOs authorized to administer managed care services to Medicaid beneficiaries through a contract with the Department of Healthcare and Family Services ("HFS") for the State of Illinois (the "State").[1]   Under this contract, Meridian administers benefits on behalf of Medicaid members who reside in the State and enroll in Meridian's health plan.  The State pays Meridian a capitated rate on a per member, per month basis.  Meridian is then responsible for contracting with providers (like Saint Anthony) and paying for Medicaid-eligible healthcare costs incurred by Meridian's members, pursuant to the terms agreed to by Meridian and those providers.  *See, e.g.*, *Midwest Emergency Assocs.-Elgin Ltd. v. Harmony Health Plan of Ill., Inc.*, 888 N.E.2d 694, 696  (Ill. App. Ct. 2008) (generally discussing Medicaid managed care arrangements).

**The Hospital Agreement.**

4.      Meridian entered into the Hospital Agreement with Saint Anthony's effective October 1, 2014 and continuing through the present.  (Ex. A.)  Among other things, the Hospital Agreement requires Saint Anthony to provide certain authorized, covered medical services to Meridian's members.  Saint Anthony must then submit timely claims for payment to Meridian in a prescribed manner.  (*Id.* at §§ 2, 4.)  Meridian then processes, adjusts, pays, or denies the claims in compliance with the time frames and other requirements specified by the parties.  (*Id.* at § 4.)

---

[1] Although HFS originally chose seven MCOs, there are currently only six MCOs contracted with HFS.

5.     The parties must "make a good faith effort to negotiate and resolve all billing disputes." (*Id.* at § 4.9.)  In the event they are unable to do so, the Hospital Agreement requires "Binding Arbitration."  (*Id.* at §§ 6.1, 6.2.)[2]  Under this Hospital Agreement, "either party may seek binding arbitration either under the Rules for Arbitration of the Alternative Dispute Resolution Service of the American Health Lawyers Association or the American Arbitration Association."  (*Id.* at § 6.2.2.)  "Both [p]arties agree[d] to binding arbitration" and that such arbitration "will take place in a mutually agreed upon location."  (*Id.*)

6.     Because the parties agreed to arbitrate under the American Arbitration Association ("AAA") Rules, the parties have authorized the AAA to administer the Arbitration. *See* AAA Commercial Arbitration Rule R-2.

**The Parties' Disputes.**

7.     In Summer 2019, certain disputes arose between the parties.  These disputes included Saint Anthony's demand that Meridian pay certain claims submitted pursuant to the Hospital Agreement.  In an effort to resolve those disputes, the parties exchanged information and held meetings.

8.     On August 1, 2019, Meridian and Saint Anthony both confirmed in writing their commitment to work together to resolve all outstanding disputes.  To that end, throughout the remainder of 2019 and in 2020, the parties continued to communicate in writing and orally regarding the disputes.  Unfortunately, however, the parties' efforts were unsuccessful.[3]

---

[2] Meridian and Saint Anthony entered into related practitioner agreements also effective October 1, 2014.  To the extent applicable, those agreements also control billing and payment disputes and include an arbitration provision.  (*See* Ex. B and C.)

[3] Section 6.2.1 of the Hospital Agreement provides that when negotiations fail, the parties "may request" mediation, but only if both parties agree.  Meridian has chosen not to pursue mediation of the parties' disputes.

**The Federal Court Complaint.**

9.      While the Hospital Agreement requires the parties' disputes to be resolved through binding arbitration, Saint Anthony has instead sought to resolve the disputes in court.  Specifically, on April 27, 2020, Saint Anthony filed a lawsuit in the United States District Court for the Northern District of Illinois, Case No. 20 CV 2561 (the "Lawsuit").  The Complaint is attached as Exhibit D.

10.      Although Saint Anthony filed the Lawsuit against Theresa Eagleson, in her official capacity as Director of HFS, the Complaint raises numerous disputes against Meridian—all of which arise under the Hospital Agreement.  The disputes set forth in the Complaint include, for example:

- *Claim Denials.*  Saint Anthony alleges that its claims "have been denied by the MCOs [including Meridian] at rates that are multiples of those Saint Anthony experienced in the past," and that "[o]ften claims are denied because of administrative paperwork delays by the MCOs."  (Ex. D at ¶ 44, 47.)  As an example "Meridian/Harmony MCO recently denied a pediatric charge from Saint Anthony because the claim did not include the birth weight, which was irrelevant to the service provided."  (*Id*. at ¶ 47.)  Sections 4.4 and 4.5 of the Hospital Agreement govern such claim denials, rejections, and adjustments.  (*See* Ex. A.)

- *Delays in Payment.*  Saint Anthony alleges that "[t]he MCOs [including Meridian] regularly delay making payments for claims even after the MCO determines that the claim is valid and owed," and Saint Anthony "has to wait anywhere from 90 days to 2 years to be paid by MCOs."  (Ex. D at ¶ 51.)  Saint Anthony also alleges that "Meridian had an average monthly rate of only 39.9% of claims paid within 30 days, with some months with no claims that were submitted by Saint Anthony paid within 30 days."  (*Id*. at ¶ 72.)  Sections 4.3, 4.4, and 4.5 of the Hospital Agreement establish and govern such timing requirements for Meridian to process and pay Saint Anthony's claims.  (*See* Ex. A.)

- *Administrative Burden.*  Saint Anthony alleges that "[e]ach MCO in the State's managed care system has had different policies and procedures, creating a labyrinth for the hospitals to navigate to attempt to get paid for the services they have provided."  (Ex. D at ¶ 52.)  Saint Anthony's further alleges that "the State's managed care system [including Meridian] has imposed significant administrative burdens on Saint Anthony."  (*Id*.)  Sections 1.3 and 4.2.1 of the Hospital Agreement establish the administrative requirements for Saint Anthony to submit claims to Meridian.  (*See* Ex. A.)

- ***Lack of transparency.*** Saint Anthony alleges that "the MCOs [including Meridian] do not provide itemized claims data showing a breakdown of how it calculated the total amount of payment for a claim, leaving Saint Anthony to guess at whether it has received the full amount due to it." (*See* Ex. D at ¶ 57.) Section 4.5 of the Hospital Agreement governs requirements for Meridian to adjust payments on a submitted claim. (*See* Ex. A.)

11. In addition, in the Complaint, Saint Anthony asks the Court to enter an injunction requiring the State to "use all available means" to cause Meridian to make certain claim payments to Saint Anthony, and for Meridian to use a particular format when issuing claim payment remittances. (Ex. D at ¶¶ 87, 96.)

12. Pursuant to Section 6.2.2, Meridian hereby demands arbitration of all disputes arising out of the Hospital Agreement, including but not limited to those set forth above.

## <u>CONCLUSION</u>

WHEREFORE, Meridian demands arbitration of all disputes arising under the Hospital Agreement. At the final hearing, Meridian will request that the Panel make determinations regarding all such disputes, including but not limited to those disputes set forth above.

Dated: June 16, 2020                    Meridian Health Plan of Illinois, Inc.


                                        By:  s/ *Ashlee M. Knuckey*
                                              One of its Attorneys


Ashlee M. Knuckey
aknuckey@lockelord.com
Steven T. Whitmer
swhitmer@lockelord.com
LOCKE LORD LLP
111 South Wacker Drive
Chicago, Illinois  60606
Phone:  312.443.0700
Fax:      312.443.0336