# Exhibit 1

**From:** "Elwell, Doug" <Doug.Elwell@Illinois.gov>
**To:** "jjshannon@cookcountyhhs.org" <jjshannon@cookcountyhhs.org>,
"james.kiamos@cookcountyhhs.org" <james.kiamos@cookcountyhhs.org>,
"eakpan@cookcountyhhs.org" <eakpan@cookcountyhhs.org>
**Subject:** CountyCare payments
**Date:** Mon, 23 Sep 2019 12:58:14 +0000

---

All,

Does the County have a solution? If not the state will need to enter into the discussions at some point as we doubt all providers will make it with the delay being up to 9 months in payment.

Doug

Sent from my iPhone

State of Illinois - CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

# Exhibit 2

**From:** "Mendonsa, Robert" <Robert.Mendonsa@Illinois.gov>
**To:** "Cox, Kimberley" <Kimberley.Cox@illinois.gov>, "Kiamos, James" <james.kiamos@cookcountyhhs.org>
**Cc:** "Momon2, Angelique" <Angelique.Momon2@Illinois.gov>, "Doran, Mary" <Mary.Doran@Illinois.gov>, "Ray, Laura" <Laura.Ray@Illinois.gov>
**Subject:** RE: Need info by c.o.b. today for CMS regarding CountyCare's backlog in making payments
**Date:** Tue, 3 Mar 2020 21:19:08 +0000
**Inline-Images:** image001.jpg

---

Update. We are actually pretty current in our payments to CountyCare. This issue is the CountyCare does not pay their claims. It goes to Cook County to pay and is combined with all other outstanding payments and revenue.

---

**From:** Cox, Kimberley
**Sent:** Tuesday, March 03, 2020 3:12 PM
**To:** Mendonsa, Robert ; Kiamos, James
**Cc:** Momon2, Angelique ; Doran, Mary ; Ray, Laura
**Subject:** RE: Need info by c.o.b. today for CMS regarding CountyCare's backlog in making payments

Thanks. In anticipation of followup questions, is a basic explanation of what's changed with the County's revenue flow possible to provide?

---

**From:** Mendonsa, Robert <Robert.Mendonsa@Illinois.gov>
**Sent:** Tuesday, March 03, 2020 2:49 PM
**To:** Kiamos, James <james.kiamos@cookcountyhhs.org>
**Cc:** Momon2, Angelique <Angelique.Momon2@Illinois.gov>; Cox, Kimberley <Kimberley.Cox@illinois.gov>; Doran, Mary <Mary.Doran@Illinois.gov>; Ray, Laura <Laura.Ray@Illinois.gov>
**Subject:** RE: Need info by c.o.b. today for CMS regarding CountyCare's backlog in making payments

Thanks Jim. Can we get a weekly update on these numbers?

Also, my finance tells me we are now 3 months behind in capitation payments still owing December through February. Correct?

---

**From:** Kiamos, James <james.kiamos@cookcountyhhs.org>
**Sent:** Tuesday, March 03, 2020 2:43 PM
**To:** Mendonsa, Robert <Robert.Mendonsa@Illinois.gov>
**Cc:** Momon2, Angelique <Angelique.Momon2@Illinois.gov>; Cox, Kimberley <Kimberley.Cox@illinois.gov>; Doran, Mary <Mary.Doran@Illinois.gov>; Ray, Laura <Laura.Ray@Illinois.gov>
**Subject:** [External] Re: Need info by c.o.b. today for CMS regarding CountyCare's backlog in making payments

Robert,

Please see the answers to your questions below.

1) 703,405 unpaid clean claims older than 30 days.

2) $203,719,407 in unpaid clean claims older than 30 days.

3) Primary reason for delay in payment is funding as all plan revenue flows through Cook County.

Let me know what else you may need.

Jim

Sent from my iPhone

On Mar 3, 2020, at 1:52 PM, Mendonsa, Robert <Robert.Mendonsa@Illinois.gov> wrote:

Jim, please see below. Can you get us answers to the first 3 today or advise when. Please copy everyone on your response. Thanks.

---

**From:** Cox, Kimberley
**Sent:** Tuesday, March 03, 2020 11:56 AM
**To:** Mendonsa, Robert <Robert.Mendonsa@Illinois.gov>
**Cc:** Ray, Laura <Laura.Ray@Illinois.gov>; Doran, Mary <Mary.Doran@Illinois.gov>
**Subject:** Need info by c.o.b. today for CMS regarding CountyCare's backlog in making payments

Hi Robert,

I just got a call from our CMS liaison who informed that "CMS leadership" wants a status update by c.o.b. today on the status of CountyCare's backlog of paying claims. Specifically:

1) # of unpaid clean claims older than 30 days

2) Dollar amount of those claims

3) primary reason(s) for CountyCare's delay in payment

4) what HFS is doing to monitor and resolve

If all of this is not at hand and readily available by c.o.b., please send me what you can provide, and I'll advise the rest has been requested and will be provided when received.

Thanks

State of Illinois - CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

Be counted in the 2020 census. Visit www.cookcountyil.gov/census for more information.

Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SAINT ANTHONY HOSPITAL,

        Plaintiff,

   v.

THERESA EAGLESON, in her official capacity
as Director of the Illinois Department of
Healthcare and Family Services,

        Defendant.

No. 20 CV 2561

Judge Andrea Wood

Magistrate Judge Sunil Harjani

**DECLARATION OF ROBERT MENDONSA**

1.     My name is Robert Mendonsa. I am currently employed with the Illinois Department of Healthcare and Family Services ("HFS"). I have been employed with HFS since February of 2013.

2.     In my current role as the Deputy Administrator of Medical Programs, my duties include monitoring and overseeing administrative, operational and performance activities related to the Medicaid managed care program in the State of Illinois.

3.     One of my job duties is to serve as a point of contact with hospitals that provide medical services to Medicaid enrollees and the State of Illinois' six managed care organizations ("MCOs"), which are (1) Blue Cross and Blue Shield; (2) CountyCare; (3) IlliniCare; (4) Meridian Health; (5) Molina Healthcare of Illinois; and (6) NextLevel Health.

**BIWEEKLY MEETINGS**

4.     Part of my job duties as the Deputy Director of Medical Programs with HFS is to facilitate discussions between hospitals providing Medicaid services and the MCOs.

1

5.      HFS holds biweekly meetings (informally known as the "Monday Meetings"),
where I serve as a moderator to discuss issues regarding the managed care program. The
participants at the meetings include me and representatives from hospitals, MCOs, and the
Illinois Hospital Association.

