# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SAINT ANTHONY HOSPITAL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-2561 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THERESA EAGLESON, in her official | ) | |
| capacity as Director of the Illinois Department | ) | |
| of Health and Family Services, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Saint Anthony Hospital is a charitable hospital located on the west side of Chicago. It cares for a disproportionately poor patient population, so it relies heavily on Medicaid for its funding. But the Hospital has encountered all sorts of problems receiving payments from managed care organizations ("MCOs"), which are private healthcare insurance companies that administer the bulk of the Medicaid program in Illinois. All too often, the payments arrive late, or not at all.

Saint Anthony filed suit and asserted a right to payment under the Medicaid Act. But it didn't sue the MCOs. Instead, the Hospital filed a complaint against Theresa Eagleson, the Director of the Illinois Department of Health and Family Services ("HFS"). HFS is the state agency that is responsible for overseeing Medicaid in Illinois.

The theory of the complaint is that the state is failing to oversee the MCOs as required by federal law. The Hospital claims that the state's Medicaid system involving the MCOs is plagued by "dysfunction." *See* Cplt., at ¶ 38. The lack of oversight has allowed the MCOs to run rampant and shirk their responsibility to pay providers like Saint Anthony in full and in a

timely manner.  Saint Anthony seeks an injunction to force the state to compel the MCOs to do better.

The state moved to dismiss on a number of grounds.  For the reasons stated below, the motion to dismiss is granted.

## Background

Saint Anthony Hospital opened its doors in 1898.  *See* Cplt., at ¶ 16 (Dckt. No. 1).  For over a century, the Hospital has provided medical care and social services to the communities on the west side of Chicago.  *Id*. at ¶¶ 1, 12, 16.  The patient population at Saint Anthony is disproportionately poor.  *Id.* at ¶¶ 10, 16.

The patients may not have the means to pay for what they need, but that does not stop the Hospital from caring for them.  Saint Anthony is a "safety net" hospital, meaning that it cares for the needy without regard for their ability to pay.  *Id*. at ¶¶ 2, 16; *see also* 305 ILCS 5/5-5e.1.  Saint Anthony cares for everyone, and "turn[s] away no one."  *See* Cplt., at ¶ 10 (Dckt. No. 1).

The Hospital relies heavily on Medicaid to carry out its mission.  *Id*. at ¶¶ 1, 16.  Medicaid is a program funded by the federal and state governments to pay for health care for low-income families.  *Id.* at ¶ 22; *see generally* 42 U.S.C. § 1396 *et seq*.  The federal government provides funds to the states, and the states then contribute funds and administer the program within their borders.  *See* Cplt., at ¶ 22.

States can elect whether to participate in the Medicaid program.  But if states elect to participate, the federal government requires them to comply with certain conditions as expressed in the Medicaid Act.  For example, states must submit a plan to the federal government for approval, and the plan must describe how they intend to administer their Medicaid program.  *See* 42 U.S.C. § 1396a.

There is an enforcement mechanism on the back end. States must comply with the conditions in the statute, or else risk the possibility of losing federal funding. *See Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 969 (7th Cir. 2012); *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003) ("[O]nce a state elects to participate [in Medicaid], it must abide by all federal requirements and standards set forth in the Act."); 42 U.S.C. § 1396c.

The Illinois Department of Healthcare and Family Services is the agency that administers this state's Medicaid program. *Id.* at ¶ 13. Defendant Theresa Eagleson is the Director, and is responsible for ensuring that the state program complies with federal law. *Id.* at ¶¶ 13, 24.

Medicaid patients in Illinois can enroll in one of two programs: the "fee for service" program, or the "managed care" program. *Id.* at ¶¶ 25–26; *see also Aperion Care, Inc. v. Norwood*, 2018 WL 10231154, at *1 (N.D. Ill. 2018), *aff'd sub nom Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378 (7th Cir. 2020). When a patient is enrolled in the "fee for service" program, the state pays for the patient's medical care directly. *See Midwest Emergency Assocs.-Elgin Ltd. v. Harmony Health Plan of Illinois, Inc.*, 382 Ill. App. 3d 973, 975, 321 Ill. Dec. 175, 888 N.E.2d 694 (2008). So, when Saint Anthony treats a patient in the fee for service program, it sends the bill to the state.

The other program is the "managed care" program, and that's the program at issue in this case. Under that program, the state pays a private insurance company a flat monthly fee, on a per member basis. *Id.* at 975–76. And in exchange, the private insurance company agrees to pay for each patient's medical care. *Id.* The private insurance companies that participate in the Medicaid program are known as managed care organizations (again, "MCOs"). *Id.* When Saint Anthony treats a patient insured through the managed care program, it sends the bill to an MCO.

Illinois introduced the managed care program in 2006.  *See* Cplt., at ¶ 31 (Dckt. No. 1).

At first, the program was a small part of the state's Medicaid spending, representing less than 3%

of the state's total expenditures.  *Id.*  But the program has expanded significantly in recent years.

*Id.*  Illinois spent $251 million on MCOs in 2010, and by 2019, the expenditures shot up to

$12.73 billion.  *Id.*  As of January 2020, over 2.1 million people are enrolled in the state's

managed care program.  *Id.* at ¶ 35.  That's roughly 80% of the state's Medicaid enrollees.  *Id.*[1]

Meanwhile, the state reduced the number of MCOs from twelve to seven in 2017.  *Id.* at

¶¶ 32–35.  So fewer MCOs are providing an ever-growing amount of services.  The total value of

the state's contracts with the seven MCOs is $63 billion, the largest single procurement in

Illinois history.  *Id.* at ¶ 34.

As Saint Anthony tells it, the radical expansion came with significant growing pains.

According to the complaint, the state presided over a "hasty roll-out" of the managed care

program that was "haphazardly-planned and poorly-executed."  *Id.* at ¶¶ 36–37.  The Hospital

claims that the state fails to provide sufficient oversight of the MCOs, who take advantage of the

fact that the state is asleep at the wheel.