6.      To ensure that the biweekly meetings are organized and productive, the
participants are asked to identify the issues that they want to discuss in writing about one week in
advance of the meeting. These issues, which often concern systemic problems identified by
healthcare providers or the Illinois Hospital Association, are then compiled and placed on an
agenda provided to all of the participants, and discussed at these meetings. When such problems
are raised at the biweekly meetings, the MCOs' representatives report that they investigated
them, and the issues remain on the agenda until resolved.

7.      Plaintiff, St. Anthony Hospital, has appeared in the past at these meeting through
its authorized representative.

8.      I have attended most of the meetings since they began in April of 2019.

9.      I do not recall either St. Anthony Hospital or the Illinois Hospital Association
ever raising at the biweekly meetings the concern that the MCOs were not paying its claims in a
timely fashion.

10.     If the issue of timely payments generally had been raised by St. Anthony Hospital
or the Illinois Hospital Association at a biweekly meeting, the MCOs could have researched the
issue, and it would have been placed on the agenda and remained on the agenda until the
participants reached an acceptable resolution.

11.     HFS does not maintain official "minutes" of the biweekly meetings. Rather, it
maintains "Issue Logs" which document the issues that are proposed for discussion by the
participants and that are discussed at the biweekly meetings.

12.     The agenda of the May 18, 2020 meeting, along with the corresponding Issue Log, is attached as Exhibit 1.

**COUNTYCARE'S CORRECTIVE ACTION PLAN**

13.     HFS is aware of difficulties by one MCO, CountyCare, to timely pay reimbursements to providers for Medicaid-eligible claims.

14.     CountyCare is administered by the government of Cook County, Illinois, in conjunction with the Cook County Health System, which operates the Cook County Hospital and other public healthcare facilities.

15.     When HFS learned of the difficulty CountyCare was experiencing with making timely Medicaid payments to providers, I sent a letter to CountyCare on March 17, 2020, outlining its failure to pay providers in accordance with CountyCare's contract with HFS (which requires 90% of clean Medicaid claims to be paid within 30 days, and 99% of such claims to be paid within 90 days). A true and accurate copy of the letter that I sent to CountyCare is attached as Exhibit 2.

16.     The data available to HFS showed that CountyCare was not regularly meeting the benchmark of paying 90% of clean Medicaid claims within 30 days, and 99% of clean Medicaid claims within 90 days.

17.     Based on HFS's investigation, it appeared that the primary cause of CountyCare's delay in paying claims was Cook County's commingling in a single fund the State's capitation payments to CountyCare with other Cook County sources of revenue, and not prioritizing CountyCare's obligations to Medicaid providers over other Cook County financial obligations.

18.     In my letter, I advised CountyCare that this was not acceptable and that it must submit a Corrective Action Plan to HFS ensuring that Cook County will create a financial

structure that segregates CountyCare's capitation revenue from HFS from the general Cook County fund, and that gives CountyCare control of its funds to satisfy its Medicaid obligations.

19.     CountyCare submitted its Corrective Action Plan to HFS on April 13, 2020. A true and accurate copy of CountyCare's Corrective Action Plan is attached as Exhibit 3.

20.     As a result, CountyCare is on a plan to segregate the capitation revenue it receives from HFS from the general Cook County fund by December 1, 2020, enabling CountyCare to overcome the biggest obstacle to its ability to timely pay Medicaid claims.

21.     HFS will continue to monitor CountyCare's progress in meeting its timely payment obligations under its contract with HFS. CountyCare has been submitting biweekly reports of their outstanding claims by aging dates (e.g., claims less than 30 days old, claims between 30 and 90 days old, claims outstanding longer than 90 days). In recent months, CountyCare has significantly reduced the number of outstanding claims that are older than 90 days.

**COMPREHENSIVE BILLING MANUAL**

22.     As part of my job duties, I am familiar with the "Comprehensive Billing Manual" maintained by the Illinois Association of Medicaid Health Plans ("IAMHP").

23.     The IAMHP is a member organization for Medicaid managed care health plans.

24.     The IAMHP works with the Illinois state government, legislators, advocacy groups, Medicaid patients, providers and MCOs to promote high-quality health care focused on cost-effective, individualized care.

25.     HFS requested that the IAMHP, in partnership with the State of Illinois' MCOs, create and maintain on the IAMHP's website a "Comprehensive Billing Manual" to help providers such as St. Anthony Hospital navigate the Medicaid billing process. The

4

Comprehensive Billing Manual is published at

https://iamhp.net/resources/Documents/IAMHP_Billing%20Manual_v16.0.pdf.

26.     The Comprehensive Billing Manual represents one aspect of HFS's efforts to

facilitate and monitor the billing process between providers and MCOs under the State's

Medicaid program. It contains a significant amount of detail to assist providers so that they will

be able to better manage Medicaid billing.

27.     Sections of the Comprehensive Billing Manual are published periodically. As part

of my job duties with HFS, I am aware that HFS staff with expertise in these issues review

portions of the Comprehensive Billing Manual before they are published on the IAMHP's

website and added to the Billing Manual.

28.     Once new content is ready to be published in the Comprehensive Billing Manual,

HFS issues a notice about it that is sent to all providers who are signed up to receive these

notices.

29.     The provider notice related to the creation of the Comprehensive Billing Manual

is available at: https://www.illinois.gov/hfs/MedicalProviders/notices/Pages/prn190719a.aspx.

30.     Along with other helpful information, the Comprehensive Billing Manual

contains a section on assisting providers to understand the Explanations of Payment ("EOPs")

that the MCOs tender to the providers after processing claims. The EOPs also are known as

"remittance advices" or "remittance reports."

31.     According to the Comprehensive Billing Manual, each MCO sends an EOP that

contains details on claims that have been paid, denied, or adjusted, and that contains information

such as Member ID; Member Name; Date of Service; Provider Name/Number; Billed Amount;

Allowed Amount; Paid Amount; and Adjustment Code/Reasons. (Comprehensive Billing

Manual at p. 31.)

Comprehensive Billing Manual is published at

https://iamhp.net/resources/Documents/IAMHP_Billing%20Manual_v16.0.pdf.

26.     The Comprehensive Billing Manual represents one aspect of HFS's efforts to

facilitate and monitor the billing process between providers and MCOs under the State's

Medicaid program. It contains a significant amount of detail to assist providers so that they will

be able to better manage Medicaid billing.