The complaint recounts the many problems that Saint Anthony has experienced when it

attempts to receive payment from the MCOs.  In the Hospital's view, the MCOs have an

incentive to pay nothing, or pay as little as possible, or pay as late as possible.  *Id.* at ¶¶ 26, 65.

And that's exactly what the MCOs are doing.  According to the complaint, the MCOs are

dragging their feet, and the state isn't doing anything about it.  *Id*. at ¶ 65.

---

[1]  For additional background, *see Illinois' Massive Shift to Managed Care* at *1, 5, Illinois Comptroller,
available at https://illinoiscomptroller.gov/news/fiscal-focus/illinois-massive-shift-to-managed-care/ (last
visited July 1, 2021).  Saint Anthony cited this article in the complaint.  *See* Cplt., at ¶ 31 n.8 (Dckt. No.
1).

Saint Anthony points to four bad practices in particular. *Id*. at ¶ 43. In a nutshell, the MCOs deny many of the claims, or don't pay in full, or put up roadblocks, or don't make it clear what they are paying and what they're denying. "The MCOs have systematically delayed and denied claims without justification, failed to pay undisputed claims, and when payments are made, they refuse to provide the detail necessary for Saint Anthony to determine if it is receiving proper payment or, if not, why not." *Id.* at ¶ 6.

First, the MCOs deny Saint Anthony's claims much more often than in the past. Specifically, claims are denied at a rate that is "four times greater" than "under the previous system." *Id*. at ¶ 46. As a result, the Hospital "is not paid for a substantial amount of services it provides." *Id.* at ¶ 48. A denial means that Saint Anthony must foot the bill. *Id.*

Many of the denials involve ticky-tack issues and "technical 'gotchas.'" *Id*. at ¶ 47. For example, "Illinicare MCO denied $92,000 in charges submitted by Saint Anthony because the patient label was placed on a State-mandated consent form for the procedure instead of the patient's name being handwritten on the form." *Id*.

Second, when the MCOs do approve claims, they make Saint Anthony wait a long time for the funds. Today, Saint Anthony "has to wait anywhere from 90 days to 2 years to be paid by the MCOs." *Id*. at ¶ 51; *see also id.* at ¶¶ 72–73. But in the meantime, Saint Anthony has bills of its own to pay. Without receiving payment from the MCOs, Saint Anthony has trouble paying its vendors. *Id*. at ¶ 51.

Third, the process for requesting payment from the MCOs is unduly cumbersome. *Id.* at ¶¶ 52–54. Each MCO has its own policies and procedures for how to request payment, creating a "labyrinth" that is difficult to navigate. *Id.* at ¶ 52.

Fourth, when the MCOs do tender payment, it's difficult to tell what they're paying for. That is, the "MCOs do not provide itemized claims data showing a breakdown of how it calculated the total amount of payment for a claim, leaving Saint Anthony to guess whether it received the full amount due to it." *Id*. at ¶ 57.

Overall, Saint Anthony is facing "unjustified denials, unwarranted delays . . . and increased costs to try to navigate this broken system." *Id*. at ¶ 54. The Hospital has to devote resources to try to get paid, and any money spent on reimbursement efforts is money that it can't spend on patient care. *Id*. The lack of payment creates a risk of cutting services, and may put the Hospital itself in jeopardy. *Id*.

All of those bad practices, but especially the delays in payment, have had disastrous financial consequences for Saint Anthony. *Id*. at ¶¶ 10, 70. For one, late payments have resulted in a precipitous decline in cash on hand. "From 2015 to 2019, Saint Anthony's cash on hand has fallen 98%: from over $20 million (enough to fund 72 days of operation) to less than $500,000 (less than 2 days)." *Id*. at ¶ 21. By Saint Anthony's calculations, MCOs currently owe Saint Anthony north of $20 million in Medicaid payments. *Id*. at ¶ 4. Saint Anthony has also suffered a 20% decline in net revenue per patient. *Id.* at ¶ 71.

According to the complaint, the MCOs know that they have leverage over vulnerable hospitals like Saint Anthony. And they are taking full advantage of it. Saint Anthony has attempted to resolve disputes with the MCOs, but has encountered "delay, unreasonable requests for additional information, and a general lack of responsiveness." *Id*. at ¶ 64. The Hospital is forced to endure a "time-consuming, resource-intensive, [and] often futile appeals process." *Id*. at ¶ 48. The MCOs subject Saint Anthony to months of haggling, and all too often, the end result is a settlement offer at a "substantial discount." *Id*. at ¶ 64.

The "bottom line" is that Saint Anthony "is being paid much less than before the Medicaid managed care expansion under the prior administration [of Governor Rauner]." *Id.* at *Id.* at ¶ 61. And the financial situation of the Hospital has hit a "crisis point." *Id.* at ¶ 70; *see also id.* at ¶ 10.

At this point, a reader could be forgiven for thinking that Saint Anthony filed suit against the MCOs. But that's not the case at all. The contracts between Saint Anthony and the MCOs include an arbitration provision, so presumably the Hospital didn't sue the MCOs because it can't sue the MCOs (in federal court, anyway).[2] Instead, Saint Anthony brought this lawsuit against Theresa Eagleson in her capacity as the Director of the Illinois Department of Health and Family Services.

The theory of the case is that the Medicaid Act requires states to oversee the MCOs. Saint Anthony basically claims that the Medicaid Act requires the state to ensure that the MCOs pay providers in a timely manner. But instead of doing its job and providing oversight, the state "has given MCOs *carte blanche* to delay and deny claims and payments." *Id.* at ¶ 65. And by falling down on the job, the state is violating federal law, and placing the Hospital in peril. *Id.* at ¶¶ 70, 78.