27.     Sections of the Comprehensive Billing Manual are published periodically. As part

of my job duties with HFS, I am aware that HFS staff with expertise in these issues review

portions of the Comprehensive Billing Manual before they are published on the IAMHP's

website and added to the Billing Manual.

28.     Once new content is ready to be published in the Comprehensive Billing Manual,

HFS issues a notice about it that is sent to all providers who are signed up to receive these

notices.

29.     The provider notice related to the creation of the Comprehensive Billing Manual

is available at: https://www.illinois.gov/hfs/MedicalProviders/notices/Pages/prn190719a.aspx.

30.     Along with other helpful information, the Comprehensive Billing Manual

contains a section on assisting providers to understand the Explanations of Payment ("EOPs")

that the MCOs tender to the providers after processing claims. The EOPs also are known as

"remittance advices" or "remittance reports."

31.     According to the Comprehensive Billing Manual, each MCO sends an EOP that

contains details on claims that have been paid, denied, or adjusted, and that contains information

such as Member ID; Member Name; Date of Service; Provider Name/Number; Billed Amount;

Allowed Amount; Paid Amount; and Adjustment Code/Reasons. (Comprehensive Billing

Manual at p. 31.)

32. The Comprehensive Billing Manual contains sample EOPs from each of the MCOs in Illinois and advises providers that although the EOPs of the various MCOs may contain similar information, each MCO's EOPs may be organized differently. (Comprehensive Billing Manual at p. 31 & Appx. D at pp. 193-209.)

33. Each of the MCOs' EOPs contain contact information (telephone numbers and mailing addresses) to raise questions that providers may have about the EOPs they have received, or if they wish to contest/appeal a claims decision by an MCO. (Comprehensive Billing Manual Appx. D at pp.193-209.)

34. The Comprehensive Billing Manual also provides hyperlinks that direct providers to locations where providers can retrieve EOPs issued by MCOs. (Comprehensive Billing Manual at p. 32.)

35. The MCOs' EOPs also contain a variety of other information to assist providers in understanding how their claims have been processed. To assist with the interpretation of EOPs, Appendix E to the Comprehensive Billing Manual explains the various components of each of the MCO's EOPs. (Comprehensive Billing Manual Appx. E, pp. 211-222.)

36. The Comprehensive Billing Manual also includes other helpful information, such as reminding providers of the common reasons that MCOs deny claims, such as missing or incomplete billed charges, missing the 4th or 5th digit of a diagnosis code, submitting an incorrect claim form, failing to obtain pre-authorization for medical care, missing or including an incorrect tax identification number, failing to recognize that the member has not been enrolled on the date of service, failing to recognize that the medical service was not included on the fee schedule, and missing a valid taxonomy, among others. (Comprehensive Billing Manual at p. 34.)

37. Information about how to contest claims, submit corrected claims, or submit a new claim when problems arise is detailed in the Comprehensive Billing Manual.

(Comprehensive Billing Manual at pp. 34-35.) Also included in the Comprehensive Billing Manual are contact addresses and phone numbers to ask questions of the MCOs. (Comprehensive Billing Manual at pp. 36-41.)

    38.    I declare under penalty of perjury that the foregoing is true and correct.


_____                Dated: 6.15, 2020

Robert Mendonsa

7

# Mendonsa Declaration

# Ex. 1

# (OMITTED)

Mendonsa Declaration

Exhibit 2

HFS 014265

**iHFS** ILLINOIS DEPARTMENT OF
Healthcare and
Family Services

**JB Pritzker,** Governor
Theresa Eagleson, Director

201 South Grand Avenue East
Springfield, Illinois 62763-0002

**Telephone:** (217) 782-1200
**TTY:** (800) 526-5812

March 17, 2020

Debra D. Carey
Interim Chief Executive Officer
Cook County Health
1950 W. Polk St., Suite 9816
Chicago, IL 60612

Dear Ms. Carey,

As you are aware, HFS has been working with CountyCare to try to resolve a significant backlog of unpaid claims to providers in its network. To date, progress on this backlog has been insufficient. Section 5.29 of the Contract for Furnishing Health Services by a Managed Care organization requires timely payment to providers. The standard in this section requires 90% of claims to be paid within 30 days and 99% within 90 days. The Department's most recent data shows that only 40% of claims are being paid in 30 days and only 62% are paid in 90 days. Data shows 711,178 claims worth $200 million unpaid over 30 days old at CountyCare.

HFS has learned that the primary obstacle to CountyCare becoming timely in its claims' payment is the fact that revenue from HFS to County Care is comingled in a larger County fund and that CountyCare obligations are not prioritized over other county obligations. This is an unacceptable situation. HFS would not allow other health plans to be significantly delinquent in their contractual obligations due to funds from HFS being diverted to corporate obligations outside of Illinois or otherwise unrelated to operations of the plan under their contract with HFS.

Therefore, HFS is placing CountyCare on a corrective action plan that requires the County to establish a financial structure that segregates CountyCare capitation revenue from the larger County fund in a manner that gives CountyCare control of the funds and dedicates those funds to the obligations of CountyCare before being used for any other County obligations.

Please submit your detailed corrective action plan including timelines to comply with this requirement within 30 days of receipt of this letter.

Sincerely,

*Robert Mendonsa*
ℋ
Robert Mendonsa
Deputy Administrator, Medical Programs

Cc:     M. Hill Hammock
        Aaron Galeener
        James Kiamos

**E-mail:** hfs.webmaster@illinois.gov                    **Internet:** http://www.hfs.illinois.gov/

Mendonsa Declaration

Exhibit 3

HFS 014266


## COOK COUNTY
# HEALTH

**Leadership**

**Toni Preckwinkle**
President
Cook County Board of Commissioners

**Debra D. Carey**
Interim CEO
Cook County Health

**Board of Directors**

**M. Hill Hammock**
Chair of the Board

**Mary B. Richardson-Lowry**
Vice Chair of the Board

Hon. Dr. Dennis Deer, LCPC, CCFC
Mary Driscoll, RN, MPH
Ada Mary Gugenheim
Mike Koetting
David Ernesto Munar

Heather M. Prendergast, MD, MS, MPH
Robert G. Reiter, Jr.
Layla P. Suleiman Gonzalez, PhD, JD
Sidney A. Thomas, MSW

April 13, 2020

Mr. Robert Mendonsa
Deputy Administrator, Medical Programs
201 South Grand Avenue East
Springfield, Illinois 62763-0002

Dear Mr. Mendonsa:

I am in receipt of your March 17th request for a corrective action plan related to compliance with the managed care contract provisions to pay 90% of claims within 30 days and establishing a segregated fund for CountyCare claims. I have reviewed your request in collaboration with the County and am hereby submitting a corrective action plan. In summary, the County is willing to develop a plan to segregate funds as part of this corrective action plan with an implementation date of December 1, 2020. We are also proposing some specific actions to address the underlying cause of the delayed timing of payment related to cash flow.