Saint Anthony filed a two-count complaint. Each Count alleges that provisions of the Medicaid Act give providers rights that are enforceable under section 1983. The provisions

---

[2] Saint Anthony could have taken up these issues directly with the MCOs through arbitration. Saint Anthony has contracts with all seven MCOs in the Illinois managed care program, and those contracts detail which services each entity covers, how much they'll reimburse the Hospital, and how the claims approval process works. *See* Joint Reply Brief in Support of the MCOs' Mtns.' to Compel Arbitration and Stay Action, at 3 (Dckt. No. 93); Cplt. at ¶ 72 (Dckt. No. 1). The agreements also state the timeline when the MCOs must process certain claims. *Id.* But the contracts also contain binding arbitration clauses, which require both parties to litigate any disputes in front of an arbitrator instead of a court. *Id.* A number of the MCOs intervened in this action and filed motions to compel arbitration. As they see it, Saint Anthony's lawsuit against the state is a round-about, back-door way to get around the arbitration provisions.

differ, but the gist of each Count is the same.  The Hospital claims that it has a statutory right to prompt payment, and that the state has a duty to enforce the payment obligations of the MCOs.

Count I rests largely on section 1396u-2(f), a statutory provision about the content of a contract between the state and an MCO.  That section provides that a "contract" between the state and an MCO "shall provide" that the MCO "shall make payment to health care providers . . . on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title," unless the MCO and the provider make a different deal.  *See* 42 U.S.C. § 1396u-2(f).

That section ropes in section 1396a(a)(37)(A).  And section 1396a(a)(37)(A), in turn, requires a state's plan to have procedures that ensure prompt payment.  "A State plan for medical assistance must . . . provide for claims payment procedures which . . . ensure" that a certain percentage of claims are paid by a certain period of time.  *See* 42 U.S.C. § 1396a(a)(37)(A). Specifically, the "procedures" must "ensure" that 90% of claims are paid within 30 days, and 99% of claims are paid within 90 days.  *Id.*

Count I also cites a statutory provision that creates a remedy for non-compliance.  *See* Cplt., at ¶ 81.  The federal government can withhold funds from a state if the MCOs do not comply with section 1396u-2, and by extension 1396u-2(f).  "[N]o payment shall be made under this subchapter to a State . . . unless . . . the entity complies with the applicable requirements of section 1396u-2."  *See* 42 U.S.C. § 1396b(m)(2)(A)(xii).

Viewing those provisions as a whole, Saint Anthony claims that the state has a duty to ensure that MCOs pay providers in a timely manner.  The Hospital alleges that the state is falling down on the job, by shirking its responsibility to ensure payment to providers.  The state's lax approach toward payment, in the Saint Anthony's view, violates federal law.

Count II rests primarily on section 1396a(a)(8), which is about the state's Medicaid plan. The state plan must provide that "medical assistance . . . shall be furnished with reasonable promptness to all eligible individuals." *See* 42 U.S.C. § 1396a(a)(8). The definition of "medical assistance" includes payment for medical care. *See* 42 U.S.C. § 1396d(a). Reading those provisions together, Saint Anthony claims that the reference to "reasonable promptness" creates a right to be paid on the 30-day/90-day schedule set out in section 1396a(a)(37)(a), the section discussed above. *See* Cplt., at ¶ 90 (Dckt. No. 1).

Saint Anthony seeks declaratory and injunctive relief. The Hospital seeks a declaratory judgment that the state has violated federal law by failing to ensure that the MCOs meet the requirements for timely payment. *Id.* at ¶¶ 87, 96.

The Hospital also requests an injunction to force the state to "caus[e]" the MCOs to pay claims by set deadlines. *Id.* The sought-after injunction also would require the state to collect monthly reports on the payment of claims by the MCOs, and would compel the state to force the MCOs to use a standard format for the payment of all claims. *Id.* So the Hospital wants an injunction to force the *state's* hand to twist the *MCOs'* arms.

If the MCOs still do not comply, Saint Anthony seeks an injunction requiring the state to "terminate its MCO contracts," and "retake responsibility for payment of claims." *Id.* That relief would, in effect, end a program that currently serves 80% of the state's Medicaid enrollees, totaling more than 2.1 million people. *Id.* at ¶ 35.

The state moved to dismiss on a number of grounds. *See* Def.'s Mem. (Dckt. No. 24). The lead argument is that the Medicaid Act does not impose a 30-day/90-day payment schedule for hospitals like Saint Anthony. In its view, that timetable applies to practitioners, not

providers.  Next, the state argues that the provisions in question do not give rise to a private of action.  The state also invokes the Eleventh Amendment.

The Court concludes that the statutory provisions in question do not give rise to a private right of action, because they do not create rights that are enforceable under section 1983.  And even if a plaintiff could bring a claim, Saint Anthony has failed to state a claim for which relief can be granted.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case.  *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor.  *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).  To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Discussion

The motion to dismiss raises a number of issues.  The Court will first address whether there is a private right of action, and then will turn to whether Saint Anthony's complaint states a claim.  Step one is deciding whether Congress authorized claimants to enter the courthouse at all.

## I.    The Existence of a Private Right of Action

"Medicaid is a cooperative program through which the federal government reimburses certain expenses of states that promise to abide by the program's rules." *See Nasello v. Eagleson*, 977 F.3d 599, 601 (7th Cir. 2020); *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990) (noting that the Medicaid Act requires states to "comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services"); *see also Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 969 (7th Cir. 2012).  The Medicaid Act is an example of Congress exercising its power under the Spending Clause.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012).  "[L]egislation enacted pursuant to the spending power is much in the nature of a contract; in return for federal funds, the States agree to comply with federally imposed conditions."  *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 2 (1981).  The federal government provides funds, with strings attached.

Saint Anthony believes that the state is not living up to its end of the bargain.  As the Hospital tells it, the MCOs are shirking their payment obligations, and the state is letting them get away with it.