The County and Cook County Health (CCH) have already been working together to improve the timeliness of payments. The below chart summarizes this progress, with notable progress made on claims over 90 days. While the Coronavirus is placing heavy constraints on cash flow, CCH expects to make further progress in reducing claims over 30 days in the coming weeks.

### Received but Not Yet Paid Claims

| Aging Days | 0-30 days | 31-60 days | 61-90 days | 91+ days | Grand Total |
|---|---|---|---|---|---|
| Week of 1/5/2020 | $133,655,242 | $ 52,179,920 | $ 38,477,342 | $ 77,725,426 | $ 302,037,930 |
| Week of 2/2/2020 | $111,215,994 | $ 61,181,936 | $ 51,616,956 | $100,069,434 | $ 324,084,319 |
| Week of 3/1/2020 | $101,206,926 | $ 64,679,160 | $ 57,429,572 | $ 82,454,541 | $ 305,770,199 |
| Week of 4/5/2020 | $ 97,660,208 | $ 58,749,022 | $ 51,246,927 | $ 24,412,563 | $ 232,068,720 |
| Week of 4/12/2020 | $ 91,423,882 | $ 51,306,900 | $ 35,088,093 | $ 1,066,158 | $ 178,885,032 |

*0-30 days is increased for an estimated $47.5M of received but not adjudicated claims
*Medical claims only-does not include pharmacy, dental, vision or transportation claims
*The amounts in the table are clean claims

HFS 014267

CCH has identified the root cause of the delay in payments as related to cash flow constraints that started as early as 2015 during the State's budget crisis and the rate setting policies under the previous administration. There were delays in receiving PMPM revenues which came in sporadically, rather than consistently and predictably, straining the overall Health system. In addition, in 2018 the previous State administration instituted a retroactive rate change reduction of over $100 million that occurred well after payments to providers had already been made. CCH was forced to take the reduction out of CCH's finances rather than go back to the provider community. This exacerbated our liquidity at the time, with some lingering effects even in FY2020. The improvements made by the current HFS administration in timeliness of payments has helped mitigate the cash flow problems and we have been able to make progress clearing the backlog.

Despite these challenges, CountyCare has been a leader in innovation and quality among the health plans and remains the only provider-led managed care organization in the state. CountyCare received the highest scores for quality by NCQA, has developed a unique provider-led care management model, created numerous value-based and risk-sharing agreements with our provider partners, launched a prospective interim payment program (PIP)[1] for critical safety net hospitals, and ensured expedited safety-net provider payments are paid within 30 days. Additionally, CountyCare has accomplished these items while maintaining the lowest administrative cost ratio of all health plans.

Although the reduction required by the retroactive rate adjustment had a negative impact on CCH financially, CCH did not reduce services to the uninsured. In fact, CCH has seen overall volumes go up overall in the past several years, including the number of uninsured patients. As part of the CCH strategic plan, CCH intends to maintain the commitment to uninsured by increasing and attracting additional insured patients. The uninsured, of course, create enormous pressure on the CCH cash flow. Even prior to the current COVID 19 crisis, CCH was reviewing potential expenditure reductions and revenue enhancement strategies to relieve the cash flow pressure created by the growing cost of care for the uninsured.

## Cook County Health Corrective Action Plan

The Cook County Health System proposes the following specific actions as corrective measures.

---

[1] PIP payments are made to Mt. Sinai, Holy Cross, Schwab, Loretto, South Shore and Roseland Hospitals.

HFS 014268

**Claims Payment.** CCH/CountyCare and the County will continue its focused efforts to reduce the outstanding claims greater than 30 days and monitor adherence to this going forward.

**Claims Adjudication.** Although CountyCare claims are already adjudicated between 10-15 days on average, CountyCare will continue to work with its third-party administrators to further streamline its adjudication processes, with a particular focus on initial claims processing accuracy and a reduction in initial denials. CountyCare has also made adjudicated but not yet paid claims information available to providers through its portal to give providers more immediate feedback on the outcome of a claims adjudication and has defined payment policies to guide prioritization of provider payments, including prioritization of the HFS Expedited Provider List, as well as payments to other providers based on the date a claim was received.

**Internal Cash Flow.** To further improve cash flow, CCH will begin making transfers mid-month and again at the end of the month from CCH's revenue bank account into the County's master banking account to better align cash flow with each pay period beginning in April, 2020.

**Revenue Cycle Enhancements.** CCH also has a variety of revenue cycle projects underway to help bring in additional funding and improve cash flow, to ensure reimbursement for transportation, dental, and behavioral health, services not historically provided to Medicare and uninsured patients.

**Property Taxes and Cash Flow.** Cook County will review property tax sources of revenue that support correctional health and public health to even out cash flow throughout the year. Currently CCH receives $82.7 million annually in property tax support or the equivalent of $6.8 million per month for these unfunded mandates. These funds come in twice year in line with the County's tax collection cycle. The County will use other cash sources to even out those payments on a monthly basis to ensure more cash is available for CCH and specifically external claims payables.

**Establishing a Separate Account for CountyCare.** The County has historically maintained only one account for cash and confirms that State PMPM payments have been co-mingled in that cash account since the launch of the program in 2012; however, the County's accounting system tracks these funds separately. While the County and CCH have been focusing efforts on improving the payment of outstanding claims, the County is open to separating CountyCare funds. Cook County is reviewing options to effectively segregate CountyCare funds along with the necessary administrative procedures needed to ensure proper controls and reconciliations. The County needs time to analyze the system impact of that change and plan for its implementation. The COVID 19 crisis is consuming our attention at this time and we would propose that the necessary review take place later this fiscal year with potential implementation if warranted in FY2021 that begins December 1, 2020.

HFS 014269

**Request for Assistance from the State.** Finally, CCH would like to continue to work with the State on the following initiatives that could support this corrective action plan.