A threshold issue is whether Saint Anthony can bring a claim at all.  That is, the first step is deciding whether Congress created a private right of action.  It is one thing to create substantive federal law; it is another to create a private right of action to enforce it in the federal courthouse.  *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. . . .  Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how

compatible with the statute."); *see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 365 (1991) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.") (Scalia, J., concurring).

The Medicaid Act is chock-full of requirements for the states. But it does not create a private cause of action for providers like Saint Anthony to enforce the payment obligations. The Hospital has not pointed to any foothold in the text of the statute that authorizes a claim against the state. In fact, Saint Anthony doesn't even argue that the Medicaid Act itself green-lights a private right of action.

Instead, the Hospital relies on section 1983 as the springboard for bringing a claim. The text of the statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any *rights*, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

*See* 42 U.S.C. § 1983 (emphasis added).

Section 1983 "means what it says." *See Maine v. Thiboutot*, 448 U.S. 1, 4 (1980). The statute "authorizes suits to enforce individual rights under federal statutes as well as the Constitution." *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005).

For present purposes, the key word in the statute is "rights." *See* 42 U.S.C. § 1983. The text of the statute authorizes suits to enforce "*rights*, not the broader or vaguer 'benefits' or 'interests.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (emphasis in original); *see also Blessing v. Freestone*, 520 U.S. 329, 340 (1997) ("In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal

*law*.").  The statute "does not provide an avenue for relief every time a state actor violates a federal law."  *City of Rancho Palos Verdes*, 544 U.S. at 119.

To enforce a federal statute under section 1983, a plaintiff must demonstrate that the "federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs."  *Id.*  Three factors come into play when deciding whether a statute creates a right that is enforceable under section 1983:  (1) "Congress must have intended that the provision in question benefit the plaintiff;" (2) the asserted right must not be "so vague and amorphous that its enforcement would strain judicial competence;" and (3) the statute must "unambiguously impose a binding obligation on the States," meaning that the "provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms."  *Blessing*, 520 U.S. at 340–41.

Those factors "are meant to set the bar high."  *See Planned Parenthood of Indiana*, 699 F.3d at 973; *see also BT Bourbonnais Care LLC v. Norwood*, 866 F.3d 815, 820–21 (7th Cir. 2017) (noting that the test is "strict").  A plaintiff must come forward with an "unambiguously conferred right to support a cause of action brought under § 1983."  *See Gonzaga*, 536 U.S. at 283; *see also id.* at 290 ("In sum, if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms . . . ."); *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 332 (2015) ("Our precedents establish that a private right of action under federal law is not created by mere implication, but must be 'unambiguously conferred.'") (quoting *Gonzaga*, 536 U.S. at 283).

This "rigorous" approach reflects concerns about federalism, by ensuring that courts do not allow states to become embroiled in litigation based on conditions not clearly expressed in the statutory text.  *See Planned Parenthood of Indiana*, 699 F.3d at 973; *Pennhurst*, 451 U.S. at

24.  It promotes the separation of powers, too, by ensuring that courts do not give the green light to suits not authorized by Congress.  *See Hernandez v. Mesa*, 140 S. Ct. 735 (2020); *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017); *Alexander*, 532 U.S. at 287 ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."); *Nasello*, 977 F.3d at 601 ("Creating new rights of action is a legislative rather than a judicial task.").  It is the role of Congress, not courts, to open the courthouse doors to claimants.

"Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by §1983."  *Gonzaga*, 536 U.S. at 284.  But the presumption is rebuttable.  *See Blessing*, 520 U.S. at 341.  The state can rebut the presumption by showing that Congress "shut the door to private enforcement either expressly, through 'specific evidence from the statute itself,' or 'impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'"  *See Gonzaga*, 536 U.S. at 284 n.4 (quoting *Blessing*, 520 U.S. at 341).

In *Wilder v. Virginia Hospitals*, 496 U.S. 498, 508–12 (1990), the Supreme Court allowed plaintiffs to use section 1983 to bring a claim to enforce a now-defunct provision of the Medicaid Act known as the Boren Amendment.  That provision permitted the federal government to reduce a state's Medicaid funding unless it paid hospitals for their services at certain rates.  The Supreme Court held that the plaintiffs could bring their claim under section 1983.  *Id.* at 508.

But the *Wilder* approach to section 1983 seems to have reached the end of the line.  In the ensuing decades, the Supreme Court has shown little enthusiasm for using section 1983 as a gateway for claims involving Spending Clause legislation.  The Supreme Court itself has acknowledged that its "later opinions plainly repudiate the ready implication of a § 1983 action

that *Wilder* exemplified." *See Armstrong*, 575 U.S. at 330 n.*; *see also Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 911 (7th Cir. 2003) (holding that section 1396a(a)(19) "cannot be interpreted to create a private right of action, given the Supreme Court's hostility, most recently and emphatically expressed in *Gonzaga* . . . to implying such rights in spending statutes").

In a string of cases, the Seventh Circuit has addressed whether various provisions of the Medicaid Act create a right that is enforceable under section 1983. The outcomes are a mixed bag, meaning that the Court of Appeals has sometimes found a private right of action, and sometimes not. Each case turned on the unique statutory provisions at issue. *See Bontrager v. Indiana Family and Social Servs. Admin.*, 697 F.3d 604, 607 (7th Cir. 2012) (recognizing a private right of action under section 1396a(a)(10)(A)); *Planned Parenthood of Indiana*, 699 F.3d at 974 (holding that section 1396a(a)(23) creates a federal right vested in Medicaid-eligible individuals); *BT Bourbonnais Care*, 866 F.3d 820–23 (holding that section 1396a(a)(13) creates a federal right vested in nursing homes); *Nasello*, 977 F.3d at 601 (holding that section 1396a(r)(1)(A) does not create a federal right vested in nursing home residents).