*State Payments.* CCH would like to acknowledge the positive impact of the State's efforts to provide timely PMPM payments. The historic unpredictability of timing for PMPM payments has been a challenge in managing the County's overall cash flows. To the extent that these payments can continue to be made consistently and predictabley, this will support timely payments. In addition, we ask for your continued support on other payments such as Disproportionate Share Hospital (DSH), Graduate Medical Eduction (GME), BIPA, and Directed Hospital payments.

*GME and BIPA Proposed Timing Changes.* The County would like to continue to review these two revenue streams with the State to determine if there is an opportunity to leverage them for cash flow impact. CCH would like to request that the State consider front loading the $77 million in FY2020 GME as soon as practical prior to the end of the state fiscal year of June 30, 2020, and then begin regular monthly payments again in the next state fiscal year after July 1st, with a positive cash impact of $38.5 million. CCH would also like to continue considering changes to the timing of receiving BIPA funds to improve cash flow. Specifically, CCH would receive BIPA funds from the state as usual through the end of September, but then change the timing so that the full amount of BIPA would be received in October/November, at the beginning of the federal fiscal year. Following this one-time earlier payment, the new schedule would assume full payment every October.

*CCH Prospective Interim Payments.* CCH would like to request the State's support as we approach the MCOs to be a recipient of PIPs.

Please let me know if you have any questions about this proposed course of action and advise if this corrective action plan is accepted. Thank you for your assistance.

Sincerely,

Debra Carey

Interim CEO, Cook County Health System

CC:     Theresa Eagleson, Director, Illinois Department of Healthcare and Family Services, HFS
        Kelly Cunningham, Interim Medicaid Administrator, HFS
        Ben Winick, Chief of Staff, HFS
        Hill Hammock, Chairman, Cook County Health Board of Directors

HFS 014270

Ammar Rizki, Cook County CFO
James Kiamos, CountyCare Executive Director

# Exhibit 4

| From: | Oliver, Tasha |
|---|---|
| To: | HFS.AMrequests |
| Cc: | Momon2, Angelique; Duszczak, Karolina; HFS Request |
| Subject: | [External] RE: MCO ACCOUNT MANAGER ACTION: URGENT - Follow-Up Question due COB Monday, June 1st |
| Date: | Monday, June 1, 2020 2:29:00 PM |

Good Afternoon:

CountyCare reports that the average number of days from adjudicated to paid is **64**.

Thanks,

David Allen

TashaLaJeanna Oliver, MBA

Managed Care Operations Manager

Cook County Health, Health Plan Services

Phone: 312.466.2929 | Mobile: 312.350.5048

Fax: 312.466.2997

"Give your smile away today     "

**From:** HFS.AMrequests <HFS.AMrequests@illinois.gov>

**Sent:** Friday, May 29, 2020 2:33 PM

**Subject:** MCO ACCOUNT MANAGER ACTION: URGENT - Follow-Up Question due COB Monday, June 1st

**Importance:** High

MCO ACCOUNT MANAGER

05/29/2020

Health Plans —

Please respond with the **average number of days** between adjudication of a claim and payment of a claim. Please respond by COB, Monday, June 1st.

Thank you.

HFS.AMrequests@illinois.gov

Jennifer Sawicki

HFS, Bureau of Managed Care

State of Illinois - CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

Census 2020 Be Counted

Be counted in the 2020 census. Visit www.cookcountyil.gov/census for more information.

Exhibit 5

**From:** "Gross, David" <DGross@team-iha.org>
**To:** "'Elwell, Doug'" <Doug.Elwell@Illinois.gov>
**Subject:** [External] FYI
**Date:** Fri, 22 Mar 2019 21:29:27 +0000
**Attachments:** 03-21-19_MCO_Oversight.pdf
**Inline-Images:** image001.jpg

---

Doug—

I want to apologize to you and the Director. I arrived late to the meeting and failed to provide copies to you and the Director.

Take a look and let's discuss your concerns after you have had a chance to review.

Dave



**Dave Gross** | Senior Vice President| Government Relations
**T** 217-541-1161 | **M** 217-836-3303 | dgross@team-iha.org

**Illinois Health and Hospital Association**

700 S. Second Street, Springfield, IL 62704

*Your trusted voice and resource*

Illinois Health and Hospital Association

# MEDICAID MANAGED CARE: PRIORITY ISSUES

Hospitals face an overwhelming array of challenges working with the six Medicaid Managed Care Organizations (MCOs) charged with serving more than two million Illinois Medicaid beneficiaries. IHA has identified priority areas where enhanced oversight of MCO operational performance, coupled with requiring the MCOs to immediately implement proven, common sense business practices, would lead to improved outcomes for patients and providers.

| | |
|---|---|
| **Problem** | **Lack of uniformity of key definitions** related to MCO claims adjudication and service authorization terms.  The MCOs use some terms interchangeably (e.g., rejection/denial), leading to confusion regarding how to appropriately resolve payment and authorization disputes. |
| **Proposed Remedy** | MCOs should use uniform clear definitions for the following regularly misunderstood terms: *Claims Rejections, Claims Payment Rate Adjustments, Claim Recoupment Adjustment, Claim Denial and Service Authorization*. |
| **Problem** | **Non-uniform list of essential clinical information requested by MCOs to adjudicate and pay an otherwise clean claim.** Each of the six MCOs have their own, unique list of clinical or other documentation, outside of the standard information reported on a claim, that may be required to support payment. Moreover, these lists change constantly, with little or no warning given to hospitals.  Navigating these ever-changing payment rules increases the administrative burden on hospitals and diverts resources from patient care. |
| **Proposed Remedy** | Require the MCOs to use a single, standard list of essential clinical information or other documentation to support payment of claims.  To provide stability, this standard list would be developed by HFS, posted on the agency's website and only updated annually. |
| **Problem** | **Non uniform claim coding and messaging**. Each MCO has a proprietary list of codes that identify the reason a claim has been paid or not paid and any action that must be taken to change the claim from unacceptable to acceptable. The code descriptions often lack the detail needed for the hospital to determine why the MCO has reduced or refused payment, requiring staff to conduct substantial manual research to determine the real reason for the denial and whether the issue can be corrected.  Adhering to six different sets of insufficiently defined instructions unnecessarily increases the administrative cost of seeking payment for services. |
| **Proposed Remedy** | The MCOs should adhere to a single, standard list of payment determination codes that are cross-referenced with the national standard codes.  This would provide uniformity and consistency to help providers bill correctly and effectively manage denials, and significantly mitigate the rising administrative costs being passed on to the provider community. |