The Seventh Circuit recently surveyed the state of the law in this area in *Nasello v. Eagleson*, 977 F.3d 599 (7th Cir. 2020). *Nasello* involved a claim under section 1983 to enforce a provision of the Medicaid Act requiring states to pay more for "medically needy" individuals. *Id.* at 600–01. Plaintiffs argued that the statute required the state to reimburse them for past bills. *Id.*

The Seventh Circuit held that the provision in question did not create a right enforceable under section 1983. "Medicaid does not establish anyone's entitlement to receive medical care (or particular payments); it requires only compliance with the terms of the bargain between the

state and federal governments." *Id.* at 601. The Court of Appeals noted the steady flow of cases from the Supreme Court finding no private right of action under Spending Clause legislation. "In the three decades since *Wilder* it has repeatedly declined to create private rights of action under statutes that set conditions on federal funding of state programs." *Id.*; *see also Armstrong*, 575 U.S. 320; *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011); *Gonzaga*, 536 U.S. 273.

Courts have no power to "enlarge the list of implied rights of action when the statute sets conditions on states' participation in a program, rather than creating direct private rights." *See Nasello*, 977 F.3d at 601. Creating a private right of action is the business of the legislature, not the judiciary. *Id.* If the state is falling down on the job under the Medicaid Act, an interested person can resort to the "administrative process – and if that fails they could ask the responsible federal officials to disapprove a state's plan or withhold reimbursement." *Id.* at 601–02.

So the question here is whether the provisions of the Medicaid Act create a right that is enforceable by providers like Saint Anthony under section 1983. Based on the standards laid down in *Blessing* and *Gonzaga*, Saint Anthony has no private right of action against the state. The Court will take up the relevant statutory provisions by Count.

### A. Section 1396u-2(f) (Count I)

In Count I, Saint Anthony claims that the state has an obligation to ensure that the MCOs pay providers in a timely manner. The Hospital rests its claim on section 1396u-2(f) of the Medicaid Act, which sets requirements for a contract between a state and MCOs. Section 1396u-2(f) provides:

> A *contract* under section 1396b(m) of this title with a medicaid managed care organization *shall provide that the organization shall make payment to health care providers* for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under

this subchapter who are enrolled with the organization *on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A)* of this title, unless the health care provider and the organization agree to an alternate payment schedule and, in the case of primary care services described in section 1396a(a)(13)(C) of this title, consistent with the minimum payment rates specified in such section (regardless of the manner in which such payments are made, including in the form of capitation or partial capitation).

*See* 42 U.S.C. § 1396u-2(f) (emphasis added). The "contract under section 1396b(m)" means a "contract between the State and the entity," meaning the an MCO. *Id.*; 42 U.S.C. § 1396b(m)(2)(A)(iii).

Section 1396u-2(f) expressly invokes the "claims payment procedures" in section 1396a(a)(37)(A). That section, in turn, sets requirements for claims payment procedures in a state's plan. Specifically:

A State plan for medical assistance must . . . provide for *claims payment procedures which . . . ensure* that 90 per centum of claims for payment (for which no further written information or substantiation is required in order to make payment) made for services covered under the plan and furnished by health care practitioners through individual or group practices or through shared health facilities are paid within 30 days of the date of receipt of such claims and that 99 per centum of such claims are paid within 90 days of the date of receipt of such claims.

*See* 42 U.S.C. § 1396a(a)(37)(A) (emphasis added).

Applying the *Blessing* factors, the Court concludes that sections 1396u-2(f) and 1396a(a)(37)(A) do not create rights that are enforceable under 1983. Simply put, there is no private right of action.

The first factor under *Blessing* is whether "Congress . . . intended that the provision in question benefit the plaintiff." *Blessing*, 520 U.S. at 340. Nothing "less than an unambiguously conferred right is enforceable by § 1983." *Gonzaga*, 536 U.S. at 282.

At first blush, the provisions might give the impression that they are designed to benefit providers like Saint Anthony. After all, the provisions are about timely payment. In life, the people most interested in timely payment are the people getting paid.

But that's not the sort of entitlement that can give rise to an enforceable right. The Supreme Court made clear in *Gonzaga* that a generalized "benefit" isn't good enough. *See id.* at 283. Falling within the "general zone of interest" is not enough to have a right. *Id.* To create judicially enforceable rights, the statute's text "must be 'phrased in terms of the persons benefited,'" and have "'an *unmistakable focus* on the benefited class.'" *Id.* at 284 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692 n.13 (1979)) (emphasis in original).

That sort of rights-creating language is missing in the provisions at hand. Section 1396u-2(f) is about the content of contracts between the state and MCOs. A "contract" with MCOs "shall provide" that the MCOs "shall make payment" on a "timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A)." *See* 42 U.S.C. § 1396u-2(f). Instead of creating rights to payment, section 1396u-2(f) requires the contracts to do the heavy lifting. *Id.* The provision itself does not entitle providers to much of anything, and does not contain any "explicit rights-creating terms." *See Gonzaga*, 536 U.S. at 284.

In other words, section 1396u-2(f) requires the state to include certain provisions in its contracts with MCOs. It does not require the state to enforce those provisions, or otherwise ensure that MCOs pay providers promptly.

Saint Anthony is not claiming that the contracts between the state of Illinois and the MCOs are missing provisions required by the statute. In other words, Saint Anthony is not attempting to change the contractual arrangement between the state and the MCOs to bring it into compliance with section 1396u-2(f). The issue isn't whether a provider has an enforceable

right to require the state to include certain provisions in its contract with MCOs.  Instead, the Hospital asserts that it has a right to prompt payment, and that the state has a duty to make sure that the MCOs pay as they should.  And when reading the statute, that right simply isn't there.