Medicaid Managed Care Priority Issues
March 21, 2019
Page 2

| | |
|---|---|
| **Problem** | **Medical necessity documentation and service authorization uniform guidelines.** Hospitals have noted wide ranging rules related to medical necessity and service authorization requests. Often MCO rules change with little or no notice. MCOs vary in how they confirm receipt of service authorizations, and many require a non-electronic, cumbersome system of faxing that is prone to error. Hospitals may not know if their requests were ever received. MCOs will often conduct audits after services are provided and take back payments without giving providers sufficient notice or a rationale for why the funds are being recouped. All these obstacles ultimately result in significant administrative burden and cost on the hospitals, barriers to receiving payment, and delays in providing medically necessary care. |

**Proposed Remedy**  A comprehensive and uniform set of common sense business practices related to service authorization process:

- MCOs must maintain and make available to providers an electronic tracking system of all service authorization requests, including a tracking number and identification of services being requested.
- MCOs must respond within four days, or 48 hours for urgent cases, and if the MCO does not respond within these timeframes, the service is deemed authorized.
- Once an MCO has approved a service, no further clinical information should be requested to determine if the provider will be paid, unless the services billed are substantially different than those approved by the MCO.
- Once a service is approved, the MCO should not be allowed to downgrade the service.
- MCOs should follow standard post-payment audit rules and give providers sufficient notice and identify the reason for the recovery when MCOs seek to take money back from providers.
- MCOs should be penalized when they deny payment for a service that was authorized by the MCO prior to delivery, but claim that service authorization was not obtained.
- MCOs should be penalized for claims that are denied due to insufficient documentation when it can be shown that the original submission contained all necessary information.

**Problem**  **Timely MCO requests for additional information** and clarifying the timeline associated with clean claims for purposes of timely payment interest penalties under the insurance code. Often, hospitals receive a request for additional clinical information long after a claim has been submitted. The request for additional information has been deemed by the MCOs as justification that the timely payment provision of the Illinois Insurance Code does not apply once the request has been issued. Often, hospitals receive the request near the end of the 30-day required payment period, essentially delaying payment for a service and avoid paying the timely payment interest penalty.

Medicaid Managed Care Priority Issues
March 21, 2019
Page 3

| | |
|---|---|
| **Proposed Remedy** | MCOs should request any additional information necessary to adjudicate a claim within five days of receiving the claim. MCOs should not require the submission of additional information for a claim which the MCO previously approved. The request for additional information may only suspend the 30 day payment requirement under the timely payment provisions of the insurance code. The mere presence of a request for additional information should not remove the claims from a clean claim status in perpetuity. Once the additional information has been supplied by the hospital, the clock should begin on the balance of the 30 days. This will incentivize the MCOs to respond in a timely manner. |
| **Problem** | **Automation of the calculation and payment of penalties and clear delineation of any payment under the timely payment penalty provisions of the Illinois Insurance Code.** On the rare occasion when hospitals receive the timely payment interest penalty, the MCOs fail to identify the penalty on a payment voucher, making it nearly impossible to attribute the penalty to the correct claim. By not clearly identifying the applicable case due the penalty, the provider cannot determine if the payment is compliant with the statue. Furthermore, not all MCOs automatically calculate and pay the penalty, instead requiring the provider to separately request these payments. This added billing step increases the cost of doing business and often serves as a barrier to getting paid. Hospitals will simply decide to not "chase" a penalty payment due them because of the added administrative burden. |
| **Proposed Remedy** | Providers need to be paid timely interest penalties in a transparent manner. MCOs should be required to automatically calculate timely payment interest penalties in accordance with the Illinois Insurance Code and separately identify payments for services from payment of interest. Both of these requirements are consistent with how interest is paid under the FFS Medicaid program. The provision makes the automatic calculation and reporting requirements consistent between the MCOs and the FFS system. |
| **Problem** | **Providers need to have the option of bringing payment disputes to an independent arbitrator** much like how individuals can do so when appealing a coverage denial. Attempts to resolve payment denial disputes take too long and, after months of haggling, hospitals are given an offer to settle the disputed claim at a substantial discount. MCOs should be held accountable for improper denials. |
| **Proposed Remedy** | Providers should have the right, after exhausting their internal appeal rights within the MCO contract, to have the final decision of an MCO that denies payment of a claim, in whole or in part, to be reviewed by an external independent third party. |

Medicaid Managed Care Priority Issues
March 21, 2019
Page 4

| | |
|---|---|
| **Problem** | **There has never been a verification of how much the MCOs spend on medical care**.  Although the state is required to verify the payout ratios of the MCOs, the Auditor General found that this has not occurred.  Therefore, we do not know if the MCOs are in compliance with their contract with the state. |
| **Proposed Remedy** | HFS should calculate the payout ratios reported by MCOs no less frequently than annually and post these calculations on its website. For an MCO not meeting the 85 percent payout threshold, the MCO should refund to the State the difference between what was paid to medical provers and the payout ratio and 85 percent. MCOs that do not pay the refund should be excluded from the Medicaid program. |
| **Problem** | **Untimely MCO provider roster updates**, resulting in denial of payment for services rendered while a contracted provider waits to be added to the publically viewable roster.  Although HFS has centralized the credentialing process, the MCOs continue to deny claims due to untimely MCO updating of provider rosters once the provider has been placed under contract with the MCO.  Frequently, MCOs will reject a claim submitted by a provider not contained on the MCOs publically available roster, despite the provider having a valid in-network contract.  Additionally, the delay in loading rosters with updated information creates an access to care issue for hospitals wishing to notify their regular patients that a new physician has become available under the associated MCO.  This results in a period of time when the physician is in limbo and unable to bill and receive reimbursement from the MCO. |
| **Proposed Remedy** | Any provider under contract with an MCO on the date services are provided to a covered enrollee should be reimbursed for medically necessary services, regardless of the provider being identified on the MCO's roster. Because the MCOs currently have little incentive to load physicians timely, the MCOs should be required to update their rosters within seven days of all newly contracted providers. |
| **Problem** | **MCOs are not adhering to the same payment timelines as the state's FFS expedited provider list**.  The Illinois Pubic Aid code identifies providers who are financially vulnerable and who require regular payment of claims submitted. These providers are identified as expedited providers and are given priority for payment at the Illinois Comptroller's office and are largely paid on a weekly basis.  MCOs have been encouraged by HFS to make accommodations to pay these providers timely, but it is not currently required. |
| **Proposed Remedy** | MCOs should be required to pay all hospitals qualifying under the expedited provider rules on a schedule at least as regular as the state FFS system pays the expedited provider list.  MCOs may meet this requirement by entering into a Periodic Interim Payment (PIP) program.  The parameters of a PIP program must be mutually agreed to and documented between the MCO and provider and must be voluntary.  The program must assure that the hospital provider is paid |

Medicaid Managed Care Priority Issues
March 21, 2019
Page 5

on a regular basis, consistent with the FFS system.  The program should allow for a reconciliation provision for any overpayments or advances.