Section 1396u-2(f) loops in section 1396a(a)(37)(A), but the result is the same.  That section is about the content of a state's plan.  "A State plan for medical assistance must . . . provide for claims payment procedures . . . ."  *See* 42 U.S.C. § 1396a(a)(37)(A).  Those "procedures" must "ensure" that 90% of claims are paid within 30 days, and 99% of claims are paid within 90 days.  *Id.*

The statute sets prompt payment as a goal, but it stops short of creating a right to prompt payment for the providers.  In fact, section 1396a(a)(37)(A) does not mention providers at all. There's no "individually focused terminology" because there's no mention of the providers.  *See Gonzaga*, 536 U.S. at 287.  It's hard to see how section 1396a(a)(37)(A) could "unambiguously create[] an 'individual entitlement'" in the hands of the providers when it does not mention the providers at all.  *See Planned Parenthood of Indiana*, 699 F.3d at 973 (citation omitted).

Taken together, the provisions create a general benchmark, not an individual right.  The sections set an "aggregate plan requirement," without establishing a "personal right."  *Id.* at 974. So they cannot support the weight of a claim under section 1983.

Saint Anthony relies heavily on *BT Bourbonnais Care*, but it does not lend much of a hand.  *See* Pl.'s Resp., at 11–14 (Dckt. No. 26).  That case involved an express procedural right, that is, a right to notice and comment before the state changed reimbursement rates.  *See BT Bourbonnais Care*, 866 F.3d at 821 ("[T]he Operators are not arguing that the current version of section 1396a(a)(13)(A) creates a substantive right to any particular level of reimbursement. Instead, they contend, it creates a procedural right to certain information, as well as a procedural

right to notice and comment.").  The Court of Appeals addressed the "narrow question" whether section 1396a(a)(13)(A) created an "enforceable right to a public process."  *Id.* at 820.

The Medicaid Act required the state to "provide . . . providers . . . reasonable opportunity for review and comment on the proposed rates."  *See* 42 U.S.C. § 1396a(a)(13)(A).  Based on the plain language of the text, the Seventh Circuit held that the statute created an enforceable right. The provisions at issue in *BT Bourbonnais Care* expressly required the state to do something for the providers, to wit, give them notice and an opportunity to chime-in before changing rates.

The provisions at hand in this case, in sharp contrast, contain no comparable language. There is no language giving providers an unmistakable right to prompt payment.  *BT Bourbonnais Care* involved statutory language creating "unambiguous private rights," but this case does not.  *See BT Bourbonnais Care*, 866 F.3d at 821.  So it is not enough to argue that this case, like *BT Bourbonnais Care*, involves "procedures."  *See* Pl.'s Resp., at 13 (Dckt. No. 26). This case does involve *procedures*, but it does not involve a claim that the state violated anyone's procedural *rights*.  *See* 42 U.S.C. § 1396a(a)(37) ("A State plan for medical assistance must . . . provide for claims payment procedures . . . .").

The statute does contemplate a right of the providers in one sense.  The Medicaid Act contemplates two tiers of contracts:  a contract between a state and the MCOs, and a contract between the MCOs and the providers.  *See Community Health Care Ass'n of New York v. Shah*, 770 F.3d 129, 137 (2d Cir. 2014) ("Under this system generally, the state does not directly reimburse health service providers that serve Medicaid recipients.  Rather, the state enters into a contract with an MCO.  The state then pays the MCO for each Medicaid patient enrolled with it. The MCO, in turn, contracts with a health service provider . . . to provide medical services to its enrollees."); *see also* 42 U.S.C. § 1396u-2(a)(1)(A)(ii) (referring to "provider agreements with

managed care entities"); 42 U.S.C. § 1396u-2(f) (creating a carve-out if a "health care provider and the organization agree to an alternate payment schedule"). The state provides funds to the MCOs, and the MCOs provide funds to the providers, with each link of the chain forged by contract.

So Congress had in mind that providers would have contractual rights. And contractual rights come with an ability to enforce the contract if there is a breach. Congress legislates against the backdrop of the common law, and undoubtedly knew that contractual rights could give rise to breach-of-contract claims. *See Minerva Surgical, Inc. v. Hologic, Inc.*, No. 20-440, 2021 WL 2653265, at *7 (2021); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("Congress is understood to legislate against a background of common-law adjudicatory principles.").

Instead of imposing a statutory obligation of prompt payment, Congress decided that providers would enter into contracts with MCOs, and that the contracts would carry the load. Providers like Saint Anthony who believe that they are not receiving timely payment can assert whatever rights they may have under those agreements. But the remedy is contractual in nature, not a statutory claim against the state to compel the MCOs to do what they promised to do.

Saint Anthony could have asserted whatever rights it may have under its agreements with the MCOs. But the contracts also include arbitration provisions, and the MCOs (who intervened) rightly argue that any dispute between Saint Anthony and the MCOs about their payments belongs in front of an arbitrator. For whatever reason, the Hospital elected not to go that route. But having taken a pass on the opportunity to pursue contractual rights – rights contemplated by the statute – Saint Anthony cannot be heard to argue that this Court should open a backdoor to the courthouse.

The second *Blessing* factor is whether the asserted right is "so 'vague and amorphous' that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340–41 (citation omitted). This factor is closer to the line. If the statute simply required payment on a "timely basis" without more, it would stretch the ability of the judiciary to apply that standard in a particular case. *See* 42 U.S.C. § 1396u-2(f). Payors and payees may have much different views of what a "timely" payment is.

But here, the statute does place markers for what it means to be "timely." Under section 1396a(a)(37)(A), the procedures must ensure that 90% of so-called "clean claims" for payment (*i.e.,* claims that don't require more information) are paid within 30 days, and that 99% of such claims are paid within 90 days. *See* 42 U.S.C. § 1396a(a)(37)(A). Applying that standard to a busy hospital with who-knows-how-many claims could be a herculean task, but it is not vague or amorphous, either. It might strain judicial *resources*, but it would not strain "judicial competence." *Blessing*, 520 U.S. at 340–41. Applying a fixed standard to a lot of claims for payment is not easy, but it's not the same thing as applying a nebulous standard that no one can pin down.