**Problem**

**Hospitalization beyond medical necessity, resulting from lack of post discharge care coordination placement.**  Hospitals are increasingly being required to retain Medicaid enrollees in the hospital, beyond the date when the enrollee has been deemed ready for discharge by their attending physician.  These "Beyond Medical Necessity" stays typically do not receive reimbursement resulting in additional hospital expenses that are not reimbursed.   MCOs are required to coordinate placement or transfer to the appropriate setting of care post discharge but currently do not have an incentive to do so in a timely manner when the patient can remain in the hospital at no cost to the MCO.

**Proposed Remedy**

MCOs should be required to fulfill their obligations to arrange placement or transfer to the proper setting of care in a timely fashion, once notified by the hospital of a physician's discharge order.   Placement or transfer should occur within 24 hours, or the MCO should reimburse the hospital at a rate equal to the per day rate (per diem) for the associated stay, including any and all add-ons, such as Medicaid High Volume Adjustments (MHVA), Medicaid Percentage Adjustment (MPA) and Safety Net Hospital adjustments.  These stays often result in unreimbursed cost for the most financially vulnerable hospitals, such as Safety Net and Critical Access Hospitals.

# Exhibit 6

**From:** "Elwell, Doug" <Doug.Elwell@Illinois.gov>
**To:** Karen Brach <karen.brach@mhplan.com>, "Dawn.Kingsley@centerstone.org"
    <Dawn.Kingsley@centerstone.org>, "Mendonsa, Robert" <Robert.Mendonsa@Illinois.gov>
**Subject:** Fwd: [External] RE: Request for Settlement of Harmony Claims
**Date:** Wed, 12 Feb 2020 16:42:36 +0000

---

Karen

I am concerned about this settlement. I value what you have accomplished in this type of situation in the past and am asking if you can get this resolved.

Ms. Kingsley is copied so you can reach her directly.

Thanks in advance.

Doug

Sent from my iPhone

Begin forwarded message:

**From:** Dawn Kingsley <Dawn.Kingsley@centerstone.org>
**Date:** February 12, 2020 at 9:31:24 AM CST
**To:** "Elwell, Doug" <Doug.Elwell@illinois.gov>
**Cc:** "Mendonsa, Robert" <Robert.Mendonsa@illinois.gov>
**Subject: Re: [External] RE: Request for Settlement of Harmony Claims**

That is fine. Thank you for intervening. Would you mind copying me on your email. Thank you.
Dawn.

On Feb 12, 2020, at 8:07 AM, Elwell, Doug <Doug.Elwell@illinois.gov> wrote:

**[External Email - Please check the email address before clicking on any links in the email.]**
Dawn

I was under the impression Meridian was moving forward with all the settlements. With your permission I would like to forward your email to Karen Brach the Meridian CEO.

Doug

Sent from my iPhone

On Feb 11, 2020, at 4:53 PM, Dawn Kingsley <Dawn.Kingsley@centerstone.org> wrote:

Hi Doug,

I wanted to check in as I believe Friday is your last day. Can you tell me where this stands and if anything came out of the meeting yesterday?

Please let us know the next steps and how we can file a complaint. We still have not received the settlement proposal promised by Meridian. Thanks for your help and best of luck to you in your new endeavors.

**Dawn S. Kingsley, MSHA**
**Vice President, Payer Contracting & Strategy**
p. (615) 463-6253 | m. (615) 957-1670
44 Vantage Way, Suite 400, Nashville, TN 37228
Connect With Us | Centerstone

---

**From:** Elwell, Doug <Doug.Elwell@Illinois.gov>
**Sent:** Thursday, February 6, 2020 6:33 AM
**To:** Dawn Kingsley <Dawn.Kingsley@centerstone.org>; Mendonsa, Robert <Robert.Mendonsa@Illinois.gov>
**Cc:** Melanie A. Adkins <Melanie.Adkins@centerstone.org>; Anne Tyree <Anne.Tyree@centerstone.org>; John Markley <John.Markley@centerstone.org>; Marvin Lindsey <mlindsey@cbha.net>
**Subject:** RE: Request for Settlement of Harmony Claims

[External Email - Please check the email address before clicking on any links in the email.]

Dawn,

I am not an expert on the DOI process, but I will ask Robert Mendonsa to connect you to the correct people. On Monday we will call this issue out. Today I will ask the Meridian President to address.

Doug

---

**From:** Dawn Kingsley
**Sent:** Wednesday, February 05, 2020 10:07 PM
**To:** Elwell, Doug <Doug.Elwell@Illinois.gov>
**Cc:** Melanie A. Adkins <Melanie.Adkins@centerstone.org>; Anne Tyree <Anne.Tyree@centerstone.org>; John Markley <John.Markley@centerstone.org>; Marvin Lindsey <mlindsey@cbha.net>
**Subject:** [External] FW: Request for Settlement of Harmony Claims
**Importance:** High

Good Evening Doug,

Our billing and contracting teams have been working with Meridian for nearly 2 years to get unpaid claims resolved dating back to 2017. Below is recent email communication between Meridian and our team at Centerstone as we try to resolve claims that are nearly 3 years old. The unpaid claims total more than $300K for DOS prior to the WellCare Harmony/Meridian merger. We have had numerous meeting, both in persona and via phone. Our team has spent countless hours jumping through hoop after hoop trying to get these claims resolved and paid for services provided to Medicaid members managed under WellCare Harmony. It has been an exhausting and frustrating process as every time we adhere to their guidance Meridian come back with yet another onerous requirement.

As you can see in the communication below we gave Meridian until January 31st to provide us with a settlement proposal. We heard from them on January 22nd$^{th}$ saying they would have something by January 30th, 2020. As of COB today (February 5, 2020) we have not heard back or received a promised proposal. We attempted to file a complaint through the state website but it required us to submit individual complaints for each and every claim. We are not able to submit individual claims complaints so we collectively decided to start with you to find out what the right process would be to file a formal complaint with the State of Illinois Department of Insurance.