The problem for this second factor is not so much that the standard is loosey-goosey. The problem is that the statute does not create an individual right to payment by a fixed deadline at all (*i.e., Blessing* factor one). But if the statute hypothetically *did* entitle providers to receive a certain percentage of payments by a certain period of time, courts could use that yardstick to measure compliance.

The third and final *Blessing* factor is whether the statute "unambiguously impose[s] a binding obligation on the States" using "mandatory, rather than precatory, terms." *Id.* at 341.

"[T]he statute cannot leave any room for discretion on the part of the state . . . ." *See BT Bourbonnais Care*, 866 F.3d at 822.

The provisions do contain mandatory language, as exemplified by the use of the words "shall" and "must." *See Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020). The statute provides that contracts "shall" contain provisions about payment procedures. *See* 42 U.S.C. § 1396u-2(f). The statute also provides that a state plan "must" have claims payment procedures. *See* 42 U.S.C. § 1396a(a)(37).

But once again, § 1396u-2(f) simply requires the state to include certain provisions in its contracts with the MCOs. It does not require the state to ensure that the MCOs are complying with those provisions. That is, the Medicaid Act does not "require the State to ensure that the MCOs timely and properly" make payments to providers. *See* Cplt., at ¶ 5 (Dckt. No. 1); *see also id.* at ¶ 9 ("Saint Anthony brings this action . . . to order [the state] to comply with the federal and state statutory and regulatory mandate to safeguard Medicaid money and oversee and manage the MCOs . . . ."). The mandatory language is about the content of the contracts. It does not contain mandatory language that compels the state to make sure that the MCOs pay up.

If Congress had wanted to compel prompt payment to the providers, it could have easily done so. Congress could have guaranteed that providers must receive a certain amount of payments in a certain period of time. And it could have written a provision requiring the state to enforce those obligations. But it didn't. Instead, Congress elected to create requirements for contracts, and requirements for a state's plan. Those aren't rights for providers.

In sum, under the standards set out in *Blessing* and *Gonzaga*, sections 1396u-2(f) and 1396a(a)(37)(A) do not create rights that are enforceable under section 1983.

**B.     Section 1396a(a)(8) (Count II)**

The claim under Count II fails for many of the same reasons.  Saint Anthony relies on other statutory provisions, but they do not give rise to a private right of action, either.

Saint Anthony invokes section 1396a(a)(8), which sets requirements for a state's Medicaid plan.  "A State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."  *See* 42 U.S.C. § 1396a(a)(8).  The definition of "medical assistance" includes payment for medical care.  *See* 42 U.S.C. § 1396d(a) ("The term 'medical assistance' means payment of part or all of the cost of the following care and services or the care and services themselves . . . .").

Saint Anthony believes that those provisions create a statutory entitlement to payment with "reasonable promptness."  *See* 42 U.S.C. § 1396a(a)(8).  And the Hospital contends that it can bring suit to enforce it.  But once again, the *Blessing* factors stand in the way.

First, the statute does not contain the type of rights-vesting language required to give rise to a right of action.  The statute establishes requirements for a "State plan."  *Id.*  It sets conditions for a state's participation in the Medicaid program.  It does not create direct private rights and entitle providers to receive payment by any fixed period of time.  *Cf. Nasello*, 977 F.3d at 601–02.

In fact, the provision in question does not even mention providers at all.  The statute refers to "*individuals* wishing to make application for medical assistance."  *See* 42 U.S.C. § 1396a(a)(8) (emphasis added).  It would be unnatural to refer to a provider like a hospital as an

"individual."  Individuals go to hospitals, but few of them think that the hospital *itself* is an "individual."

Saint Anthony argues that the term "eligible individuals" applies to both providers and patients.  *See* Pl.'s Resp., at 10–11 (Dckt. No. 26).  That reading sits uncomfortably with the sentence as a whole.  Section 1396a(a)(8) uses the word "individuals" twice.  *See* 42 U.S.C. § 1396a(a)(8) ("A State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals.").  That word first appears in connection with an application – "all individuals wishing to make application for medical assistance under the plan."  *Id.*  An "application" is the form that an individual patient submits when applying to the Medicaid program.  *See* 42 C.F.R. § 435.4 ("*Applicant* means an individual who is seeking an eligibility determination for himself or herself through an application submission or a transfer from another agency or insurance affordability program . . . *Application* means the single streamlined application described at § 435.907(b) of this part or an application described in § 435.907(c)(2) of this part submitted by or on behalf of an individual." ) (emphasis added).

So the statutory phrase "individuals wishing to make application" refers to patients who apply to participate in Medicaid.  And when the sentence later states that "such assistance shall be furnished *with reasonable promptness* to all *eligible individuals*," the phrase "all eligible individuals" refers to eligible patients who applied for Medicaid benefits and who were deemed eligible.  *See* 42 U.S.C. § 1396a(a)(8) (emphasis added).  It doesn't mean providers.

Neighboring provisions reinforce the point.  The surrounding text repeatedly uses the word "individual" to refer to natural persons, not providers.  *See, e.g.*, 42 U.S.C. § 1396a(a)(4)

(referring to "any individual employed," and "each individual who formerly was such an officer, employee, or contractor"); *id*. at § 1396a(a)(10)(A)(i) (referring to "all individuals" who are "qualified pregnant women or children," or "whose family income" falls below the cutoff, or who are "qualified family members," and so on); *id.* at § 1396a(a)(10)(A)(ii)(XII) (referring to "TB-infected individuals"); *id.* at § 1396a(a)(10)(A)(ii)(XVI) (referring to "employed individuals with a medically improved disability"); *id.* at § 1396a(a)(10)(C)(ii) (referring to "individuals under the age of 18").

Even if it's *possible* to interpret the provision to include providers, Congress did not "speak with a clear voice, and manifest an unambiguous intent to confer individual rights" on them. *See Gonzaga*, 536 U.S. at 286. To create a right enforceable under section 1983, Congress must speak loud and clear. And here, it didn't.