We have documentation of all communication, promises, instructions dating back to our work with Harmony and then Meridian. We can provide as much detail as you and/or Meridian requires. We need to get these claims resolved urgently and quickly.

Can you please provide me with some guidance on this process and we will be happy to work within those guidelines. Thank you for your time and attention to this issue.

**Dawn S. Kingsley, MSHA**
**Vice President, Payer Contracting & Strategy**
p. (615) 463-6253 | m. (615) 957-1670
44 Vantage Way, Suite 400, Nashville, TN 37228
Connect With Us | Centerstone

**From:** Karen Amazigo <Karen.Amazigo@mhplan.com>
**Sent:** Wednesday, January 22, 2020 1:39 PM
**To:** Melanie A. Adkins <Melanie.Adkins@centerstone.org>
**Cc:** Karen Brach <karen.brach@mhplan.com>; Anne Tyree <Anne.Tyree@centerstone.org>; John Markley <John.Markley@centerstone.org>; Tasha Brown <Tasha.Brown@mhplan.com>; Michelle Mittleman-Horner <Michelle.Mittleman-Horner@mhplan.com>
**Subject:** RE: Request for Settlement of Harmony Claims

**[External Email - Please check the email address before clicking on any links in the email.]**

Hi Melanie.

Thank you for your email. As mentioned in my voicemail message, I will forward the settlement proposal to our leadership team for review and consideration. We will provide a response with our decision by January 30th.

Regards,

Karen

Karen Amazigo

Manager of Network Development
Meridian
300 South Riverside Plaza, Suite 500
Chicago, IL 60606
www.mhplan.com

p. 312-705-2900 x28302
f. 312-508-7225

Privacy Notice: This electronic mail message, and any attachments, are confidential and are intended for the exclusive use of the addressee(s) and may contain information that is proprietary and that may be Individually Identifiable or Protected Health Information under HIPAA. If you are not the intended recipient, please immediately contact the sender by telephone, or by email, and destroy all copies of this message. If you are a regular recipient of our electronic mail, please notify us promptly if you change your email address.

**From:** Melanie A. Adkins <Melanie.Adkins@centerstone.org>
**Sent:** Wednesday, January 22, 2020 12:12 PM
**To:** Karen Amazigo <Karen.Amazigo@mhplan.com>

Cc: Karen Brach <karen.brach@mhplan.com>; Anne Tyree <Anne.Tyree@centerstone.org>; John Markley <John.Markley@centerstone.org>
**Subject:** Request for Settlement of Harmony Claims
**Importance:** High


*** CAUTION: This e-mail originated from an external source over the Internet. Please use caution when clicking on links and opening attachments if the source is unknown. ***


Hi Karen,

I am following up with you regarding the unpaid Harmony claims. I left you a voicemail, but wanted to follow up with an email regarding the details.

Our leadership team reviewed the spreadsheet of claims. We also met internally for discussion. Our AR team is concerned about the fact that the spreadsheet does not really give much information. For example, there is no explanation for individual claims as to why each one was assigned a particular bucket. We would have to research every single claim on the spreadsheet to determine whether we agree with the bucket. We are no longer willing to spend staff time going through these claims.

Here are the issues:

- At a glance, we know for sure that at least some of the claims are in the wrong bucket.
- $300,000 + is still owed to Centerstone
- On April 9, 2018 we were advised by Claudia that she would get the timely filing waived.
- We are charged $3.90 as a copay for claims because we are an HFS Provider. No other health plans assess this charge to us. We are requesting to have it waived on our claims and to be paid for those claims to which it was assessed.
- Last year our Mobile Crisis was cut, then it was reinstated. We are requesting payment for those claims that were denied during that period of time.

Karen, our senior leadership team is extremely concerned about these outstanding claims and are watching the progress very closely. At this point, Centerstone is unwilling to continue our attempt to resolve every single claim. There are simply too many claims with too many issues. It feels like we have not made any progress toward getting reimbursement even after a tremendous amount of effort.

This email is an official request for Meridian to propose an appropriate settlement. We have gone without payment far too long. There will be no more staff hours spent combing through claim by claim. I have been instructed by leadership that Centerstone is requesting fair and appropriate settlement offer from Meridian by January 30th. If we have not received an offer by this date, we will file a complaint with the Commissioner of Insurance immediately on the morning of January 31st.

Please understand that Centerstone wishes to be a good partner in providing care for Meridian members. However, we can no longer carry this large amount of outstanding AR.

Thank you and I look forward to hearing from you.

**Melanie Adkins**
**Senior Director of Payer Contracting**

p. (615) 948-1058

Connect With Us | Centerstone

The information contained in this Email message is private and confidential. It may contain Protected Health Information deemed confidential by HIPAA regulations. It is intended only for the use of the individual(s) named above, and the privileges are not waived by virtue of this information having been sent by Email. Any use, dissemination, distribution or copying of this the information contained in this communication is strictly prohibited by anyone except the named individual or that person's agent. If you have received this Email in error, please notify the sender immediately and destroy this Email. Thank You.

Click here to report this email as spam

---

The information contained in this Email message is private and confidential. It may contain Protected Health Information deemed confidential by HIPAA regulations. It is intended only for the use of the individual(s) named above, and the privileges are not waived by virtue of this information having been sent by Email. Any use, dissemination, distribution or copying of this the information contained in this communication is strictly prohibited by anyone except the named individual or that person's agent. If you have received this Email in error, please notify the sender immediately and destroy this Email. Thank You.

State of Illinois - CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

---

The information contained in this Email message is private and confidential. It may contain Protected Health Information deemed confidential by HIPAA regulations. It is intended only for the use of the individual(s) named above, and the privileges are not waived by virtue of this information having been sent by Email. Any use, dissemination, distribution or copying of this the information contained in this communication is strictly prohibited by anyone except the named individual or that person's agent. If you have received this Email in error, please notify the sender immediately and destroy this Email. Thank You.

---

The information contained in this Email message is private and confidential. It may contain Protected Health Information deemed confidential by HIPAA regulations. It is intended only for the use of the individual(s) named above, and the privileges are not waived by virtue of this information having been sent by Email. Any use, dissemination, distribution or copying of this the information contained in this communication is strictly prohibited by anyone except the named individual or that person's agent. If you have received this Email in error, please notify the sender immediately and destroy this Email. Thank You.