Second, section 1396a(a)(8) is too murky and amorphous to create enforceable rights. *See Blessing*, 520 U.S. at 340–41. The statute refers to providing medical assistance with "reasonable promptness." *See* 42 U.S.C. § 1396a(a)(8). But the text does not set any standards for what is "reasonable," and what is "prompt[]." *Id.* Without a measuring stick, courts would be ill-equipped to evaluate compliance. *See Blessing*, 520 U.S. at 345 (holding that a requirement of "sufficient" staff was "far too tenuous" to support a claim because of the "undefined standard"); *Suter v. Artist M.*, 503 U.S. 347, 359–60 (1992) (holding that a statute that required "reasonable efforts" did not give rise to a private right of action). Maybe a court could borrow the yardstick of section 1396a(a)(37)(A) (that is, the 30-day/90-day provision), but if that's what Congress had in mind, Congress could have said so.

Third, the statute does contain some mandatory language. Individuals can apply for medical assistance, and "such assistance shall be furnished with reasonable promptness to all

eligible individuals." *See* 42 U.S.C. § 1396a(a)(8). But again, the mandatory language is geared toward "eligible individuals," not providers. *Id.* The provision does not contain language creating an unmistakable mandate on the part of the state to do anything for providers. And it does not compel the state to enforce the payment obligations of MCOs.

Overall, section 1396a(a)(8) does not contain language that creates unmistakable rights in the hands of the providers. So it cannot support a claim under section 1983.

## II.    Failure to State a Claim

Even if, for the sake of argument, providers could bring a private right of action under the provisions in question, Saint Anthony would not have a claim. The complaint fails to state a claim for which relief can be granted, because the statute does not say what the Hospital thinks it says. So, even if a provider could *bring* a claim, the complaint in question doesn't *state* a claim.

The reasons echo some of the reasons why there is no private right of action. Section 1396u-2(f) is about the content of a contract between the state and the MCOs. *See* 42 U.S.C. § 1396u-2(f). Again, a "contract" with MCOs "shall provide" that the MCOs must make payment on a timely basis consistent with the "procedures" of section 1396a(a)(37)(A). *Id.*

So the statute is about the content of contracts. And here, Saint Anthony does not allege that the contracts with the MCOs lack the necessary provisions. The complaint stops short of alleging that the state's contracts failed to include what they *must* include. So the complaint fails to state a claim.

Saint Anthony believes that the statute requires the state to "ensure" that MCOs pay their bills in a timely manner. *See* Cplt., at ¶ 80 (Dckt. No. 1) ("The State, through HFS, has an obligation to hospitals and other providers to ensure their Medicaid claims are timely paid by Illinois' MCOs."). But that's not what the statute says at all.

Section 1396a(a)(37)(A) provides that the state plan must have "claims payment procedures which . . . ensure" payment of a certain percentage of claims in a certain period of time.  *See* 42 U.S.C. § 1396a(a)(37)(A).  The "*procedures*" will "ensure" payment, not the state.  *Id.* (emphasis added).  Nothing in that provision says that states have an ongoing obligation to ensure prompt payment by the MCOs.

The second claim fares no better.  As a refresher, section 1396a(a)(8) lays down requirements for a state's Medicaid plan.  "A State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."  *See* 42 U.S.C. § 1396a(a)(8).  Saint Anthony does not allege that the Illinois Medicaid plan lacks that requisite language.

The bottom line is that the complaint fails to allege a claim against the state.  The Medicaid Act sets requirements for the content of contracts with MCOs, and the content of a state's plan.  The complaint does not allege that the contract and the plan lack the necessary provisions.  So, even if the statute could give rise to a private right of action, Saint Anthony Hospital has failed to state a claim.

## III.   Enforcement Generally

The Court adds one final word about where the parties go from here.  The gist of the complaint is that the MCOs aren't paying as they should.  Maybe Saint Anthony is right about that – the Court does not reach that issue.  But if Saint Anthony wants to pursue that issue, suing the state isn't the way to go.  Saint Anthony brought the wrong claim in the wrong forum.

Saint Anthony entered into contracts with each of the MCOs, and has the ability to press its contractual rights under those agreements.  The MCOs rightly point out that the agreements

require mandatory arbitration. So, if Saint Anthony wants to assert its right to timely payment from the MCOs, there is a brightly lit path for doing so. Saint Anthony can file for arbitration. Maybe Saint Anthony is reluctant to do so for some reason. But that reluctance is not a reason to tunnel into the federal courthouse by suing the state.

The federal government has enforcement powers, too. The federal government provides funds to states with the understanding that they will comply with certain conditions. And if they don't comply, the federal government can take funds away. The typical remedy for violating the terms of Spending Clause legislation is no more spending. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981) ("In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.").

The provisions in question illustrate the point. If an MCO doesn't comply with section 1396u-2, the federal government is prohibited from funding the state's managed care program. *See* 42 U.S.C. § 1396b(m)(2)(A)(xii). If a state doesn't comply with section 1396a(a), the Secretary of Health and Human Services "may" withhold Medicaid funding "in whole or in part." *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 969 (7th Cir. 2012); *see also* 42 U.S.C. § 1396c; 42 C.F.R. § 430.12(c).

If the MCOs failed to live up to their obligations, then the state can do something about it, too. The state can cancel a contract if an MCO fails to comply with the terms of a contract with a provider. *See* 42 U.S.C. § 1396u-2(e)(4)(A) ("In the case of a managed care entity which has failed to meet the requirements of this part or a contract under section 1396b(m) or 1396d(t)(3) of this title, the State shall have the authority to terminate such contract . . . ."). But

that power to terminate the contract rests with the state, not the judiciary. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

In sum, there are well-defined contractual and statutory routes to follow if the MCOs and the state are not living up to their obligations. But suing the state in federal court is not one of them.

## Conclusion

For the reasons stated above, the Court grants the motion to dismiss.

Date:   July 9, 2021

Steven C. Seeger
United States District Judge